## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES KAUTZ, derivatively on behalf of ISTAR FINANCIAL INC., | Civil Action No. 10-CV-3478 ECF CASE |
| Plaintiff, | |
| v. | |
| JAY SUGARMAN, GLENN AUGUST, ROBERT W. HOLMAN, JR., ROBIN JOSEPHS, JOHN G. MCDONALD, GEORGE R. PUSKAR, DALE ANNE REISS, JEFFREY A. WEBER, NICHOLAS A. RADESCA, CATHERINE D. RICE, and TIMOTHY J. O'CONNOR, | |
| Defendants, | JURY TRIAL DEMANDED |
| and | |
| ISTAR FINANCIAL INC., | |
| Nominal Defendant. | |



### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff James Kautz ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant iStar Financial Inc. ("iStar" or the "Company") against certain and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from December 2007 to the present (the "Relevant Period").

### NATURE OF THE ACTION

2.     According to its public filings, iStar operates as a finance company focusing on the commercial real estate industry, and provides custom-tailored financing to high-end private and corporate owners of real estate.  Its financing products include senior and mezzanine real

estate debt, senior and mezzanine corporate capital, corporate net lease financing, and equity.

3.      On July 2, 2007, defendants caused iStar to acquire the $6.27 billion commercial real estate loan portfolio and commercial real estate lending business of Fremont Investment & Loan ("Fremont"), a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement dated May 21, 2007 (the "Fremont Acquisition").

4.      The Fremont Acquisition would ultimately prove disastrous for the Company because it included billions of dollars worth of construction loans and funding commitments to condominium developers that would eventually default.  Defendants, however, concealed the impact that the Fremont Acquisition would have on the Company's corporate debt and loan portfolio by making false and misleading disclosures in, *inter alia*, the Company's Relevant Period statements.

5.      These Relevant Period statements included a number of prospectuses through which Defendants caused the Company to offer hundreds of millions of dollars worth of iStar shares and other securities in a December 2007 secondary offering (the "Secondary Offering"). Defendants also improperly concealed the negative effects of the Fremont Acquisition on the Company and the corresponding deterioration in value of the Company's debt and loan portfolio in iStar's fiscal third quarter earnings press release.

6.      Finally, on February 28, 2008, defendants were forced to disclose a ***$134.9 million write-down of the Company's corporate loan and debt portfolio and a $113 million increase to the Company's loan loss provisions*** in the Company's fourth quarter earnings press release.  The write-down and loan loss provision increase contributed to a ***$78.7 million loss*** for the quarter.

7.      In the wake of these disastrous disclosures, iStar's stock price declined from over

$27 per share to less than $17 per share -- a $1.3 billion market capitalization loss.

8.     On March 6, 2008, the Board disclosed that they permitted one of the chief culprits responsible for the Company's problems to "resign." Specifically, defendants revealed that defendant Nicholas A. Radesca ("Radesca"), iStar's Chief Administrative Officer ("CAO"), had "resigned" from the Company, effective February 29, 2008, which was only one day after the truth about the Company's problems was revealed.

9.     Approximately four months later, on July 2, 2008, the Board disclosed that they had permitted yet another of the chief culprits for the Company's problems to similarly walk away unscathed. Specifically, defendants revealed that, effective June 30, 2008, defendant Timothy J. O'Connor ("O'Connor"), iStar's Executive Vice President and Chief Operating Officer ("COO"), had purportedly "retired."

10.     Not surprisingly, as a result of defendants' actions during the Relevant Period, iStar became the subject of multiple securities class actions (the first of which was filed in April 2008), which were eventually consolidated in this Court (the "Securities Action").[1] The "Class Period" in the Securities Action is defined as December 6, 2007 to March 6, 2008.

11.     The individual defendants named in the Securities Action include certain of the defendants named herein -- Jay Sugarman ("Sugarman"), Radesca, Catherine D. Rice ("Rice"), and O'Connor..

12.     Notably, and as discussed in detail herein, on March 26, 2010, United States District Judge Richard J. Sullivan ("Judge Sullivan") denied in substantial part the defendants' motions to dismiss the Securities Action, and in connection therewith, determined that the plaintiffs in the Securities Action had sufficiently alleged, *inter alia*:

---

[1] The Securities Action is captioned *Citiline Holdings, Inc. v. iStar Financial, Inc., et al.,* No. 08-Civ-3612 (RJS).

a.       *Defendants omitted from their disclosures that by the time of the Secondary Offering, iStar had suffered additional losses of $60 million on its held-to-maturity investments;*

b.       *Defendants omitted from their disclosures that by the time of the Secondary Offering, iStar was suffering additional losses in its loan portfolio, such that it would need to record a $113 million charge associated with an increase in its loan loss reserves at the end of the quarter;*

c.       *Defendants omitted from their disclosures that by the time of the Secondary Offering, the carrying value of iStar's non-performing loans had increased by more than 50%, and the carrying value of its watch list assets had increased by approximately 100%;*

d.       The following statements were false or misleading: *(i) that iStar's debt was "extremely well protected," (ii) that the Company's loan portfolio had "a lot of room for things to go wrong and for us to still be okay," (iii) that the Company's loan portfolio was "performing pretty much as expected," and (iv) that iStar anticipated 2008 earnings of $4.00 to $4.20 per share;* and

e.       Defendants acted with *scienter*, especially in light of the allegations that, *inter alia*, Defendants commenced an "Investors Day conference" with only sixteen business days remaining in the fourth quarter of 2007 and that defendants needed to conceal iStar's deteriorating performance so that the Company would be able to secure financing and maintain an investment-grade credit rating.

13.       In other words, Judge Sullivan found *indicia* that defendants Sugarman, Radesca, Rice, and O'Connor were engaged in a scheme to defraud iStar's investors.

14.       As a result of defendants' breaches of fiduciary duty and other misconduct, the price of the Company's stock still has never recovered and currently trades for around $6.00 per share -- a plummet of approximately *82%* since February 2008.

## JURISDICTION AND VENUE

15.       This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed

to confer jurisdiction on this court of a court of the United States that it would not otherwise have.

16.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) iStar maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to iStar, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

18.    Plaintiff is a current shareholder of iStar and has continuously held iStar stock since March 9, 2004.  Plaintiff is a citizen of Texas.

19.    Nominal defendant iStar is a Maryland corporation headquartered in New York, New York.  According to its public filings, iStar operates as a finance company focusing on the commercial real estate industry, and provides custom-tailored financing to high-end private and corporate owners of real estate.  Its financing products include senior and mezzanine real estate debt, senior and mezzanine corporate capital, corporate net lease financing, and equity.

- 5 -

20.     Defendant Sugarman has served as Chairman of the Board and as the Company's Chief Executive Officer ("CEO") since 1997.  Upon information and belief, defendant Sugarman is a citizen of New York.

21.     Defendant Glenn August ("August") has served as a director of the Company since 2005.  Upon information and belief, defendant August is a citizen of New York.

22.     Defendant Robert W. Holman, Jr. ("Holman") has served as a director of the Company since 1999.  In addition, defendant Holman served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Holman is a citizen of California.

23.     Defendant Robin Josephs ("Josephs") has served as a director of the Company since 1998.  In addition, defendant Josephs served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Josephs is a citizen of Illinois.

24.     Defendant John G. McDonald ("McDonald") has served as a director of the Company since 1999.  Upon information and belief, defendant McDonald is a citizen of California.

25.     Defendant George R. Puskar ("Puskar") has served as a director of the Company since 1999.  In addition, defendant Puskar served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Puskar is a citizen of Florida.

26.     Defendant Dale Anne Reiss ("Reiss") has served as a director of the Company since July 2008.  In addition, defendant Reiss currently serves as a member of the Audit Committee.  Upon information and belief, defendant Reiss is a citizen of Illinois.

27.     Defendant Jeffrey A. Weber ("Weber") has served as a director of the Company since 2003.  Upon information and belief, defendant Weber is a citizen of New York.

28.   Defendant Radesca served as the Company's CAO from 2006 until he purportedly "resigned" effective February 29, 2008.   Upon information and belief, defendant Radesca is a citizen of Connecticut.

29.   Defendant Rice served as the Company's Chief Financial Officer ("CFO") from 2002 until her "retirement" in March 2009.  In addition, defendant Rice served as the Company's Executive Vice President and Treasurer from 2006 until her "retirement" in March 2009.  Upon information and belief, defendant Rice is a citizen of New York.

30.   Defendant O'Connor served as the Company's Chief Operating Officer ("COO") from March 1998 until his purported "retirement" in June 2008.   In addition, defendant O'Connor served as the Company's Executive Vice President from March 2000 until his "retirement" in June 2008.  Upon information and belief, defendant O'Connor is a citizen of New York.

31.   Collectively, defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, Reiss, Weber, Radesca, Rice, and O'Connor shall be referred to herein as "Defendants."

32.   Collectively, defendants Reiss, Holman, Josephs, and Puskar shall be referred to as the "Audit Committee Defendants."

### DEFENDANTS' DUTIES

33.   By reason of their positions as officers, directors, and/or fiduciaries of iStar and because of their ability to control the business and corporate affairs of iStar, Defendants owed iStar and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage iStar in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of iStar and its shareholders so as to benefit all shareholders equally and not in furtherance of their

personal interest or benefit. Each director and officer of the Company owes to iStar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.    Defendants, because of their positions of control and authority as directors and/or officers of iStar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with iStar, each of the Defendants had knowledge of material non-public information regarding the Company.

35.    To discharge their duties, the officers and directors of iStar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of iStar were required to, among other things:

> a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and
>
> c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

36.    Pursuant to the Audit Committee's Charter, the purposes of the Audit Committee include, among other things, oversight of the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements.

37.    Pursuant to the Audit Committee Charter, the members of the Audit Committee

are specifically required, among other things, to:

    a.  Oversee the integrity of the Company's financial statements;

    b.  Receive reports from the Company's CEO and CFO of all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and identify any material weakness in internal controls;

    c.  Review and approve the Company's credit loss reserve policy and establishment of revenues on a quarterly basis;

    d.  Obtain advice and assistance from outside legal, accounting or other advisors;

    e.  Discuss policies with respect to risk assessment and risk management;

    f.  To review annually the policies and procedures relating to compliance with legal and regulatory requirements and the Company's compliance therewith; and

    g.  To review analyses prepared by management and/or the Company's independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company; and earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies.

## SUBSTANTIVE ALLEGATIONS

### The Company, the Nature of Its Business, and the Fremont Acquisition

38.    According to its public filings, iStar is a leading publicly-traded finance company focused on the commercial real estate industry. The Company, which is taxed as a REIT, purports to provide custom-tailored financing to high-end private and corporate owners of real estate, including senior and mezzanine real estate debt, senior and mezzanine corporate capital, corporate net lease financing and equity. Generally, senior debt or equity investments possess a first priority position in the underlying assets and are less risky than mezzanine debt or equity

investments whose interest in the underlying assets are subordinated to the senior debt or equity investor. As of December 31, 2007, first mortgage/senior loans and mezzanine/subordinated debt respectively represented 85% and 11% of iStar's loan portfolio.

39.     iStar's two primary lines of business are lending and corporate tenant leasing. The lending business consists primarily of senior and mezzanine real estate loans that typically range in size from $20 million to $150 million with maturities generally ranging from three to ten years. The Company's corporate tenant leasing business provides capital to corporations and others who control facilities leased primarily to single customers.

40.     By early 2007, conditions in the U.S. mortgage market had begun to deteriorate significantly due to several factors. The Federal Reserve began raising interest rates, which climbed steadily from 4% in mid-2004 to 8.25% in September 2007. As key short-term and the prime rates rose, other interest rates rose as well, including those for most mortgage loans. This rise in interest rates dampened the demand for mortgage loans as the increase in the cost of financing reduced the expected rate of return on real property ownership. Also, and not coincidentally with the rise in interest rates, real property appreciation began to slow in 2006, and the overall economy began to cool. This combination of factors drove down the value of mortgage loans that lenders, such as iStar, carried on their books and increased the risk associated with the U.S. mortgage lending.

41.     This increased risk represented a distinct challenge to lenders structured as REITs, like iStar. Since REITs are required to return much of their cash to shareholders pursuant to federal tax laws, iStar and other REIT lenders must have ready access to capital in order to possess the liquidity necessary to issue mortgage loans.

42.     On July 2, 2007, under Defendants' direction, iStar completed the $6.27 billion

Fremont Acquisition.  As a result of the Fremont Acquisition, iStar acquired approximately 285 commercial first mortgage loans from Fremont.  Approximately 60% of the value of the loans, as of March 31, 2007, was collateralized by apartment and other types of residential properties located throughout the United States.  The balance of the loans was collateralized by a variety of property types.

43.     The aggregate principal amount of the loans that the Company acquired was approximately $6.5 billion as of March 31, 2007, and approximately 130 employees of Fremont joined the Company upon the closing of the Fremont Acquisition.

44.     As consideration for the Fremont Acquisition, Defendants caused the Company to pay Fremont approximately $1.9 billion in cash and transferred to Fremont a senior A-participation interest in the acquired portfolio of loan assets representing an approximately 70% interest in the portfolio.  iStar retained a 30% B- participation interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount.

45.     To finance the Fremont Acquisition, Defendants caused the Company to obtain a $2 billion bridge facility, which was scheduled to mature in June 2008.  In addition, Defendants agreed to fund up to approximately $4.4 billion of unfunded loan commitments associated with the acquired loan portfolio.

### The December 2007 Investor Conference

46.     On December 6, 2007, Defendants caused the Company to hold its 2007 Investors Day Conference at the New York Public Library (the "Investor Conference").  At the Investor Conference, Defendants gave presentations to the investment community (including iStar stockholders, analysts, and representatives from ratings agencies) concerning, *inter alia,* the Company's balance sheet and investments.  The Investor Conference was important for the Company in light of the already-weakening mortgage market.

47.     During the Investor Conference, Defendants portrayed iStar's business as "conservative" and represented, among other things, that "the strength of our [iStar's] balance sheet has always been one of the strong holds of the iStar story." Defendants specifically claimed that they regularly reviewed iStar's loan portfolio with a "bias towards relative conservatism with respect to values" and that the Company had "135 people that all they do from the time they get up to the time they leave work is to watch our portfolio and our assets."

48.     During the Investor Conference, Defendants also discussed the Company's non-performing loan ("NPL") portfolio and high-risk loans. Defendants claimed that they "flag internally" NPLs and that they "are talking about [them] every week." Defendants also represented that they caused iStar to maintain adequate reserves for loan losses and that their loan loss reserving practices were "conservative."

### A.     Defendants Purport to Minimize iStar's Risks as Compared to Other Mortgage Lenders

49.     During the Investor Conference, Defendants distinguished the business risks facing iStar from those facing other mortgage lenders by positively describing iStar's business model so that the marketplace would continue to supply it with the necessary liquidity during the height of the U.S. sub-prime mortgage and financial crisis. For example, during the Investor Conference, defendant Sugarman highlighted iStar's purported "balance sheet strength," stating, in pertinent part:

> I guess it's fair to say it's been a very interesting year to date, and one we like to sum up as, "Be careful what you wish for." As many of you have heard me say many times before, we've been very surprised and disappointed with the relative ease at which new finance companies in our space have been able to access extraordinary levels of leverage based on we thought business plans that were far inferior to the iStar enterprise.

> As you'll hear later today, we've spent a lot of time trying to craft our business strategies to stay away from that capital, and *I think what we hope was a correction in the credit and finance markets would really demonstrate the flexibility, the balance sheet strength and the opportunities embedded in having an unsecured, investment-grade model*.

- 12 -

Now, this slide [*infra*], which you're going to see a couple of times today, highlights the conservative level of leverage that we see in almost all corporate ratings of real estate finance companies, and we like to compare that with the very aggressive levels of leverage we have seen in the structured credit market over the past couple years. And as we've pointed out in many presentations, what's really striking is the relative value, represented by bonds issued out of this corporate family, compared to this slice of the structured credit market, despite similar ratings, BBB, BAA2, in our case.

And I want to do some quick comparisons for you. We're going to come back to this slide a couple of times, but *it's important to start with the strength of this business model. So I guess I picked iStar Financial.* Obviously, we have a viewpoint on our own credit, but I think you'll see this comparison works in a lot of other companies' case, as well.

When you're buying bonds in the iStar enterprise, you're buying a $15 billion unencumbered asset pool across multiple assets, originated in multiple years, in multiple parts of the commercial real estate world. This is a very strong sponsored CDO. It's one of probably the best in the business. It was issued in 2006. It has about $1 billion of assets, so a fraction of the size.

Almost all of the assets are originated at the same time, and, candidly, the top 10 assets in that pool, it's a 30-asset pool, represent 52% of the balance of that entire $1 billion capital stack. So we've got a very concentrated portfolio.

This portfolio, again, much more diversified, top 10 assets about 12%. That's over $3 billion of tangible equity sitting underneath, protecting those bondholders. Over here, you've got a little over $100 million.

And, lastly, this enterprise runs with significantly lower leverage than the investment grade leverage over here. *And I point this out simply to start the meeting by saying the strength of our balance sheet has always been one of the strongholds of the iStar story.*

\*       \*       \*

So given that environment, what I thought I would do to kick off the meeting is really highlight the good news, and then perhaps some of the things that are more challenging. *And we've put together a slide here where we can go through some of the things that I think really differentiate the iStar model* [*infra*].

One, obviously, we, as you saw on that last chart, believe we are relative low leverage with a very significant equity capital base. *And this is really the foundation of the balance sheet strength of our enterprise. Our loans are mostly senior mortgages. They're collateralized by high-quality assets. They're assets that we can underwrite, understand and asset manage. These are highly tangible businesses, highly tangible pieces of assets that we can underwrite. And, probably more importantly, there are loan bases in those assets and that high-quality capital represents a significant discount to replacement cost. And for us, replacement cost is the strongest long-term indicator of value in the real estate sector.*

\*       \*       \*

- 13 -

… Let me go to the not-so-good news, and these are some of the challenges we see in today's environment. First of all, as I think all of you are acutely aware, the unsecured debt and equity markets are just not that hospitable to us right now. What's interesting to me is since I know, and *I hope many of you know our debt is extremely well protected, and I really haven't met anybody who doesn't believe that.* We believe the dislocation in the debt markets is a technical factor that will correct over time. Part of our job is to spread the message of how safe our balance sheet really is.

*       *       *

And, lastly, I'm going to spend a minute on this, and somewhat concerning to me *is that the overall market is not really differentiating between some of the higher- quality stories out there and frankly some of the lower-quality stories. And I guess I'd put it under the heading of comparing commercial real estate loans to residential structured product is just not a very good comparison. It's a very poor analogy and one that's not supported by the facts at all, but it's something that we're going to have to be fairly diligent in showing people why we're not in those sectors. And so what I'd like to do for you today is really talk a little bit about what we think are the four sectors in the real estate market and really differentiate them.*

Now, the newspapers are never going to quite grasp the difference between the residential and the commercial markets, as well as the whole loan and structured product markets. But I like to think of the real estate umbrella as really these four quadrants, a simple two-by-two matrix, commercial, residential, whole loans and structured products.

*       *       *

*And, as you know, we don't do residential and we don't do structured products. So iStar really is only in that lower left-hand corner.* But I think it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year.

So let's talk about residential and commercial. Residential whole loans, small balances, tends to be an actuarial business. Probably the biggest flaw we've seen in that business over the years is it's a very one-sided business. As a borrower in the home loans sector, you get a free option. If rates fall or your credit improves, you can immediately pay off that loan. If rates rise or your credit actually worsens, you have a below-market loan for as long as 30 years. As a lender, that's not a very interesting proposition.

What we like about the commercial sector is we can underwrite that asset very heavily. Typically, they're less commodity like. And properly structured, we get a fair bet, or sometimes even a better-than-fair bet, where if things go well we can actually make excess returns and things go bad, we have a hammer to actually work with that customer before the problem gets out of hand.

So just looking at the residential versus commercial, we've always felt a better model was the commercial mortgage model. We think you can build a differentiated business model in that sector.

- 14 -

> \*      \*      \*

> What we try to focus on with people is inside the iStar envelope, with the $15 billion of assets, you don't have any leverage. You own everything. You own from the first dollar up here down to here. *And we think it's a fundamentally different business, it's a different underwriting, and it's so much more safe and so much more secure that these ratings are very misleading.* And we think the structured product issues are things that are almost totally separate and apart. Now, they may have an impact on our core markets, and that's why we spend so much time analyzing those markets and presenting on those markets.

50.     In other words, Sugarman claimed (among other things) that a substantial correction (or perhaps, collapse) in the mortgage/debt markets would actually benefit iStar because it would demonstrate the strength of iStar's balance sheet.  Sugarman used the Investor Conference to distinguish iStar from the universe of fly-by-night finance companies that were exposed to, in his view, much greater balance sheet risk.  Stated simply, Sugarman represented that upheaval in the debt markets would separate the wheat (iStar) from the chaff (iStar's peers).  This was a particularly brazen misrepresentation because the market, by that time, had become extremely skeptical of the balance sheet quality of any lender, bank, finance company or mortgage company.

**B.      Defendants Highlight iStar's Loan Portfolio Safety and Its Risk Management Processes**

51.     During the Investor Conference, defendant O'Connor explained how Defendants understood, conservatively valued, and closely monitored iStar's loan portfolio, stating, in pertinent part:

> The first is our portfolio is very understandable. This is not complicated stuff. We're going to talk about again, in detail, as to how the portfolio breaks down, but this is not black magic. This is simple, straightforward, easy to understand. *It's understandable, and we understand what we have, very important.*

> The second piece is the portfolio is underwritable. *We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.*

> \*      \*      \*

- 15 -

As we think about the portfolio, we really divide it into three components, three areas, the first being the loan component of the portfolio, our core loan portfolio, if you will. Weighted average loan to value of 67%, a very important statistic for us. I'm going to talk about this throughout my presentation, but a very important statistic.

We view that 67% as creating a 33% cushion between our last dollar of exposure and the value of the underlying collateral. *It provides for a lot of room for things to go wrong and for us to still be okay. So that's a statistic that we monitor closely and we watch on an ongoing basis.* I'm going to talk more about that as I continue. 78% of our loans, floating rate, 22% fixed rate, 3.2 weighted average maturity. *If, as we step back and think about our loan portfolio, we take into account that we have this embedded cushion by way of our loan to value, conservative position in the capital structure, combined with our on-balance sheet reserves, and the discount I just talked about from Fremont together provide a nice cushion for that portfolio.*

*    *    *

Today, condo and condo conversion loans make up a little over 16% of our overall portfolio. *So it's a significant part of our portfolio. It's a part of our portfolio that we understand, we think we understand very well.* We're going to talk about that in much more detail later this afternoon. But as I think about it and try to communicate with you, there's really two pieces of that.

*    *    *

I want to step back and talk for a minute about value, because we get asked questions about this a lot and it's the right question. And for those of you that haven't heard the answer before, many of you probably have, I'm going to go through it. *The values that we carry from quarter to quarter are our internal values, not appraisals, not third-parties. It's an internal iStar value where we sit down collectively and say, where would we want to own this asset? So for every loan that we underwrite, we're going to step back and say, where would we own this asset? And that's the value that we attribute to the transaction, not what someone else is telling us, and even moreover, not what the market is telling us.*

Because what we learned over the last 2.5 years, we started to track as loans were either refinanced out of our portfolio, or assets were sold by our borrowers. And *what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values and it's all centered around replacement cost.*

52.    In other words, O'Connor represented, among other things, that Defendants at all times monitored and fully understood the risk in the Company's loan portfolio, and that its "conservative" makeup left plenty of room for error without any material effect on iStar.

53.    Defendant O'Connor then highlighted the Company's portfolio risk management

- 16 -

processes, stating, in pertinent part:

> *Well, the first thing we do as a company is we devote a lot of people, a lot of assets and a lot of resources to watching the portfolio. We have 135 people that all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets.* That's all they do. You're going to hear from some of them later today when we go through our panel discussions, but lots of resources, lots of depth, different talent sets and maybe most importantly, people that have lived through cycles, people that have been through from the early '90s through -- have lived through real estate cycles, so know what it's like when it gets ugly. It's pretty ugly, but we know what it's like when it gets ugly. We've got those people in house, and they're working our assets.

*     *     *

> *Our entire risk management process is centered on information gathering and then actually, more important, information sharing within the firm,* because we believe that if we can get the benefit of that information from those 135 bodies on the ground, *that we as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they really become problems. And that's really how we manage the portfolio.*

*     *     *

[W]e risk weight each and every asset on a scale of one to five. One is least risk, five is the most risk, with respect to principal loss. We go through each and every asset. We talk about what's going on in the market, what's going on with the borrower, what's happening, and actually assign a numeric score to each and every investment.

Perhaps not surprisingly, when you step back from that process and look at it, we effectively have a bell curve that distributes risk across the portfolio. If you look at the assets in what we've identified here as the ones and twos, those are assets we don't talk about much, certainly don't talk about much publicly. Those are the assets that we think are most secure in our portfolio, $2 billion. They're performing great.

The assets in the middle, we don't talk about those publicly, either, but I can tell you we talk about those internally a lot, because those are the assets that we are most concerned are moving one way or the other and we've got to keep our eye on them, so we talk about those a lot.

> *And then the last piece, the fours and the fives, we obviously talk about them a lot.* We talk about them in our quarterly press releases. We talk about them in our quarterly conference calls, and we identify them and talk about them in a reasonable amount of detail. 92% of our NPL and watch lists are in that four and five bucket. So, like I said, we talk to them a lot to the outside world.

> *We talk about them weekly, if not more, inside the Company.* We have weekly meetings, again, the same process that we've had -- my start, from day one since I've been in, we sit and we say what's going on and what can we do about it? And what are we doing about it and how is the borrower reacting and how is the

market reacting and what do we do? And that's not a decision that's made by someone sitting in Atlanta or someone that's sitting in San Francisco or someone that's sitting in Dallas. That's a decision that's made jointly with the people that you see here sitting in this room. And what strategy we do and how we do it and how we counter and how we try to fix, isn't left to somebody that's out in the field. *It's done by the senior people in this Company, and I think that's a significant differentiator in our business.*

54.   In other words, defendant O'Connor, among other things, tried to distinguish iStar from its competitors by claiming that the monitoring of the Company's portfolio and risk management process involved the constant and direct involvement of the Company's top insiders.

**C.   Defendants Tout iStar's Credit Quality**

55.   During the Investor Conference, defendant O'Connor also touted iStar's purported credit quality, as well as its NPL portfolio and high-risk loans that were placed on the Company's "watch list," stating, in pertinent part:

> I want to talk a little bit about NPLs [Non-Performing Loans] and watch lists over the next several pages. We do have 29 assets on NPL, so 642 investments in the portfolio. We currently have 29 assets on NPL. That's less than 3% of the total assets on our balance sheet.
>
> *       *       *
>
> Again, as most of you know, we do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists.
>
> *       *       *
>
> Our watch list assets are performing assets. They're receiving debt service, we are getting paid as agreed, but we as a *management team are concerned and want to do two things. One, we want to flag and show the market, hey, we're concerned about these. Two, we want to flag internally to people, hey, these are assets that we are talking about every week, if not more.* And again, it's in the context of this pie chart, 6% of the total assets are in fact on watch list in the loan portfolio.
>
> We try to step back and put some of this in perspective. The white box on this page, again, is back to total portfolio, our performing watch list assets and what are our NPLs. The far right column, managed column, that's what we report. Center column, that's what's on our balance sheet, that's what's on our books.
>
> The only reason why on the bottom here we've shown iStar core portfolio and Fremont legacy portfolios is to point out a couple of things I touched on earlier.

One is with respect to the Fremont portfolio, we have marked that portfolio. We marked it as of a couple of months ago and the 18 assets that we talked about earlier, guess what, those assets are up here. Okay, so we're starting from a point where we say we've marked the assets to bring them on the books. We knew they were NPLs when we closed on this transaction. We marked them, they were NPLs, they're NPLs now.

*     *     *

The other reason why I put this up here is if you look at the percentage of NPLs, and again, this is watch lists and NPLs. We underwrote the Fremont transaction. We knew we were going to have plus or minus X number of dollars watch list and X number of dollars NPL. Not a surprise. This is not a surprise to us. *We mentioned on our last earnings call, how is the portfolio performing? It's performing pretty much as expected, pretty much as expected.*

*Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected.*

*     *     *

Okay, lots of press, lots of concern, certainly legitimate concern about certain markets and where are the assets and let's fill into the detail. What we wanted to do is we highlighted five markets, plus or minus, here and to give a sense as to, okay, here's our NPL list and how do they fall in these various markets that people are very concerned about, that we're very concerned about.

*     *     *

So we start, and I would start at the bottom and say, Phoenix, we don't have anything, New York, we don't have anything, Las Vegas, there's not anything on non-performers now. Southern California, one small transactions and then up the west coast of Florida. The west coast of Florida, these transactions in this bucket are primarily Tampa, Clearwater, Sarasota. These are primarily the condo conversion transactions, transactions that we knew about, transactions that are going to be challenging to work through and take time, as Jay suggested, but transactions that we understood going into the deal.

The next page gives you just the same look on a slightly different basis, but it's the same cut with respect to watch list transactions.

*And again, from our perspective, no surprises here, no surprises here, and I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to.*

56.     Defendant O'Connor also claimed that the loss exposure on iStar's loan portfolio

- 19 -

was limited, due to three factors: (1) the amount of borrower equity in the Company's portfolio;[2]

(2) the percentage of senior loans in the Company's portfolio; and (3) amount of the Company's

loan loss reserves.  Defendant O'Connor, stated, in pertinent part:

> I would say we take comfort in three things. One, let's look at how much borrower equity there is in our portfolio. That's kind of the first line of defense. That's going to determine what's the probability that we're going to get nicked, okay? And then the second line of defense is let's look at our position. And we're talking again about senior, secured positions. Historically, senior, secured positions, the severity of loss of those positions is less. It has been, and will be. So borrower equity, first mortgage position, and then if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves. We have $125 million or $124-ish million of on balance sheet reserves.

> \*       \*       \*

> We've grown that number [loan loss reserve]. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio.

> **So if you step back and look at it, we have available to us as kind of a bucket to address these issues, $345 million. It's a lot of money to address issues in the portfolio.**

> \*       \*       \*

> Okay, try to back up, summarize and have Jay come up here. Started by talking about Fremont, integration's going well, not quite done yet, lots of progress. We have a bigger portfolio today than we had a year ago. We do.

> **We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion.** In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business.

> **The good news is, as much as the markets are noticeably worse today, materially worse than they were a year ago, our on-balance sheet reserve, our cushion, is significantly greater than it was a year ago.**

> And then lastly, just the point again, lots of unencumbered assets. And then finally, we have what we believe is the right team in what is a very difficult, and

---

[2] Generally, borrowers' equity refers to the amount of capital a borrower has at risk. The general view is that if the borrower has more equity at risk, the borrower is more apt to work through a financial difficulty than default on a mortgage loan.

we think will be a difficult environment for the next 12 to 24 months. We've got the right team on the ground, process in place, to work our way through this.

### D.   Defendants Highlight iStar's Financial Highlights and Near Term Funding Requirements

57.   During the Investor Conference, defendant Rice highlighted iStar's purported financial performance and de-emphasized the Company's short-term capital requirements, stating, in pertinent part:

> As you've heard on our third quarter earnings call, we've had solid year-to-date financial performance, with adjusted earnings up 11% and revenues up 45% from the same period in 2006. *We announced 2008 adjusted earnings guidance of $4 to $4.20. And we continued to deliver strong returns at reasonable leverage levels. We announced a 5% increase to our quarterly dividend, which will be payable in the fourth quarter.*
>
> And *due to the increase in income that we're receiving from the Fremont portfolio, we'll be declaring a special dividend in 2007 that should be in the range of $0.15 to $0.30 a share.* Typically, we consider dividend increases in the first quarter. And as you can see on the chart, we have increased our dividends significantly and consistently since we went public in 1998.
>
> *        *        *
>
> We spent a few minutes walking you through on the earnings call our sources and uses of capital through 2008, and we wanted to give you a quick update. This data is as of the end of November. And, as you can see on the left side, funds are available, our sources of capital. We have about $5 billion of regularly scheduled maturities from borrowers and amortization. We tried to be conservative in this estimate, given the fact that many of our borrowers, particularly in the next couple of months, will have a difficult time refinancing our mortgages, given the dislocations in the real estate credit market.
>
> We also have $1.5 billion of capacity on our credit facilities for a total sources of about $6.5 billion. If you look to the right, our financing needs include about $4.4 billion of unfunded commitments. This includes both the Fremont portfolio, as well as the iStar portfolio. As we talked about on the call, a number of these projects are early-stage projects that may or may not get funded over time.
>
> In addition, we have about $2.1 billion of debt maturities in 2008, for a total of $6.5 billion. So, as you can see, assuming no additional investment activity, we have minimal capital raising requirements in 2008.

58.   Following the Investor Conference, analysts trumpeted what Defendants had told them about the strength of the Company's balance sheet and loan portfolio.  For example:

Bear Stearns – December 11, 2007

Investor Day Adds Clarity

- Investor Day. iStar held its second annual investor day last week. The presentation sought to distinguish iStar's business model from other more highly levered companies and structured finance vehicles. ***The company also sought to calm concerns regarding the credit quality of the Fremont portfolio, demonstrate its strategic benefits, and address future capital needs.***

Key Banc – December 7, 2007

***We believe SFI has a strong balance sheet***, with more than $15 billion of unencumbered assets, favoring unsecured and secured debt over the collateralized debt obligation model used by many of its peers. The Company worked hard to achieve investment grade status, but must also comply with the agencies more stringent requirements, including lower leverage. The Company's leverage ratio is 3.25x. SFI anticipates minimal capital raising in 2008 as its sources of cash closely match its needs next year.

***SFI appears to be comfortable with the credit quality of its core portfolio.*** Most of its loans are senior mortgages and the weighted average LTV of the portfolio is 67%. The corporate tenant lease portfolio is viewed as a long-term stable cash flow business, with properties 96% leased and 11.2 years average remaining lease term; 31% are investment grade credits. SFI's assets are well-diversified by location and collateral type. The Company maintains a 135-person risk management team, which is well-tenured with extensive resources. Non-performing loans total $428.7 million, or 3% of total assets.

## The Secondary Offering

59.     Long before the Investor Conference, on or about May 2, 2007, Defendants caused the Company to file a Registration Statement with the Securities and Exchange Commission ("SEC") in connection with the Secondary Offering.

60.     The Registration Statement was filed on a Form S-3 and offered to sell, over time, common stock, preferred stock, depository shares debt securities, and warrants of the Company. Accordingly, the Secondary Offering was considered to be a "shelf registration" that allowed the Company to register securities for sale while leaving them on the "shelf" until it determined to conduct the offering, provided, however, that the Registration Statement met all the requirements proscribed under applicable securities regulations, including that the information contained therein be current.

61.     The May 2, 2007 Registration Statement was signed by, among others, defendants Sugarman, Rice, Radesca, August, Holman, and Josephs.

62.     On or about October 10, 2007, Defendants caused the Company to file the Prospectus that formed part of the Registration Statement associated with the Secondary Offering.

63.     On or about December 13, 2007, Defendants caused the Company to file the Prospectus Supplement, which offered 6 million common iStar shares to the public.  On or about December 14, 2007, the Registration Statement, which incorporated the Prospectus and the Prospectus Supplement, became effective and at least 6 million shares of iStar common stock were sold at $28.41 per share to the public.  On or about December 17, 2007, Defendants amended the Prospectus Supplement to increase the number of common shares offered to the public to 8 million.  The total proceeds from the Secondary Offering were in excess of $218 million.

### Defendants' Representations In the Registration Statement Were Materially False and Misleading and Defendants Failed to Disclose Facts Required to be Stated Therein

64.     The Registration Statement (which incorporated the Prospectus and the Prospectus Supplements) issued in connection with the Secondary Offering, signed by Sugarman, Rice, Radesca, August, Holman, and Josephs, contained numerous untrue statements of material fact made by Defendants and Defendants further omitted material information which was required to be disclosed pursuant to the regulations governing the preparation of the Registration Statement.

### A.     Failure To Disclose "Material Changes"

65.     As noted above, Defendants filed the Registration Statement on Form S-3, which is a streamlined registration statement for certain well-capitalized, widely followed issuers.  Such

issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings – *e.g.,* Forms 10-K and 10-Q. Pursuant to Instruction 11(a) of Form S-3, an issuer utilizing Form S-3 must disclose "any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934."

66.     Accordingly, an issuer utilizing Form S-3 is required to update the information in its periodic filings including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations," which is required to be disclosed in SEC periodic filings pursuant to Item 303(a) of Regulation S-K. Under Item 303(a) an issuer is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

67.     Here, in the Registration Statement, Defendants failed to disclose several "material changes" to iStar's continuing operations which were required to be disclosed pursuant to Instruction 11(a). None of these "material changes" were disclosed in the SEC filings that Defendants incorporated by reference in the Registration Statement and, therefore, the Registration Statement omitted to state material facts required to be stated therein.

**B.     The Material Decline In Debt Security Values**

68.     By the time of the Secondary Offering, the amount of the unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million -- almost 100% since the end of its third quarter, the period ended September 30, 2007. These increased losses

represented more than 20% of all income from continuing operations iStar reported during the first nine months of 2007.

69.     On or about November 9, 2007, Defendants caused iStar to file its Form 10-Q with the SEC for the third quarter of 2007, the period ending September 30, 2007 (the "Third Quarter 10-Q"). The Third Quarter 10-Q was incorporated by reference in the Registration Statement.

70.     With respect to the iStar's held-to-maturity investments, in the Third Quarter 10-Q, Defendants stated in pertinent part:

> As of September 30, 2007, the carrying value of Other Lending Investment-Securities includes $586.2 million of held-to-maturity investments with an aggregate fair value of $526.9 million and gross unrealized gains and losses of $8.1 million and $67.3 million, respectively.

71.     By the time of the Secondary Offering, however, iStar had suffered a material, incremental unrealized loss on its held-to-maturity investments of approximately $60 million. In particular, the Company incurred material incremental losses on its undisclosed Linens n' Things ("LNT") and WCI Communities ("WCI") debt securities.

72.     At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy. In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering.

73.     Defendants knew or should have known that iStar's held-to-maturity investments had experienced a material decline in value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007, because by then the prices of the debt securities of LNT and WCI had traded in the bond market at severely depressed prices for an extended period of time. Defendants also knew or should have known that applicable accounting

standards required that iStar record a charge for the impairment in the value of iStar's held-to-maturity investments during the fourth quarter of 2007.

74. Indeed, Defendants knew or turned a deliberate blind eye to the following adverse facts about WCI and LNT by the time of the Secondary Offering:

## WCI

- On November 7, 2007, PrimeNews Wire reported that Jerry Starkey, President and CEO of WCI stated 'this prolonged downturn requires that we continue to assess our overhead and make reductions in order to remain viable through the trough of this cycle" and that "WCI announced another significant reduction to its workforce in response to continued soft demand in its markets." As a part of this restructuring, iStar combined several lines of business, implemented a net reduction in force of about 575 employees which, when combined with previous reductions in force represented a 46% decline from its 2006 employment level, and its Board of Directors significantly reduce its compensation with six board members agreeing to forego all director compensation.

- On November 8, 2007, The Associated Press reported, "Moody's on Thursday cut its credit ratings on struggling Florida homebuilder WCI Communities Inc. deeper into junk status and suggested they could move even lower as the housing slump worsens. The credit rating agency cut WCI's corporate family rating to Caa2 from B3, and the ratings on its senior subordinated notes to Caa3 from Caa2. Moody's cited WCI's "substantially weaker-than-expected cash flow generation, continued difficulties in complying with bank covenants, accelerating losses and increasing debt leverage."

- November 12, 2007, the shares of WCI trade at a ten year low, declining from more than $20 per share in early 2007 to less than $5 per share at the time of the Secondary Offering.

- On November 15, 2007, WCI Communities Inc reported that EBITDA for its twelve months ended September 30, 2007 was a negative $(62,064,000), compared with a positive EBITDA of $288,411,000 for the comparable year earlier twelve months.

- On November 27, 2007, The New York Sun, reported, "A Banc of America Securities analyst, Daniel Oppenheim, is one of a number of homebuilding analysts who takes a dim view of WCI, which is awash in red ink. In its most recent quarter, WCI reported a loss of $1.66 a share, much greater than Street expectations, in large part due to higher charges. Liquidity issues are likely to increase, Mr. Oppenheim warns, citing a deteriorating cash flow outlook. The company has reported it is not in compliance with its fixed-charged covenant and the analyst expects lenders to be less flexible in renegotiations, given the deterioration in Florida. Even if a favorable income is reached, WCI will have just $210 million in liquidity, which Mr. Oppenheim believes will quickly erode.

- On November 20, 2007, Thomson Financial News reported, "Standard & Poor's Ratings Services lowered its junk corporate credit rating on WCI Communities Inc to 'CCC' from 'CCC+', citing a sharp spike in cancelled contracts to buy the company's luxury high-rise condominiums and the company's need to once again renegotiate the terms of its revolving credit facility. The outlook on WCI remains negative.

- On December 3, 2007, Market News Publishing, Inc., reported "Of the 24 builders Standard & Poor's rates, five are currently in the 'BBB' category, seven are in the 'BB' category, and 10 are in the 'B' category. The other two companies have fallen into the low speculative-grade realm: WCI Communities is rated 'CCC' and TOUSA is rated 'CC'. U.S. homebuilders face an array of challenges at this point in the housing cycle, many of which will likely worsen before they improve. While unit deliveries were up in the recent fiscal quarter, there's little evidence to suggest that companies will be able to quickly replenish shrinking order backlogs. Additionally, impairment charges were huge in the recent fiscal quarter, as builders wrote off $6 billion on inventory, goodwill, and option deposits as home prices continued to drift lower and absorption slowed."

- In its Form 10-Q for the quarter ended September 30, 2007, WCI disclosed that is was not in compliance with a debt covenant under a revolving credit facility and term loan agreement.

## LNT

- On August 15, 2007, Deutsche Bank Securities reiterated its Sell rating on LNT's bonds.

- On October 2, 2007, Fitch Ratings Downgraded LNT as follows: Issuer Default Rating (IDR) to 'CCC' from 'B-'; Asset-based revolver to 'B-/RR2' from 'B+/RR2'; Senior secured notes to 'CCC-/RR5' from 'CCC/RR6'. The Rating Outlook is Stable. The downgrades reflected LNT's continued weak operating performance which has resulted in worsening credit metrics and negative cash flow generation as well as the challenging operating environment and intense competition from other specialty retailers, discounters and department stores in the home furnishings segment.

- On October 15, 2007, Standard & Poor's Ratings Services slashed the corporate credit rating on LNT to 'B-' from 'B' and removed the ratings from CreditWatch, where they had been placed with negative implications on Nov. 17, 2006 and lowered the bank loan rating on the Company's $650 million floating-rate senior secured notes to 'CCC' (two notches below its corporate credit rating). The downgrade was a result of LNTs' "continued weak operating performance and poor profitability and productivity relative to its key competitor" as well as a "very high debt leverage and extremely thin interest coverage." Standard & Poor's also announced that the outlook was negative.

- On November 13, 2007, LNT reported that adjusted EBITDA for the third quarter of 2007, the quarter ended September 30, 2007 was negative ($3)

million compared with adjusted EBITDA of positive $21.5 million in the third quarter of 2006, a decrease of $24.5 million.

75.     Defendants also failed to disclose the approximate $60 million incremental unrealized loss on iStar's held-to-maturity investments that constituted a "material change" in the Company's operations.  Since such incremental loss was then having, and would have, a material and unfavorable impact on the Company's operating income, Defendants were required make appropriate disclosures regarding the same in the Registration Statement.

76.     On February 28, 2008, in connection with announcing the Company's financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, Defendants announced, *inter alia*, that the Company recorded a $135 million charge associated with the "impairment of two credits."  The facts and circumstances that caused the Company to take this charge as of December 31, 2007, existed on December 14, 2007, the date of the Secondary Offering, and were, therefore, required to be disclosed in the Registration Statement, but were not disclosed by Defendants.

77.     Further, Defendants blamed the Company's disappointing 2007 fourth quarter financial results on the impairment charge the Company recorded on its held-to-maturity investments.  Accordingly, by Defendants' own admission, the charge iStar recorded in connection with the decline in value of such debt securities negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

C.      **The Material Increase In Loan Losses**

78.     In the Registration Statement, Defendants also failed to disclose that losses in iStar's loan portfolio increased dramatically between September 30, 2007 and the time of the Secondary Offering.

79.     During the fourth quarter of 2007, economic and financial conditions deteriorated

significantly. These trends and events had a material adverse effect on market liquidity generally and the value of iStar's loan portfolio specifically.

80.     During the first nine months of 2007, Defendants caused iStar to record a cumulative $72 million charge against earnings for loan losses. However, for the fourth quarter of 2007, the last three months of 2007, Defendants caused iStar to record a $113 million charge for loan losses. This amount exceed the total loan losses Defendants reported during the first nine months of 2007 combined by *57%* and approximated 40% of the total income Defendants reported from iStar's continuing operations during the first nine months of 2007.

81.     Indeed, Defendants undeniably knew that iStar's loan portfolio had experienced material decline in value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007.   At the Investor Conference, just days before the Secondary Offering, defendant O'Connor represented that Defendants monitored iStar's portfolio risk on a real-time basis, stating, in pertinent part:

> We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.

82.     Defendants failed to disclose the approximate $110 million incremental increase in iStar's loan loss reserves that constituted a "material change" in the Company's operations. Since such an incremental increase in loan loss reserves was then having, and would have, a material unfavorable impact on the Company's operating income, it was required to be disclosed in the Registration Statement.

83.     On February 28, 2008, in connection with announcing the Company's financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, Defendants announced, *inter alia*, that the Company recorded a $113 million charge associated with an increase in its loan loss reserves. The facts and circumstances that caused the

Company to take this charge as of December 31, 2007, existed on December 14, 2007, the date of the Secondary Offering and were, therefore, required to be disclosed in the Registration Statement, but were not.

84.     Furthermore, Defendants blamed the Company's disappointing 2007 fourth quarter financial results on the charge it recorded on the increase in its loan loss reserves. Accordingly, by Defendants' own admission, the charge they recorded in connection with the decline in value of the Company's loan portfolio negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

**D.     Material Decline In Credit Quality**

85.     In the Registration Statement, Defendants also failed to disclose that iStar had a material increase in the amount of its NPLs and watch list assets.

86.     In the Third Quarter 10-Q, which was incorporated by reference in the Registration Statement, Defendants set forth a chart detailing the Company's loan loss reserves, NPLs and watch list assets as follows:

**Risk Management**

*Loan Credit Statistics*—The table below summarizes our non-performing loans and details the reserve for loan losses associated with our loans (in thousands):

|  | As of September 30, 2007 | As of December 31, 2006 |
|---|---|---|
| **Non-performing loans** |  |  |
| Carrying value | $ 428,694 | $ 61,480 |
| Participated portion | 420,020 | — |
| Gross book value | $ 848,714 | $ 61,480 |
| As a percentage of total assets | 5.5% | 0.6% |
| As a percentage of total loans | 8.4% | 1.0% |
| **Reserve for loan losses** | $ 124,201 | $ 52,201 |
| As a percentage of total loans | 1.2% | 0.9% |
| **Watch list loans** |  |  |
| Carrying value | $ 610,536 | $ 147,800 |

| | | | | |
|---|---|---|---|---|
| Participated portion | | | 485,280 | — |
| Gross book value | $ | 1,095,816 | $ | 147,800 |

*Non-Performing Loans*—All non-performing loans are placed on non-accrual status and income is recognized only upon actual cash receipt. We designate loans as non-performing at such time as: (1) management determines the borrower is incapable of, or has ceased efforts towards, curing the cause of an impairment; (2) the loan becomes 90 days delinquent; (3) the loan has a maturity default; or (4) the net realizable value of the loan's underlying collateral approximates our carrying value of such loan. As of September 30, 2007, we had 29 non-performing loans with an aggregate carrying value of $428.7 million and an aggregate gross book value of $848.7 million, or 5.5% of total assets. Management believes there is adequate collateral and reserves to support the book values of the loans.

87.     By the time of the Secondary Offering, on or about December 14, 2007, the carrying value of iStar's NPLs increased by more than 50% since September 30, 2007 and the carrying value of iStar's watch list assets increased by approximately 100% since September 30, 2007.

88.     Defendants knew that between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007, the credit quality of iStar's loan portfolio declined precipitously, causing a sharp spike in the Company's NPLs and watch list assets by the time of the Secondary Offering.  In fact, as noted above, just days before the Secondary Offering during, the Investor Conference, defendant O'Connor represented that Defendants inspected the Company's 4 and 5 rated loans (which composed 92% of iStar's NPLs and watch list assets) "every week, if not more."

### E.     Defendants' Misleading Risk Disclosures

89.     Pursuant to Item 3 of Form S-3, the Registration Statement was required to furnish the information pursuant to Item 503 of Regulation S-K [ 17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

90.     The Registration Statement incorporated by reference the "Risk Factors" set forth by Defendants in iStar's 2006 Form 10-K.  None of these so-called risk disclosures warned of

the problems in the Company's corporate loan and debt portfolio then impacting the Company's operations, as Defendants characterized any impairment and credit issues as prospective when, in fact, the Company was then being negatively impacted by the problems. Indeed, the crisis in the U.S. financial markets had increased dramatically from the time Defendants caused iStar to file its 2006 Form 10-K with the SEC and the Secondary Offering in mid-December 2007.

91.     Accordingly, in the Registration Statement, Defendants failed to disclose the most significant factors that made the Secondary Offering risky or speculative as required by Item 3 of Form S-3, including the extent to which deterioration in the economy and financial markets adversely affected the quality of iStar's loan portfolio.

## Defendants Violate GAAP During the Relevant Period

92.     As noted above, the Registration Statement and the Prospectus incorporated by reference the financial statements contained in iStar's 2006 Annual Report on Form 10-K and its 2007 Quarterly Reports on Form 10-Q. The Company's 2006 Annual Report on Form 10-K was signed by, among others, defendants Sugarman, Rice, Holman, Josephs, McDonald, Puskar, Weber, and August. The Company's 2007 Quarterly Reports on Form 10-Q were each signed by defendants Sugarman and Rice.

93.     The unaudited financial statements included in the Third Quarter 10-Q were materially inaccurate in that Defendants failed to disclose facts, referred to under Generally Accepted Accounting Principles ("GAAP") as "subsequent events," evidencing the adverse conditions loans that were reasonably likely to have a material effect on the value of certain of the Company's investments in debt securities. These facts, which were required to be disclosed pursuant to GAAP, were necessary to make the interim financial statements not false and/or misleading. Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that financial statements filed

with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

94.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") AU §411.02.

95.    GAAP, in its Emerging Issues Task Force ("EITF") Topic D-86, provides:

A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

96.    Concerning subsequent events, EITF Topic D-86 makes reference to the American Institute of Certified Public Accountant's ("AICPA") Statement on Auditing Standards ("SAS") No. 1, Subsequent Events (or AU §560), which, in pertinent part, states:

[E]vents or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements. These occurrences hereinafter are referred to as "subsequent events."

The first type [of subsequent event] consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. . . .

The second type [of subsequent event] consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements. *Some of these events, however, may be of such a nature that disclosure of them is required to keep the financial statements from being misleading. . . .*

\*        \*        \*

When financial statements are reissued, for example, in reports filed with the Securities and Exchange Commission or other regulatory agencies, events that require disclosure in the reissued financial statements to keep them from being misleading may have occurred subsequent to the original issuance of the financial statements.

97.    In iStar's financial statements issued in the Third Quarter 10-Q, Defendants falsely represented that "[t]he accompanying unaudited Consolidated Financial Statements have

been prepared in accordance with the instructions to Form 10-Q and Article 10-01 of Regulation

S-X for interim financial statements." Article 10 of Regulation S-X [C.F.R. §210.10-01.(a)(5)]

provides, in pertinent part, that:

- Interim financial information shall include disclosure either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading;

- Disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant; and

- Where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred.

98.     Defendants further misrepresented that the interim financial statements were

presented in conformity with the requirements of Article 10 of Regulation S-X.

99.     As noted above, by the time the Registration Statement was declared effective by

the SEC, deteriorating economic and financial conditions had a material adverse effect on the

value of iStar's loan portfolio. In fact, between September 30, 2007 and the Secondary Offering,

the value of iStar's loan portfolio declined by almost *$170 million*, an amount that wiped out

almost 60% of iStar's earnings from its continuing operations during the first nine months of

2007.

100.     These material "subsequent events," which Defendants were required to disclose

pursuant to GAAP and the requirements of Article 10 of Regulation S-X, were instead omitted

from the financial statements incorporated by reference in the Registration Statement and

Prospectus.

101.     Accordingly, Defendants issued false and misleading representations in the

Registration Statement and Prospectus, in which they claimed that the Company's financial

statements were presented in conformity with GAAP and Article 10 of Regulation S-X, thereby

rendering the Registration Statement materially inaccurate.

102.    In addition to the violations of GAAP noted above, the financial statements

Defendants incorporated by reference in the Registration Statement were presented in violation

of at least the following provisions of GAAP:

a.    The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred. (Statement of Financial Accounting Standard No. 5);

b.    The principle that financial statements disclose certain significant risks and uncertainties. (Statement of Position No. 94-6);

c.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (Statement of Concepts ("Concepts Statement") No. 1, ¶34);

d.    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. (Concepts Statement No. 1, ¶40);

e.    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (Concepts Statement No. 1, ¶50);

f.    The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶42);

g.    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (Concepts Statement No. 2, ¶79); and

h.    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (Concepts Statement No. 2, ¶¶95, 97).

103.    Defendants' failure to incorporate by reference in the Registration Statement

financial statements that conformed to the requirements of GAAP and Regulation S-X rendered the Registration Statement materially inaccurate.

### The Truth Emerges

104.    On February 28, 2008, Defendants caused the Company to issue a press release announcing its financial results for the fourth quarter of 2007 and full year 2007, the periods ending December 31, 2007.  For the fourth quarter, Defendants were forced to report that the Company's financial results were impacted by *$134.9 million of charges associated with the "impairment of two credits" and a $113 million increase in its loan loss provisions*.

105.    These two charges, which totaled approximately a quarter of a billion dollars, effectively wiped out close to *90%* of the earnings Defendants reported from the Company's continuing operations during the first nine months of 2007.

106.    In addition, Defendants reported that during the fourth quarter of 2007, the amount of the Company's NPLs and watch list assets increased by more than 65% and 100%, respectively.  Defendants' February 28, 2008 press release, stated, in pertinent part:

- *Our quarterly earnings include both increased reserves and mark-to-market impairments, reflecting the impact of the current credit environment on specific investments in our portfolio, as well as the continued stresses in the overall market.*

- Included in fourth quarter earnings were $134.9 million of non-cash charges associated with the impairment of two credits that are accounted for as held-to-maturity debt securities in its Corporate Loan and Debt portfolio. These securities are performing and continue to pay interest. Accounting standards for these securities do not allow for loan loss reserves to be taken on these assets; the standards require that the value be impaired based on a significant drop in market price and on management's current assessment that the decline is other than temporary.

- The Company had $217.9 million in loan loss reserves at December 31, 2007 versus $52.2 million at December 31, 2006. During the fourth quarter, the Company recorded $113.0 million in loan loss provision versus $62.0 million in the prior quarter. The $51.0 million quarter-over-quarter increase reflects the continued deterioration in the overall credit markets and its impact on the Company's portfolio as determined in its regular quarterly risk ratings review process.

- As expected, non-performing loans and watch list assets increased from the prior quarter. On December 31, 2007, the Company had 31 loans on NPL status representing $1.2 billion of gross loan value, compared to 29 loans on NPL status representing $848.7 million of gross loan value in the prior quarter. At the end of the fourth quarter, the Company had 40 loans on its watch list representing $1.6 billion of gross loan value, compared to 28 loans on its watch list representing $1.1 billion of gross loan value in the prior quarter.

107. That same day, Defendants held a conference call with securities analysts to discuss iStar's fourth quarter results and operations.  On the conference call, defendants Sugarman and Rice discussed the charges and increases in reserves, stating, in pertinent part, as follows:

Sugarman:

First, on the earnings front, our fourth quarter earnings included two unusual items, $135 million in non-cash impairments in our corporate loan invest portfolio and an increase loan loss provision of approximately $50 million higher than expected.

\*     \*     \*

I would say as just a characterization, the fourth quarter was unusual.

Rice:

Our fourth quarter earnings clearly reflect the impact of the current credit environment on certain of our investments, as well as the continued stress in the overall market. Our adjusted earnings resulted in a loss this quarter of $36.6 million, or a loss of $0.29 per diluted common share.

Included in fourth quarter earnings were $135 million of non-cash charges associated with the impairment of two credits in our corporate loan and debt portfolio.

Excluding the effect of the impairment for these two credits, adjusted earnings for the fourth quarter were $95.4 million or $0.74 per diluted common share.

Let me provide you with some background on the impairments. *We took a non-cash impairment charge totaling $135 million on two credits, which are accounted for as held to maturity debt securities. Both credits are performing and continue to pay interest. The accounting for these securities does not allow loan loss provisions to be taken against them, but requires that the value be impaired based on a significant drop in market value for an extended or other than temporary period of time.*

\*     \*     \*

As we mentioned earlier, we took a relatively conservative stance based on the continued deterioration of the market and the impact we expect it to have on our portfolio. If the increase from our third quarter to our fourth quarter loan loss provision was also excluded, adjusted earnings per share would have been $4.14, in line with our guidance. However, the market has deteriorated somewhat more than we expected over the last quarter, and we believed it was prudent to increase our loan loss provision accordingly, or by $51 million more than we originally modeled for the fourth quarter.

*        *        *

*[T]o the extent assets in that portfolio trade down significantly on a more than temporary basis, we are acquired to take an impairment based on the market trading.* So that group of assets, as we outlined, is only about $423 million. We took an impairment on two of the six assets in that bucket. And I'm sure you're well aware that the corporate debt market is being subjected to some fairly draconian trading levels at this point. *I think at the end of the quarter we felt, although we're still relatively confident in both of these assets, that we needed to take this impairment based on the market price.*

108.    Immediately following this news and these disclosures on February 28, 2008, the

price of iStar common stock declined by approximately 12%.

109.    During the next few days, iStar's common stock price continued to decline as

analysts downgraded iStar stock, representing, in pertinent part:

Credit Suisse - February 28, 2008

**NPLs Increase Across the Board**

iStar Financial reported a 4Q adjusted EPS loss of $0.29, well below our estimate ($1.07). Credit losses, both asset impairments and higher provisioning, accounted for the lower than expected earnings.

Deutsche Bank - February 28, 2008

**Downgrading to Hold given near-term risks**

We are downgrading iStar to Hold from Buy, as we are concerned about near-term market deterioration resulting in continued elevated loss provisions. We believe these elevated loss provisions as well as increasing nonperforming loans could result in depressed earnings during the next few quarters.

*        *        *

Given the expectation of lower near-term earnings, management reduced 2008 adjusted earnings guidance to $3.50 to $4.00 per share from $4.00 to $4.20 per share.

- 38 -

Deutsche Bank - February 29, 2008

**Disappointing 4Q results and 2008 guidance**

We are reducing our 2008 estimate and price target after disappointing 4Q results. While we expect book value and the current yield to provide support for shares, our Hold rating reflects our belief that near-term upside is unlikely given concerns regarding loss provisions and increasing NPLs. While our new target is $26.50 per share, we believe our Hold rating is appropriate given near-term risks.

*    *    *

**Reducing price target to $26.50 per share from $42 per share**

While our prior target was based on applying a 10x multiple to our 2008 adjusted earnings estimate, our new price target is based on applying a 7x multiple to our new 2009 adjusted earnings estimate. Given the near-term concerns (loss provisions and NPLs) and reduced visibility for our out year estimate, we believe a 7x multiple is appropriate. Historically, iStar has traded in a range of 6-13x forward adjusted earnings. While our target represents upside from the recent close price, we believe current risks limit near-term upside warranting a Hold rating.

110.    On March 5, 2008 Citibank issued a downgrade on iStar stock, which was quickly followed by a Smith Barney downgrade on March 6, 2008.

111.    Following Defendants' admissions regarding the impairment charges and increase in loan loss reserves, the price of iStar's common stock closed at $13.98, less than half of the price it sold for in the Secondary Offering and its closing high during the Relevant Period.

112.    In its Form 10-K for the year ended December 31, 2007, the period that concluded just ten additional business days from the time of the Secondary Offering, Defendants disclosed that the Company recorded a charge for impairment of two credits, materially increased loan loss reserves and that the value of it NPLs and watch list assets increased dramatically.  The Form 10-K, stated, in pertinent part:

> *During the fourth quarter, we took a $134.9 million non-cash impairment charge on two of our credits accounted for as held-to-maturity debt securities that have traded well below our carrying value.*
>
> *In addition, based on increased risks in our loan portfolio, including those associated with the Fremont acquired loans, as well as the deterioration in economic and financial conditions, we had provisions for loan losses of $185.0 million during the year, versus $14.0 million in 2006 and $2.3 million in 2005.*

*With the addition of the Fremont portfolio, we had material increases in our watch list and non-performing loans.* Our total loss coverage, defined as the combination of loan loss reserves and the remaining purchase discount on the acquisition, was $384.8 million or 3.6% of total loans, at the end of the year. *The impairments and additional loan loss reserves negatively impacted our return on common book equity and our adjusted return on common book equity this year.*

113.    As a result of Defendants' breaches of fiduciary duty, the price of the Company's stock has never recovered and currently trades for around $6.00 per share -- a plummet of approximately 82% since February 2008.

### Defendant Radesca Supposedly "Resigns" Immediately Following the Bad News

114.    On March 6, 2008, the Board disclosed that they permitted one of the chief culprits responsible for the Company's problems to "resign." Specifically, Defendants revealed that defendant Radesca, iStar's CAO, had "resigned" from the Company, effective February 29, 2008, which was only one day after the truth about the Company's problems was revealed.

115.    Upon information and belief, defendant Radesca was eligible to collect severance payments and/or other valuable benefits as provided for in his employment and/or severance agreements if he "resigned," but not if he was terminated "for cause."

116.    The Board's decision to permit defendant Radesca to "resign" is particularly offensive given that Judge Sullivan has now found *indicia* that defendant Radesca engaged in a scheme to defraud iStar's investors. Accordingly, it is clear that the Board's decision to permit defendant Radesca to resign was not in good faith and, thus, was not a proper exercise of its business judgment.

### Defendant O'Connor Supposedly "Retires" Shortly After the Filing of the Securities Action

117.    On July 2, 2008, the Board disclosed that they permitted another one of the chief culprits responsible for the Company's problems to walk away unscathed. Specifically, Defendants revealed that defendant O'Connor, iStar's longtime Executive Vice President and

COO, had "retired," (for all intents and purposes, a "resignation") effective June 30, 2008 -- only about four months after the truth about iStar's problems were revealed, and only about six weeks after O'Connor was named as a defendant in the Securities Action and alleged to have participated in a scheme to defraud iStar's investors.

118.    Upon information and belief, defendant O'Connor was eligible to collect severance payments and/or other valuable benefits as provided for in his employment and/or severance agreements if he "retired" or "resigned," but not if he was terminated "for cause."

119.    The Board's decision to permit defendant O'Connor to "retire" or "resign" is particularly offensive given that Judge Sullivan has now found *indicia* that defendant O'Connor engaged in a scheme to defraud iStar's investors.    Accordingly, it is clear that the Board's decision to permit defendant O'Connor to retire or resign was not in good faith and, thus, was not a proper exercise of its business judgment.

### The Securities Action

120.    Beginning on April 15, 2008, the Company became the subject of several similar class action securities fraud lawsuits pending in this Court, which were ultimately consolidated on November 17, 2008 as the Securities Action.  The "Class Period" in the Securities Action has been defined as December 6, 2007 until March 6, 2008.

121.    The individual defendants to the Securities Action -- Sugarman, Radesca, Rice, and O'Connor -- are also defendants to the instant shareholder derivative action.

122.    On March 26, 2010, Judge Sullivan issued an opinion denying in substantial part the defendants' motions to dismiss the Securities Action. In his opinion, Judge Sullivan issued a number of findings concerning certain conduct which is also alleged herein by Plaintiff.  Among the findings by Judge Sullivan are that the plaintiffs to the Securities

Action sufficiently alleged, *inter alia*, that:

    a.    Defendants omitted from their disclosures that by the time of the Secondary Offering, *iStar had suffered additional losses of $60 million on its held-to-maturity investments;*

    b.    Defendants omitted from their disclosures that by the time of the Secondary Offering, *iStar was suffering additional losses in its loan portfolio, such that it would need to record a $113 million charge associated with an increase in its loan loss reserves at the end of the quarter;*

    c.    Defendants omitted from their disclosures that by the time of the Secondary Offering, *the carrying value of iStar's non-performing loans had increased by more than 50%, and the carrying value of its watch list assets had increased by approximately 100%;*

    d.    *Defendants' following statements were false or misleading: (i) that iStar's debt was "extremely well protected," (ii) that the loan portfolio had "a lot of room for things to go wrong and for us to still be okay," (iii) that the loan portfolio was "performing pretty much as expected," and (iv) that iStar anticipated 2008 earnings of $4.00 to $4.20 per share*; and

    e.    *Defendants acted with scienter*, especially in light of the allegations that, *inter alia*, Defendants commenced an "Investors Day conference" with only sixteen business days remaining in the fourth quarter of 2007 and that they needed to conceal iStar's deteriorating performance so that the Company would be able to secure financing and maintain an investment-grade credit rating.

123.    In other words, Judge Sullivan found *indicia* that defendants Sugarman, Radesca, Rice, and O'Connor were engaged in a scheme to defraud iStar's investors.

124.    Significantly, Judge Sullivan reached each the above conclusions notwithstanding the significantly heightened pleading standards imposed upon the plaintiffs to the Securities Action by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[3]

---

[3] The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and *scienter*. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002). To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed. *Id.* at 1085. With respect to pleading *scienter*, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind. 15 U.S.C. § 78-u4(b)(2). The inference of *scienter* must be more than merely reasonable -- it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the

## DERIVATIVE AND DEMAND ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of iStar to redress the breaches of fiduciary duty and other violations of law by Defendants.

126.    Plaintiff will adequately and fairly represent the interests of iStar and its shareholders in enforcing and prosecuting its rights.

127.    The Board currently consists of the following eight (8) directors: defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, Reiss, and Weber.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

    a.    During the Relevant Period, defendants Holman, Josephs, and Puskar served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the adequacy of the Company's internal controls and reviewing the integrity of the Company's financial statements.  Further, pursuant to the Audit Committee Charter, members of the Audit Committee are responsible for reviewing and approving the Company's credit loss reserve policy, and reviewing earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies.  Defendants Holman, Josephs, and Puskar breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures and failed to ensure that adequate internal controls were in place.  Defendants Holman, Josephs, and Puskar further breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee reviewed and approved the Company's credit loss reserve policy, which was clearly inadequate.  Moreover, defendants Holman, Josephs, and Puskar breached their fiduciary duties by allowing or permitting false and misleading financial information to analysts and rating agencies, including, but not limited to, Defendants' representations at the Investor Conference.  Therefore, defendants Holman, Josephs, and Puskar each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

---

inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  *Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 127 S. Ct. 2499, 2502 (2007).  Notably, the PSLRA's heightened pleading standards do not apply to the instant shareholder derivative action.

b.  The principal professional occupation of defendant Sugarman is his employment with iStar as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  For example, in 2007 defendant Sugarman's salary, bonus, and other compensation totaled $6,684,713, and in 2008, defendant Sugarman's salary, bonus, and other compensation totaled $5,400,708.  Thus, defendant Sugarman lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

c.  Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber are interested because they engaged in conduct which is not protected by the business judgment rule in connection with their decision to allow defendant Radesca to resign, when they had grounds to terminate him "for cause."  Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber clearly had grounds to terminate Radesca for cause and instead they allowed him to resign, essentially bestowing gifts on him pursuant to the terms of his employment and/or other agreements with the Company, which was a waste of corporate assets.  Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber's decision to permit defendant Radesca to resign is not a protected business judgment.  Thus, demand is excused; and

d.  Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber are interested because they engaged in conduct which is not protected by the business judgment rule in connection with their decision to allow defendant O'Connor to "retire," when they had grounds to terminate him "for cause."  Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber clearly had grounds to terminate O'Connor for cause and instead they allowed him to retire (or effectively resign), essentially bestowing gifts on him pursuant to the terms of his employment and/or other agreements with the Company, which was a waste of corporate assets.  Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber's decision to permit defendant O'Connor to resign is not a protected business judgment.  Thus, demand is excused.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

128.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.  As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that iStar disseminated accurate, truthful and complete information to its shareholders.

130.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to iStar shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

131.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

### COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

132.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

133.   As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

134.   Defendants willfully ignored the obvious and pervasive problems with iStar's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

135.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

### COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

136.   Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

137.    Defendants owed and owe iStar fiduciary obligations.   By reason of their fiduciary relationships, Defendants specifically owed and owe iStar the highest obligation of good faith, fair dealing, loyalty and due care.

138.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

139.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, iStar has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

140.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

141.    Plaintiff, on behalf of iStar, has no adequate remedy at law.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of iStar.

144.    Plaintiff, as a shareholder and representative of iStar, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

145.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

146.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence iStar, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing iStar to misrepresent material facts regarding its financial position and business prospects.

147.    As a direct and proximate result of Defendants' abuse of control, iStar has sustained significant damages.

148.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

149.    Plaintiff, on behalf of iStar, has no adequate remedy at law.

**COUNT VI**
**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    Defendants had a duty to iStar and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of iStar.

152.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of iStar in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of iStar's affairs and in the use and preservation of iStar's assets.

153.    During the course of the discharge of their duties, Defendants knew or recklessly

disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused iStar to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to iStar, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged iStar.

## COUNT VII
## AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

154. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155. As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused iStar to incur (and iStar may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

156. As a result of this waste of corporate assets, Defendants are liable to the Company.

157. Plaintiff, on behalf of iStar, has no adequate remedy at law.

## COUNT VIII
## AGAINST DEFENDANTS SUGARMAN, AUGUST, HOLMAN, JOSEPHS, MCDONALD, PUSKAR, AND WEBER FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH RADESCA'S RESIGNATION

158. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159. Each director on the Board was required to act with the utmost loyalty and good faith to the Company. As alleged in detail herein, each director violated these core duties by allowing Radesca to "resign" even though they had grounds to terminate him for cause.

160. As a direct and proximate result of the Board's foregoing breaches of fiduciary

duties, the Company has suffered significant damages, as alleged herein.

## COUNT IX
### AGAINST DEFENDANTS SUGARMAN, AUGUST, HOLMAN, JOSEPHS, MCDONALD, PUSKAR, AND WEBER FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH O'CONNOR'S RETIREMENT

161. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162. Each director on the Board was required to act with the utmost loyalty and good faith to the Company. As alleged in detail herein, each director violated these core duties by allowing O'Connor to "retire" or "resign" even though they had grounds to terminate him for cause.

163. As a direct and proximate result of the Board's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B. Directing iStar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.     Awarding to iStar restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

      D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 26, 2010

                                **HARWOOD FEFFER LLP**

                                ROBERT I. HARWOOD
                                488 Madison Avenue
                                New York, NY 10022
                                Telephone (212) 935-7400
                                Facsimile: (212) 753-3630

                                **THE WEISER LAW FIRM, P.C.**
                                ROBERT B. WEISER
                                BRETT D. STECKER
                                JEFFREY J. CIARLANTO
                                121 N. Wayne Avenue, Suite 100
                                Wayne, PA 19087
                                Telephone:  (610) 225-2677
                                Facsimile:  (610) 225-2678

                                Counsel for Plaintiff

## ISTAR FINANCIAL, INC. VERIFICATION

I, James Kautz, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 4/21/2010

James Kautz