# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES KAUTZ, derivatively on behalf of ISTAR FINANCIAL INC., | Civil Action No. 10 CV 3478 (RJS) |
| Plaintiff, | |
| v. | ECF CASE |
| JAY SUGARMAN, GLENN AUGUST, ROBERT W. HOLMAN, JR., ROBIN JOSEPHS, JOHN G. MCDONALD, GEORGE R. PUSKAR, DALE ANNE REISS, JEFFREY A. WEBER, NICHOLAS A. RADESCA, CATHERINE D. RICE, and TIMOTHY J. O'CONNOR, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and | |
| ISTAR FINANCIAL INC., | |
| Nominal Defendant. | |

## VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff James Kautz ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Amended Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant iStar Financial Inc. ("iStar" or the "Company") against certain and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from December 2007 to the present (the "Relevant Period").

## NATURE OF THE ACTION

1.     According to its public filings, iStar operates as a finance company focusing on the commercial real estate industry, and provides custom-tailored financing to high-end private and corporate owners of real estate. Its financing products include senior and mezzanine real

- 1 -

estate debt, senior and mezzanine corporate capital, corporate net lease financing, and equity.

2.      On July 2, 2007, defendants caused iStar to acquire the $6.27 billion commercial real estate loan portfolio and commercial real estate lending business of Fremont Investment & Loan ("Fremont"), a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement dated May 21, 2007 (the "Fremont Acquisition").

3.      The Fremont Acquisition would ultimately prove disastrous for the Company because it included billions of dollars worth of construction loans and funding commitments to condominium developers that would eventually default. Defendants, however, concealed the impact that the Fremont Acquisition would have on the Company's corporate debt and loan portfolio by making false and misleading disclosures in, *inter alia*, the Company's Relevant Period statements.

4.      These Relevant Period statements included a number of prospectuses through which Defendants caused the Company to offer hundreds of millions of dollars worth of iStar shares and other securities in a December 2007 secondary offering (the "Secondary Offering"). Defendants also improperly concealed the negative effects of the Fremont Acquisition on the Company and the corresponding deterioration in value of the Company's debt and loan portfolio in iStar's fiscal third quarter earnings press release.

5.      Finally, on February 28, 2008, defendants were forced to disclose a *$134.9 million write-down of the Company's corporate loan and debt portfolio and a $113 million increase to the Company's loan loss provisions* in the Company's fourth quarter earnings release. The write-down and loan loss provision increase contributed to a *$78.7 million loss* for the quarter.

6.      In the wake of these disastrous disclosures, iStar's stock price declined from over

$27 per share to less than $17 per share -- a $1.3 billion market capitalization loss.

7. On March 6, 2008, the Board disclosed that they permitted one of the chief culprits responsible for the Company's problems to "resign." Specifically, defendants revealed that defendant Nicholas A. Radesca ("Radesca"), iStar's Chief Administrative Officer ("CAO"), had "resigned" from the Company, effective February 29, 2008, which was only one day after the truth about the Company's problems was revealed.

8. Approximately four months later, on July 2, 2008, the Board disclosed that they had permitted yet another of the chief culprits for the Company's problems to similarly walk away unscathed. Specifically, defendants revealed that, effective June 30, 2008, defendant Timothy J. O'Connor ("O'Connor"), iStar's Executive Vice President and Chief Operating Officer ("COO"), had purportedly "retired."

9. Further, on March 6, 2009, the Board permitted the Company's Chief Financial Officer ("CFO"), defendant Catherine D. Rice ("Rice"), to retire from the Company. Over a year later, on April 23, 2010, the Board disclosed that it awarded defendant Rice a "special compensation payment" of $1 million in 2009 due to, among other things, "her many years of valuable service as our chief financial officer." Upon information and belief, Rice was not entitled to any such "special compensation payment" under the terms of her employment contract.

10. As a result of defendants' breaches of fiduciary duty and other misconduct, the price of the Company's stock still has never recovered and currently trades for less than $5.50 per share -- a decline of over *80%* since February 2008.

11. Not surprisingly, as a result of defendants' actions during the Relevant Period, iStar became the subject of multiple securities class actions (the first of which was filed in April

2008), which were eventually consolidated in this Court (the "Securities Action").[1]  The "Class

Period" in the Securities Action is defined as December 6, 2007 to March 6, 2008.

12.    The individual defendants named in the Securities Action include certain of the

defendants named herein -- Jay Sugarman ("Sugarman"), Radesca, Rice, and O'Connor.

13.    Notably, and as discussed in detail herein, on March 26, 2010, U.S. District Judge

Richard J. Sullivan ("Judge Sullivan") denied in substantial part the defendants' motions to

dismiss the Securities Action, and in connection therewith, determined that the plaintiffs in the

Securities Action had sufficiently alleged, *inter alia*:

> a.    ***Defendants omitted from their disclosures that by the time of the
> Secondary Offering, iStar had suffered additional losses of $60 million on its
> held-to-maturity investments;***
>
> b.    ***Defendants omitted from their disclosures that by the time of the
> Secondary Offering, iStar was suffering additional losses in its loan portfolio,
> such that it would need to record a $113 million charge associated with an
> increase in its loan loss reserves at the end of the quarter***;
>
> c.    ***Defendants omitted from their disclosures that by the time of the
> Secondary Offering, the carrying value of iStar's non-performing loans had
> increased by more than 50%, and the carrying value of its watch list assets had
> increased by approximately 100%;***
>
> d.    The following statements were false or misleading:  ***(i) that iStar's debt
> was "extremely well protected," (ii) that the Company's loan portfolio had "a
> lot of room for things to go wrong and for us to still be okay," (iii) that the
> Company's loan portfolio was "performing pretty much as expected," and (iv)
> that iStar anticipated 2008 earnings of $4.00 to $4.20 per share;*** and
>
> e.    Defendants acted with *scienter*, especially in light of the allegations that,
> *inter alia*, Defendants commenced an "Investors Day conference" with only
> sixteen business days remaining in the fourth quarter of 2007 and that defendants
> needed to conceal iStar's deteriorating performance so that the Company would
> be able to secure financing and maintain an investment-grade credit rating.

14.    In other words, Judge Sullivan found *indicia* that defendants Sugarman, Radesca,

Rice, and O'Connor were engaged in a scheme to defraud iStar's investors.

---

[1] The Securities Action is captioned *Citiline Holdings, Inc. v. iStar Financial, Inc., et al.,* No. 08-
Civ-3612 (RJS).

15.     Further, as a result of defendants' actions during the Relevant Period, Addie Vancil ("Vancil"), a stockholder of iStar who is represented by Robbins Umeda LLP ("Robbins Umeda") issued a pre-suit demand (the "Vancil Demand") upon the Board on or about June 1, 2009 to "investigate and remedy the violations of law described [therein] as required by Federal Rule of Civil Procedure Rule 23.1 and Maryland law." *See* Plaintiff's Complaint in *Vancil v. Sugarman, et al.,* Case No. 10-cv-04312-UA (S.D.N.Y. May, 28, 2010) (the "*Vancil* Complaint") at ¶130 attached hereto as Exhibit A.

16.     On June 15, 2009, the Company's General Counsel and Secretary, Geoffrey Dugan ("Dugan"), sent a letter to Robbins Umeda indicating that the Board would purportedly "conduct a reasonable and good faith investigation" in response to the Demand. *Vancil* Complaint, ¶131.

17.     On June 26, 2009, Robbins Umeda wrote a letter to Dugan seeking additional information regarding the Board's purported investigation. *Vancil* Complaint, ¶132. Among other things, Robbins Umeda inquired as whether the Board delegated its purported investigation to a sub-committee (and if so, who the directors of such subcommittee were and how they were selected), how the purported investigation would be documented, and whether the Board had set a schedule or deadline within which the investigation would be completed. *Id.* The Board, however, refused to provide further information. *Id.*

18.     On July 10, 2009, Robbins Umeda received a letter from counsel purporting to represent a "special committee" of the Board (the "Special Committee"), which was apparently charged with investigating the Demand. *Vancil* Complaint, ¶133. Later, on September 9, 2009, Robbins Umeda received another letter from counsel for the Special Committee, in which counsel for the Special Committee characterized Vancil as a "busybody," stated that the Demand

merely "serves a notice function," and stated that the Securities Action provided the Board with "notice" of Vancil's "grievances" before the Board received the Demand. *Vancil* Complaint, ¶138. Thus, according to the Special Committee, the Demand was "redundant notice." *Id.* In other words, the Special Committee claimed that the Vancil Demand was superfluous and unnecessary because the Board was already on notice of the allegations therein.

19.    In the September 9, 2009 letter, counsel for the Special Committee also asserted that the Company's "engage[ment] of very competent counsel to address" the Securities Action was a sufficient and appropriate response to the "notice" of the issues underlying the Securities Action and the Demand. *Id.* This was an unequivocal statement that the Special Committee and the Board could simply ignore the Vancil Demand because of the pendency of the Securities Action.

20.    Finally, on November 23, 2009, the Special Committee, through its counsel, informed Robbins Umeda that the Board may "ignore the demand...if, in the exercise of its good faith judgment, the circumstances indicate that the corporation's interests would be served thereby." *Vancil* Complaint, ¶140. The only "circumstances" cited by the Special Committee as justifying its determination to ignore and refuse the Demand were Vancil's refusal to provide extensive proof that she had standing to sue derivatively[2] and iStar's retention of purportedly "very competent counsel" to represent the Company and its officers and directors in the Securities Action. *Id.*

21.    This was a refusal of the Vancil Demand, and there is doubt as to whether it was made in good faith because the Board did not actually consider its merits, or conduct any true investigation.   Upon information and belief, and based on the Company's financial filings, the

---

[2] In fact, Robbins Umeda provided counsel for the Special Committee with a brokerage statement reflecting its client's ownership of iStar stock. *Vancil* Complaint, ¶135.

Board and Special Committee still have not conducted any true investigation into the allegations of this Complaint or the Vancil Demand, and the reason why is clear -- the directors on the Board refuse to investigate their own conduct, or that of the Company's current and/or former officers.

22.     Clearly, the refusal of the Vancil Demand, which was apparently made without any substantive analysis or investigation of the allegations and issues raised in the Vancil Demand, coupled with the Board's and/or Special Committee's failure to revisit and re-evaluate the Vancil Demand in the wake of the recent findings in the Securities Action, would give a reasonable stockholder reason to believe that the Board would not consider a pre-suit demand in good faith and within the ambit of the business judgment rule.

23.     Accordingly, the Board's hostility to this action renders pre-suit demand excused and this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on this court of a court of the United States that it would not otherwise have.

25.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to

render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) iStar maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to iStar, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

27.     Plaintiff is a current shareholder of iStar and has continuously held iStar stock since March 9, 2004.  Plaintiff is a citizen of Arizona.

28.     Nominal defendant iStar is a Maryland corporation headquartered in New York, New York.  According to its public filings, iStar operates as a finance company focusing on the commercial real estate industry, and provides custom-tailored financing to high-end private and corporate owners of real estate.  Its financing products include senior and mezzanine real estate debt, senior and mezzanine corporate capital, corporate net lease financing, and equity.

29.     Defendant Sugarman has served as Chairman of the Board and as the Company's Chief Executive Officer ("CEO") since 1997.  Upon information and belief, defendant Sugarman is a citizen of New York.

30.     Defendant Glenn August ("August") has served as a director of the Company since 2005.  Upon information and belief, defendant August is a citizen of New York.

31.     Defendant Robert W. Holman, Jr. ("Holman") has served as a director of the Company since 1999.  In addition, defendant Holman served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Holman is a citizen of California.

32.     Defendant Robin Josephs ("Josephs") has served as a director of the Company since 1998.  In addition, defendant Josephs served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Josephs is a citizen of Illinois.

33.     Defendant John G. McDonald ("McDonald") has served as a director of the Company since 1999.   Upon information and belief, defendant McDonald is a citizen of California.

34.     Defendant George R. Puskar ("Puskar") has served as a director of the Company since 1999.  In addition, defendant Puskar served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Puskar is a citizen of Florida.

35.     Defendant Dale Anne Reiss ("Reiss") has served as a director of the Company since July 2008.   In addition, defendant Reiss currently serves as a member of the Audit Committee.  Upon information and belief, defendant Reiss is a citizen of Illinois.

36.     Defendant Jeffrey A. Weber ("Weber") has served as a director of the Company since 2003.  Upon information and belief, defendant Weber is a citizen of New York.

37.     Defendant Radesca served as the Company's CAO from 2006 until he purportedly "resigned" effective February 29, 2008.  Upon information and belief, defendant Radesca is a citizen of Connecticut.

38.     Defendant Rice served as the Company's CFO from 2002 until her "retirement" in March 2009.  In addition, defendant Rice served as the Company's Executive Vice President

and Treasurer from 2006 until her "retirement" in March 2009. Upon information and belief, defendant Rice is a citizen of New York.

39. Defendant O'Connor served as the Company's COO from March 1998 until his purported "retirement" in June 2008. In addition, defendant O'Connor served as the Company's Executive Vice President from March 2000 until his "retirement" in June 2008. Upon information and belief, defendant O'Connor is a citizen of New York.

40. Collectively, defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, Reiss, Weber, Radesca, Rice, and O'Connor shall be referred to herein as "Defendants."

41. Collectively, defendants Reiss, Holman, Josephs, and Puskar shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

42. By reason of their positions as officers, directors, and/or fiduciaries of iStar and because of their ability to control the business and corporate affairs of iStar, Defendants owed iStar and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage iStar in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of iStar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to iStar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43. Defendants, because of their positions of control and authority as directors and/or officers of iStar, were able to and did, directly and/or indirectly, exercise control over the

wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with iStar, each of the Defendants had knowledge of material non-public information regarding the Company.

44.  To discharge their duties, the officers and directors of iStar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of iStar were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

45.  Pursuant to the Audit Committee's Charter, the purposes of the Audit Committee include, among other things, oversight of the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements.

46.  Pursuant to the Audit Committee Charter, the members of the Audit Committee are specifically required, among other things, to:

    a.  Oversee the integrity of the Company's financial statements;

    b.  Receive reports from the Company's CEO and CFO of all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and identify any material weakness in internal controls;

    c.  Review and approve the Company's credit loss reserve policy and establishment of revenues on a quarterly basis;

    d.  Obtain advice and assistance from outside legal, accounting or other advisors;

    e.  Discuss policies with respect to risk assessment and risk management;

    f.  Review annually the policies and procedures relating to compliance with legal and regulatory requirements and the Company's compliance therewith; and

    g.  Review analyses prepared by management and/or the Company's independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company; and earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies.

## SUBSTANTIVE ALLEGATIONS

### The Company, the Nature of Its Business, and the Fremont Acquisition

47.    According to its public filings, iStar is a leading publicly-traded finance company focused on the commercial real estate industry. The Company, which is taxed as a REIT, purports to provide custom-tailored financing to high-end private and corporate owners of real estate, including senior and mezzanine real estate debt, senior and mezzanine corporate capital, corporate net lease financing and equity. Generally, senior debt or equity investments possess a first priority position in the underlying assets and are less risky than mezzanine debt or equity investments whose interest in the underlying assets are subordinated to the senior debt or equity investor. As of December 31, 2007, first mortgage/senior loans and mezzanine/subordinated debt respectively represented 85% and 11% of iStar's loan portfolio.

48.    iStar's two primary lines of business are lending and corporate tenant leasing. The lending business consists primarily of senior and mezzanine real estate loans that typically range in size from $20 million to $150 million with maturities generally ranging from three to

ten years. The Company's corporate tenant leasing business provides capital to corporations and others who control facilities leased primarily to single customers.

49. By early 2007, conditions in the U.S. mortgage market had begun to deteriorate significantly due to several factors. The Federal Reserve began raising interest rates, which climbed steadily from 4% in mid-2004 to 8.25% in September 2007. As key short-term and the prime rates rose, other interest rates rose as well, including those for most mortgage loans. This rise in interest rates dampened the demand for mortgage loans as the increase in the cost of financing reduced the expected rate of return on real property ownership. Also, and not coincidentally with the rise in interest rates, real property appreciation began to slow in 2006, and the overall economy began to cool. This combination of factors drove down the value of mortgage loans that lenders, such as iStar, carried on their books and increased the risk associated with the U.S. mortgage lending.

50. This increased risk represented a distinct challenge to lenders structured as REITs, like iStar. Since REITs are required to return much of their cash to shareholders pursuant to federal tax laws, iStar and other REIT lenders must have ready access to capital in order to possess the liquidity necessary to issue mortgage loans.

51. On July 2, 2007, under Defendants' direction, iStar completed the $6.27 billion Fremont Acquisition. As a result of the Fremont Acquisition, iStar acquired approximately 285 commercial first mortgage loans from Fremont. Approximately 60% of the value of the loans, as of March 31, 2007, was collateralized by apartment and other types of residential properties located throughout the U.S. The balance of the loans was collateralized by a variety of property types.

52. The aggregate principal amount of the loans that the Company acquired was

approximately $6.5 billion as of March 31, 2007, and approximately 130 employees of Fremont joined the Company upon the closing of the Fremont Acquisition.

53.    As consideration for the Fremont Acquisition, Defendants caused the Company to pay Fremont approximately $1.9 billion in cash and transferred to Fremont a senior A-participation interest in the acquired portfolio of loan assets representing an approximately 70% interest in the portfolio.  iStar retained a 30% B- participation interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount.

54.    To finance the Fremont Acquisition, Defendants caused the Company to obtain a $2 billion bridge facility, which was scheduled to mature in June 2008.  In addition, Defendants agreed to fund up to approximately $4.4 billion of unfunded loan commitments associated with the acquired loan portfolio.

### The December 2007 Investor Conference

55.    On December 6, 2007, Defendants caused the Company to hold its 2007 Investors Day Conference at the New York Public Library (the "Investor Conference").  At the Investor Conference, Defendants gave presentations to the investment community (including iStar stockholders, analysts, and representatives from ratings agencies) concerning, *inter alia,* the Company's balance sheet and investments.  A confidence-inspiring presentation at the Investor Conference was critical for the Company in light of the already-weakening mortgage market.

56.    During the Investor Conference, Defendants portrayed iStar's business as "conservative" and represented, among other things, that "the strength of our [iStar's] balance sheet has always been one of the strong holds of the iStar story."  Defendants specifically claimed that they regularly reviewed iStar's loan portfolio with a "bias towards relative conservatism with respect to values" and that the Company had "135 people that all they do from the time they get up to the time they leave work is to watch our portfolio and our assets."

57.    During the Investor Conference, Defendants also discussed the Company's non-performing loan ("NPL") portfolio and high-risk loans.    Defendants claimed that they "flag internally" NPLs and that they "are talking about [them] every week."    Defendants also represented that they caused iStar to maintain adequate reserves for loan losses and that their loan loss reserving practices were "conservative."

### A .    Defendants Minimize iStar's Risks as Compared to Other Mortgage Lenders

58.    During the Investor Conference, Defendants distinguished the business risks facing iStar from those facing other mortgage lenders by positively describing iStar's business model so that the marketplace would continue to supply it with the necessary liquidity during the height of the U.S. sub-prime mortgage and financial crisis.    For example, during the Investor Conference, defendant Sugarman highlighted iStar's purported "balance sheet strength," stating, in pertinent part:

> I guess it's fair to say it's been a very interesting year to date, and one we like to sum up as, "Be careful what you wish for." As many of you have heard me say many times before, we've been very surprised and disappointed with the relative ease at which new finance companies in our space have been able to access extraordinary levels of leverage based on we thought business plans that were far inferior to the iStar enterprise.

> As you'll hear later today, we've spent a lot of time trying to craft our business strategies to stay away from that capital, and *I think what we hope was a correction in the credit and finance markets would really demonstrate the flexibility, the balance sheet strength and the opportunities embedded in having an unsecured, investment-grade model*.

> Now, this slide [*infra*], which you're going to see a couple of times today, highlights the conservative level of leverage that we see in almost all corporate ratings of real estate finance companies, and we like to compare that with the very aggressive levels of leverage we have seen in the structured credit market over the past couple years. And as we've pointed out in many presentations, what's really striking is the relative value, represented by bonds issued out of this corporate family, compared to this slice of the structured credit market, despite similar ratings, BBB, BAA2, in our case.

> And I want to do some quick comparisons for you. We're going to come back to this slide a couple of times, but *it's important to start with the strength of this business model. So I guess I picked iStar Financial*. Obviously, we have a

viewpoint on our own credit, but I think you'll see this comparison works in a lot of other companies' case, as well.

When you're buying bonds in the iStar enterprise, you're buying a $15 billion unencumbered asset pool across multiple assets, originated in multiple years, in multiple parts of the commercial real estate world. This is a very strong sponsored CDO. It's one of probably the best in the business. It was issued in 2006. It has about $1 billion of assets, so a fraction of the size.

Almost all of the assets are originated at the same time, and, candidly, the top 10 assets in that pool, it's a 30-asset pool, represent 52% of the balance of that entire $1 billion capital stack. So we've got a very concentrated portfolio.

This portfolio, again, much more diversified, top 10 assets about 12%. That's over $3 billion of tangible equity sitting underneath, protecting those bondholders. Over here, you've got a little over $100 million.

And, lastly, this enterprise runs with significantly lower leverage than the investment grade leverage over here. ***And I point this out simply to start the meeting by saying the strength of our balance sheet has always been one of the strongholds of the iStar story.***

\*       \*       \*

So given that environment, what I thought I would do to kick off the meeting is really highlight the good news, and then perhaps some of the things that are more challenging. ***And we've put together a slide here where we can go through some of the things that I think really differentiate the iStar model*** [*infra*].

One, obviously, we, as you saw on that last chart, believe we are relative low leverage with a very significant equity capital base. ***And this is really the foundation of the balance sheet strength of our enterprise. Our loans are mostly senior mortgages. They're collateralized by high-quality assets. They're assets that we can underwrite, understand and asset manage. These are highly tangible businesses, highly tangible pieces of assets that we can underwrite. And, probably more importantly, there are loan bases in those assets and that high-quality capital represents a significant discount to replacement cost. And for us, replacement cost is the strongest long-term indicator of value in the real estate sector.***

\*       \*       \*

... Let me go to the not-so-good news, and these are some of the challenges we see in today's environment. First of all, as I think all of you are acutely aware, the unsecured debt and equity markets are just not that hospitable to us right now. What's interesting to me is since I know, and ***I hope many of you know our debt is extremely well protected, and I really haven't met anybody who doesn't believe that.*** We believe the dislocation in the debt markets is a technical factor that will correct over time. Part of our job is to spread the message of how safe our balance sheet really is.

\*       \*       \*

And, lastly, I'm going to spend a minute on this, and somewhat concerning to me *is that the overall market is not really differentiating between some of the higher- quality stories out there and frankly some of the lower-quality stories. And I guess I'd put it under the heading of comparing commercial real estate loans to residential structured product is just not a very good comparison. It's a very poor analogy and one that's not supported by the facts at all, but it's something that we're going to have to be fairly diligent in showing people why we're not in those sectors. And so what I'd like to do for you today is really talk a little bit about what we think are the four sectors in the real estate market and really differentiate them.*

Now, the newspapers are never going to quite grasp the difference between the residential and the commercial markets, as well as the whole loan and structured product markets. But I like to think of the real estate umbrella as really these four quadrants, a simple two-by-two matrix, commercial, residential, whole loans and structured products.

\*       \*       \*

*And, as you know, we don't do residential and we don't do structured products. So iStar really is only in that lower left-hand corner.* But I think it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year.

So let's talk about residential and commercial. Residential whole loans, small balances, tends to be an actuarial business. Probably the biggest flaw we've seen in that business over the years is it's a very one-sided business. As a borrower in the home loans sector, you get a free option. If rates fall or your credit improves, you can immediately pay off that loan. If rates rise or your credit actually worsens, you have a below-market loan for as long as 30 years. As a lender, that's not a very interesting proposition.

What we like about the commercial sector is we can underwrite that asset very heavily. Typically, they're less commodity like. And properly structured, we get a fair bet, or sometimes even a better-than-fair bet, where if things go well we can actually make excess returns and things go bad, we have a hammer to actually work with that customer before the problem gets out of hand.

So just looking at the residential versus commercial, we've always felt a better model was the commercial mortgage model. We think you can build a differentiated business model in that sector.

\*       \*       \*

What we try to focus on with people is inside the iStar envelope, with the $15 billion of assets, you don't have any leverage. You own everything. You own from the first dollar up here down to here. *And we think it's a fundamentally different business, it's a different underwriting, and it's so much more safe and so much more secure that these ratings are very misleading.* And we think the structured product issues are things that are almost totally separate and apart. Now, they may have an impact on our core markets, and that's why we spend so much time analyzing those markets and presenting on those markets.

59.     In other words, defendant Sugarman claimed (among other things) that a **substantial correction** (or perhaps, a collapse) in the mortgage/debt markets would **actually benefit iStar** because it would demonstrate the "strength" of iStar's balance sheet.   Defendant Sugarman used the Investor Conference to distinguish iStar from the universe of fly-by-night finance companies that were exposed to, in his view, much greater balance sheet risk.   Stated simply, Sugarman represented that upheaval in the debt markets would separate the wheat (iStar) from the chaff (iStar's peers).   This was a particularly brazen misrepresentation because the market, by that time, had become extremely skeptical of the balance sheet quality of any lender, bank, finance company or mortgage company.

**B.     Defendants Highlight iStar's Loan Portfolio**
**Safety and Risk Management Processes**

60.     During the Investor Conference, defendant O'Connor explained how Defendants understood, conservatively valued, and closely monitored iStar's loan portfolio, stating, in pertinent part:

> The first is our portfolio is very understandable. This is not complicated stuff. We're going to talk about again, in detail, as to how the portfolio breaks down, but this is not black magic. This is simple, straightforward, easy to understand. **It's understandable, and we understand what we have, very important.**
>
> The second piece is the portfolio is underwritable. **We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.**
>
> \*     \*     \*
>
> As we think about the portfolio, we really divide it into three components, three areas, the first being the loan component of the portfolio, our core loan portfolio, if you will. Weighted average loan to value of 67%, a very important statistic for us. I'm going to talk about this throughout my presentation, but a very important statistic.
>
> We view that 67% as creating a 33% cushion between our last dollar of exposure and the value of the underlying collateral. **It provides for a lot of room for things to go wrong and for us to still be okay. So that's a statistic that we monitor closely and we watch on an ongoing basis.** I'm going to talk more about that as I

continue. 78% of our loans, floating rate, 22% fixed rate, 3.2 weighted average maturity. *If, as we step back and think about our loan portfolio, we take into account that we have this embedded cushion by way of our loan to value, conservative position in the capital structure, combined with our on-balance sheet reserves, and the discount I just talked about from Fremont together provide a nice cushion for that portfolio.*

                    *        *        *

Today, condo and condo conversion loans make up a little over 16% of our overall portfolio. *So it's a significant part of our portfolio. It's a part of our portfolio that we understand, we think we understand very well.* We're going to talk about that in much more detail later this afternoon. But as I think about it and try to communicate with you, there's really two pieces of that.

                    *        *        *

I want to step back and talk for a minute about value, because we get asked questions about this a lot and it's the right question. And for those of you that haven't heard the answer before, many of you probably have, I'm going to go through it. *The values that we carry from quarter to quarter are our internal values, not appraisals, not third-parties. It's an internal iStar value where we sit down collectively and say, where would we want to own this asset? So for every loan that we underwrite, we're going to step back and say, where would we own this asset? And that's the value that we attribute to the transaction, not what someone else is telling us, and even moreover, not what the market is telling us.*

Because what we learned over the last 2.5 years, we started to track as loans were either refinanced out of our portfolio, or assets were sold by our borrowers. And *what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values and it's all centered around replacement cost.*

61.    In other words, defendant O'Connor represented, among other things, that Defendants at all times monitored and fully understood the risk in the Company's loan portfolio, and that its "conservative" makeup left plenty of room for error without any material effect on iStar.

62.    Defendant O'Connor then highlighted the Company's portfolio risk management processes, stating, in pertinent part:

> *Well, the first thing we do as a company is we devote a lot of people, a lot of assets and a lot of resources to watching the portfolio. We have 135 people that all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets.* That's all they do. You're going to hear from some of them later today when we go through our panel discussions, but lots of resources, lots of depth, different talent sets and maybe most importantly, people

that have lived through cycles, people that have been through from the early '90s through -- have lived through real estate cycles, so know what it's like when it gets ugly. It's pretty ugly, but we know what it's like when it gets ugly. We've got those people in house, and they're working our assets.

*     *     *

*Our entire risk management process is centered on information gathering and then actually, more important, information sharing within the firm,* because we believe that if we can get the benefit of that information from those 135 bodies on the ground, *that we as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they really become problems. And that's really how we manage the portfolio.*

*     *     *

[W]e risk weight each and every asset on a scale of one to five. One is least risk, five is the most risk, with respect to principal loss. We go through each and every asset. We talk about what's going on in the market, what's going on with the borrower, what's happening, and actually assign a numeric score to each and every investment.

Perhaps not surprisingly, when you step back from that process and look at it, we effectively have a bell curve that distributes risk across the portfolio. If you look at the assets in what we've identified here as the ones and twos, those are assets we don't talk about much, certainly don't talk about much publicly. Those are the assets that we think are most secure in our portfolio, $2 billion. They're performing great.

The assets in the middle, we don't talk about those publicly, either, but I can tell you we talk about those internally a lot, because those are the assets that we are most concerned are moving one way or the other and we've got to keep our eye on them, so we talk about those a lot.

*And then the last piece, the fours and the fives, we obviously talk about them a lot.* We talk about them in our quarterly press releases. We talk about them in our quarterly conference calls, and we identify them and talk about them in a reasonable amount of detail. 92% of our NPL and watch lists are in that four and five bucket. So, like I said, we talk to them a lot to the outside world.

*We talk about them weekly, if not more, inside the Company.* We have weekly meetings, again, the same process that we've had -- my start, from day one since I've been in, we sit and we say what's going on and what can we do about it? And what are we doing about it and how is the borrower reacting and how is the market reacting and what do we do? And that's not a decision that's made by someone sitting in Atlanta or someone that's sitting in San Francisco or someone that's sitting in Dallas. That's a decision that's made jointly with the people that you see here sitting in this room. And what strategy we do and how we do it and how we counter and how we try to fix, isn't left to somebody that's out in the field. *It's done by the senior people in this Company, and I think that's a significant differentiator in our business.*

- 20 -

63.     In other words, defendant O'Connor, among other things, tried to distinguish iStar from its competitors by claiming that the monitoring of the Company's portfolio and risk management process involved the constant and direct involvement of the Company's top insiders.

## C.     Defendants Tout iStar's Credit Quality

64.     During the Investor Conference, defendant O'Connor also touted iStar's purported credit quality, as well as its NPL portfolio and high-risk loans that were placed on the Company's "watch list," stating, in pertinent part:

> I want to talk a little bit about NPLs [Non-Performing Loans] and watch lists over the next several pages. We do have 29 assets on NPL, so 642 investments in the portfolio. We currently have 29 assets on NPL. That's less than 3% of the total assets on our balance sheet.

*      *      *

> Again, as most of you know, we do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists.

*      *      *

> Our watch list assets are performing assets. They're receiving debt service, we are getting paid as agreed, but we as a *management team are concerned and want to do two things. One, we want to flag and show the market, hey, we're concerned about these. Two, we want to flag internally to people, hey, these are assets that we are talking about every week, if not more.* And again, it's in the context of this pie chart, 6% of the total assets are in fact on watch list in the loan portfolio.

> We try to step back and put some of this in perspective. The white box on this page, again, is back to total portfolio, our performing watch list assets and what are our NPLs. The far right column, managed column, that's what we report. Center column, that's what's on our balance sheet, that's what's on our books.

> The only reason why on the bottom here we've shown iStar core portfolio and Fremont legacy portfolios is to point out a couple of things I touched on earlier. One is with respect to the Fremont portfolio, we have marked that portfolio. We marked it as of a couple of months ago and the 18 assets that we talked about earlier, guess what, those assets are up here. Okay, so we're starting from a point where we say we've marked the assets to bring them on the books. We knew they were NPLs when we closed on this transaction. We marked them, they were NPLs, they're NPLs now.

*      *      *

- 21 -

The other reason why I put this up here is if you look at the percentage of NPLs, and again, this is watch lists and NPLs. We underwrote the Fremont transaction. We knew we were going to have plus or minus X number of dollars watch list and X number of dollars NPL. Not a surprise. This is not a surprise to us. *We mentioned on our last earnings call, how is the portfolio performing? It's performing pretty much as expected, pretty much as expected.*

*Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected.*

\*     \*     \*

Okay, lots of press, lots of concern, certainly legitimate concern about certain markets and where are the assets and let's fill into the detail. What we wanted to do is we highlighted five markets, plus or minus, here and to give a sense as to, okay, here's our NPL list and how do they fall in these various markets that people are very concerned about, that we're very concerned about.

\*     \*     \*

So we start, and I would start at the bottom and say, Phoenix, we don't have anything, New York, we don't have anything, Las Vegas, there's not anything on non-performers now. Southern California, one small transactions and then up the west coast of Florida. The west coast of Florida, these transactions in this bucket are primarily Tampa, Clearwater, Sarasota. These are primarily the condo conversion transactions, transactions that we knew about, transactions that are going to be challenging to work through and take time, as Jay suggested, but transactions that we understood going into the deal.

The next page gives you just the same look on a slightly different basis, but it's the same cut with respect to watch list transactions.

*And again, from our perspective, no surprises here, no surprises here, and I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to.*

65.    Defendant O'Connor also claimed that the loss exposure on iStar's loan portfolio was limited, due to three factors: (1) the amount of borrower equity in the Company's portfolio;[3] (2) the percentage of senior loans in the Company's portfolio; and (3) amount of the Company's loan loss reserves.  Defendant O'Connor, stated, in pertinent part:

---

[3] Generally, borrowers' equity refers to the amount of capital a borrower has at risk. The general view is that if the borrower has more equity at risk, the borrower is more apt to work through a financial difficulty than default on a mortgage loan.

I would say we take comfort in three things. One, let's look at how much borrower equity there is in our portfolio. That's kind of the first line of defense. That's going to determine what's the probability that we're going to get nicked, okay? And then the second line of defense is let's look at our position. And we're talking again about senior, secured positions. Historically, senior, secured positions, the severity of loss of those positions is less. It has been, and will be. So borrower equity, first mortgage position, and then if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves. We have $125 million or $124-ish million of on balance sheet reserves.

*     *     *

We've grown that number [loan loss reserve]. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio.

***So if you step back and look at it, we have available to us as kind of a bucket to address these issues, $345 million. It's a lot of money to address issues in the portfolio.***

*     *     *

Okay, try to back up, summarize and have Jay come up here. Started by talking about Fremont, integration's going well, not quite done yet, lots of progress. We have a bigger portfolio today than we had a year ago. We do.

***We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion.*** In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business.

***The good news is, as much as the markets are noticeably worse today, materially worse than they were a year ago, our on-balance sheet reserve, our cushion, is significantly greater than it was a year ago.***

And then lastly, just the point again, lots of unencumbered assets. And then finally, we have what we believe is the right team in what is a very difficult, and we think will be a difficult environment for the next 12 to 24 months. We've got the right team on the ground, process in place, to work our way through this.

## D.  Defendants Highlight iStar's Financial Highlights and Near Term Funding Requirements

66.     During the Investor Conference, defendant Rice highlighted iStar's purported

financial performance and de-emphasized the Company's short-term capital requirements,

stating, in pertinent part:

As you've heard on our third quarter earnings call, we've had solid year-to-date financial performance, with adjusted earnings up 11% and revenues up 45% from the same period in 2006. *We announced 2008 adjusted earnings guidance of $4 to $4.20. And we continued to deliver strong returns at reasonable leverage levels. We announced a 5% increase to our quarterly dividend, which will be payable in the fourth quarter.*

And *due to the increase in income that we're receiving from the Fremont portfolio, we'll be declaring a special dividend in 2007 that should be in the range of $0.15 to $0.30 a share.* Typically, we consider dividend increases in the first quarter. And as you can see on the chart, we have increased our dividends significantly and consistently since we went public in 1998.

*     *     *

We spent a few minutes walking you through on the earnings call our sources and uses of capital through 2008, and we wanted to give you a quick update. This data is as of the end of November. And, as you can see on the left side, funds are available, our sources of capital. We have about $5 billion of regularly scheduled maturities from borrowers and amortization. We tried to be conservative in this estimate, given the fact that many of our borrowers, particularly in the next couple of months, will have a difficult time refinancing our mortgages, given the dislocations in the real estate credit market.

We also have $1.5 billion of capacity on our credit facilities for a total sources of about $6.5 billion. If you look to the right, our financing needs include about $4.4 billion of unfunded commitments. This includes both the Fremont portfolio, as well as the iStar portfolio. As we talked about on the call, a number of these projects are early-stage projects that may or may not get funded over time.

In addition, we have about $2.1 billion of debt maturities in 2008, for a total of $6.5 billion. So, as you can see, assuming no additional investment activity, we have minimal capital raising requirements in 2008.

67.     Following the Investor Conference, analysts trumpeted what Defendants had told

them about the strength of the Company's balance sheet and loan portfolio. For example:

Bear Stearns – December 11, 2007

Investor Day Adds Clarity

- Investor Day. iStar held its second annual investor day last week. The presentation sought to distinguish iStar's business model from other more highly levered companies and structured finance vehicles. *The company also sought to calm concerns regarding the credit quality of the Fremont portfolio, demonstrate its strategic benefits, and address future capital needs.*

Key Banc – December 7, 2007

*We believe SFI has a strong balance sheet*, with more than $15 billion of unencumbered assets, favoring unsecured and secured debt over the collateralized

- 24 -

debt obligation model used by many of its peers. The Company worked hard to achieve investment grade status, but must also comply with the agencies more stringent requirements, including lower leverage. The Company's leverage ratio is 3.25x. SFI anticipates minimal capital raising in 2008 as its sources of cash closely match its needs next year.

***SFI appears to be comfortable with the credit quality of its core portfolio.*** Most of its loans are senior mortgages and the weighted average LTV of the portfolio is 67%. The corporate tenant lease portfolio is viewed as a long-term stable cash flow business, with properties 96% leased and 11.2 years average remaining lease term; 31% are investment grade credits. SFI's assets are well-diversified by location and collateral type. The Company maintains a 135-person risk management team, which is well-tenured with extensive resources. Non-performing loans total $428.7 million, or 3% of total assets.

### The Secondary Offering

68.     Long before the Investor Conference, on or about May 2, 2007, Defendants caused the Company to file a Registration Statement with the Securities and Exchange Commission (the "SEC") in connection with the Secondary Offering.

69.     The Registration Statement was filed on a Form S-3 and offered to sell, over time, common stock, preferred stock, depository shares debt securities, and warrants of the Company. Accordingly, the Secondary Offering was considered to be a "shelf registration" that allowed the Company to register securities for sale while leaving them on the "shelf" until it determined to conduct the offering, provided, however, that the Registration Statement met all the requirements proscribed under applicable securities regulations, including that the information contained therein be current.

70.     The May 2, 2007 Registration Statement was signed by, among others, defendants Sugarman, Rice, Radesca, August, Holman, and Josephs.

71.     On or about October 10, 2007, Defendants caused the Company to file the Prospectus that formed part of the Registration Statement associated with the Secondary Offering.

72.     On or about December 13, 2007, Defendants caused the Company to file the

Prospectus Supplement, which offered 6 million common iStar shares to the public. On or about December 14, 2007, the Registration Statement, which incorporated the Prospectus and the Prospectus Supplement, became effective and at least 6 million shares of iStar common stock were sold at $28.41 per share to the public. On or about December 17, 2007, Defendants amended the Prospectus Supplement to increase the number of common shares offered to the public to 8 million. The total proceeds from the Secondary Offering were in excess of $218 million.

**Defendants' Representations In the Registration Statement Were Materially False and Misleading and Defendants Failed to Disclose Facts Required to be Stated Therein**

73. The Registration Statement (which incorporated the Prospectus and the Prospectus Supplements) issued in connection with the Secondary Offering, signed by Sugarman, Rice, Radesca, August, Holman, and Josephs, contained numerous untrue statements of material fact made by Defendants and Defendants further omitted material information which was required to be disclosed pursuant to the regulations governing the preparation of the Registration Statement.

A. **Failure To Disclose "Material Changes"**

74. As noted above, Defendants filed the Registration Statement on Form S-3, which is a stream-lined registration statement for certain well-capitalized, widely followed issuers. Such issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings -- *e.g.,* Forms 10-K and 10-Q. Pursuant to Instruction 11(a) of Form S-3, an issuer utilizing Form S-3 must disclose "any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of

1934."

75.     Accordingly, an issuer utilizing Form S-3 is required to update the information in its periodic filings including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations," which is required to be disclosed in SEC periodic filings pursuant to Item 303(a) of Regulation S-K.  Under Item 303(a) an issuer is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

76.     Here, in the Registration Statement, Defendants failed to disclose several "material changes" to iStar's continuing operations which were required to be disclosed pursuant to Instruction 11(a).  None of these "material changes" were disclosed in the SEC filings that Defendants incorporated by reference in the Registration Statement and, therefore, the Registration Statement omitted to state material facts required to be stated therein.

**B.      The Material Decline In Debt Security Values**

77.     By the time of the Secondary Offering, the amount of the unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million -- almost 100% since the end of its third quarter, the period ended September 30, 2007.  These increased losses represented more than 20% of all income from continuing operations Defendants reported during the first nine months of 2007.

78.     On or about November 9, 2007, Defendants caused iStar to file its Form 10-Q with the SEC for the third quarter of 2007, the period ending September 30, 2007 (the "Third Quarter 10-Q").  The Third Quarter 10-Q was incorporated by reference in the Registration Statement.

79.     With respect to the iStar's held-to-maturity investments, in the Third Quarter 10-Q, Defendants stated in pertinent part:

> As of September 30, 2007, the carrying value of Other Lending Investment-Securities includes $586.2 million of held-to-maturity investments with an aggregate fair value of $526.9 million and gross unrealized gains and losses of $8.1 million and $67.3 million, respectively.

80.     By the time of the Secondary Offering, however, iStar had suffered a material, incremental unrealized loss on its held-to-maturity investments of approximately $60 million.  In particular, the Company incurred material incremental losses on its undisclosed Linens n' Things ("LNT") and WCI Communities ("WCI") debt securities.

81.     At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy.  In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering.

82.     Defendants knew or should have known that iStar's held-to-maturity investments had experienced a material decline in value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007, because by then the prices of the debt securities of LNT and WCI had traded in the bond market at severely depressed prices for an extended period of time.  Defendants also knew or should have known that applicable accounting standards required that iStar record a charge for the impairment in the value of iStar's held-to-maturity investments during the fourth quarter of 2007.

83.     Indeed, Defendants knew or turned a deliberate blind eye to the following adverse facts about WCI and LNT by the time of the Secondary Offering:

**WCI**

- On November 7, 2007, PrimeNews Wire reported that Jerry Starkey, President and CEO of WCI stated 'this prolonged downturn requires that we continue to assess our overhead and make reductions in order to remain viable through the

trough of this cycle" and that "WCI announced another significant reduction to its workforce in response to continued soft demand in its markets." As a part of this restructuring, iStar combined several lines of business, implemented a net reduction in force of about 575 employees which, when combined with previous reductions in force represented a 46% decline from its 2006 employment level, and its Board of Directors significantly reduce its compensation with six board members agreeing to forego all director compensation.

- On November 8, 2007, The Associated Press reported, "Moody's on Thursday cut its credit ratings on struggling Florida homebuilder WCI Communities Inc. deeper into junk status and suggested they could move even lower as the housing slump worsens. The credit rating agency cut WCI's corporate family rating to Caa2 from B3, and the ratings on its senior subordinated notes to Caa3 from Caa2. Moody's cited WCI's "substantially weaker-than-expected cash flow generation, continued difficulties in complying with bank covenants, accelerating losses and increasing debt leverage."

- November 12, 2007, the shares of WCI trade at a ten year low, declining from more than $20 per share in early 2007 to less than $5 per share at the time of the Secondary Offering.

- On November 15, 2007, WCI Communities Inc reported that EBITDA for its twelve months ended September 30, 2007 was a negative $(62,064,000), compared with a positive EBITDA of $288,411,000 for the comparable year earlier twelve months.

- On November 27, 2007, The New York Sun, reported, "A Banc of America Securities analyst, Daniel Oppenheim, is one of a number of homebuilding analysts who takes a dim view of WCI, which is awash in red ink. In its most recent quarter, WCI reported a loss of $1.66 a share, much greater than Street expectations, in large part due to higher charges. Liquidity issues are likely to increase, Mr. Oppenheim warns, citing a deteriorating cash flow outlook. The company has reported it is not in compliance with its fixed-charged covenant and the analyst expects lenders to be less flexible in renegotiations, given the deterioration in Florida. Even if a favorable income is reached, WCI will have just $210 million in liquidity, which Mr. Oppenheim believes will quickly erode.

- On November 20, 2007, Thomson Financial News reported, "Standard & Poor's Ratings Services lowered its junk corporate credit rating on WCI Communities Inc to 'CCC' from 'CCC+', citing a sharp spike in cancelled contracts to buy the company's luxury high-rise condominiums and the company's need to once again renegotiate the terms of its revolving credit facility. The outlook on WCI remains negative.

- On December 3, 2007, Market News Publishing, Inc., reported "Of the 24 builders Standard & Poor's rates, five are currently in the 'BBB' category, seven are in the 'BB' category, and 10 are in the 'B' category. The other two companies have fallen into the low speculative-grade realm: WCI Communities is rated 'CCC' and TOUSA is rated 'CC'. U.S. homebuilders face an array of challenges at this point in the housing cycle, many of which will likely worsen before they improve. While unit deliveries were up in the

recent fiscal quarter, there's little evidence to suggest that companies will be able to quickly replenish shrinking order backlogs. Additionally, impairment charges were huge in the recent fiscal quarter, as builders wrote off $6 billion on inventory, goodwill, and option deposits as home prices continued to drift lower and absorption slowed."

- In its Form 10-Q for the quarter ended September 30, 2007, WCI disclosed that is was not in compliance with a debt covenant under a revolving credit facility and term loan agreement.

## **LNT**

- On August 15, 2007, Deutsche Bank Securities reiterated its Sell rating on LNT's bonds.

- On October 2, 2007, Fitch Ratings Downgraded LNT as follows: Issuer Default Rating (IDR) to 'CCC' from 'B-'; Asset-based revolver to 'B-/RR2' from 'B+/RR2'; Senior secured notes to 'CCC-/RR5' from 'CCC/RR6'. The Rating Outlook is Stable. The downgrades reflected LNT's continued weak operating performance which has resulted in worsening credit metrics and negative cash flow generation as well as the challenging operating environment and intense competition from other specialty retailers, discounters and department stores in the home furnishings segment.

- On October 15, 2007, Standard & Poor's Ratings Services slashed the corporate credit rating on LNT to 'B-' from 'B' and removed the ratings from CreditWatch, where they had been placed with negative implications on Nov. 17, 2006 and lowered the bank loan rating on the Company's $650 million floating-rate senior secured notes to 'CCC' (two notches below its corporate credit rating). The downgrade was a result of LNTs' "continued weak operating performance and poor profitability and productivity relative to its key competitor" as well as a "very high debt leverage and extremely thin interest coverage." Standard & Poor's also announced that the outlook was negative.

- On November 13, 2007, LNT reported that adjusted EBITDA for the third quarter of 2007, the quarter ended September 30, 2007 was negative ($3) million compared with adjusted EBITDA of positive $21.5 million in the third quarter of 2006, a decrease of $24.5 million.

84.     Defendants also failed to disclose the approximate $60 million incremental unrealized loss on iStar's held-to-maturity investments that constituted a "material change" in the Company's operations.  Since such incremental loss was then having, and would have, a material and unfavorable impact on the Company's operating income, Defendants were required make appropriate disclosures regarding the same in the Registration Statement.

85.     On February 28, 2008, in connection with announcing the Company's financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, Defendants announced, *inter alia*, that the Company recorded a $135 million charge associated with the "impairment of two credits."  The facts and circumstances that caused the Company to take this charge as of December 31, 2007, existed on December 14, 2007, the date of the Secondary Offering, and were, therefore, required to be disclosed in the Registration Statement, but were not disclosed by Defendants.

86.     Further, Defendants blamed the Company's disappointing 2007 fourth quarter financial results on the impairment charge the Company recorded on its held-to-maturity investments.   Accordingly, by Defendants' own admission, the charge iStar recorded in connection with the decline in value of such debt securities negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

C.     **The Material Increase In Loan Losses**

87.     In the Registration Statement, Defendants also failed to disclose that losses in iStar's loan portfolio increased dramatically between September 30, 2007 and the time of the Secondary Offering.

88.     During the fourth quarter of 2007, economic and financial conditions deteriorated significantly.  These trends and events had a material adverse effect on market liquidity generally and the value of iStar's loan portfolio specifically.

89.     During the first nine months of 2007, Defendants caused iStar to record a cumulative $72 million charge against earnings for loan losses.  However, for the fourth quarter of 2007, the last three months of 2007, Defendants caused iStar to record a $113 million charge for loan losses.  This amount exceed the total loan losses Defendants reported during the first

nine months of 2007 combined by *57%* and approximated 40% of the total income Defendants reported from iStar's continuing operations during the first nine months of 2007.

90.     Indeed, Defendants undeniably knew that iStar's loan portfolio had experienced material decline in value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007.  At the Investor Conference, just days before the Secondary Offering, defendant O'Connor represented that Defendants monitored iStar's portfolio risk on a real-time basis, stating, in pertinent part:

> We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis.

91.     Defendants failed to disclose the approximate $110 million incremental increase in iStar's loan loss reserves constituted a "material change" in the Company's operations.  Since such an incremental increase in loan loss reserves was then having, and would have, a material unfavorable impact on the Company's operating income, it was required to be disclosed in the Registration Statement.

92.     On February 28, 2008, in connection with announcing the Company's financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, Defendants announced, *inter alia*, that the Company recorded a $113 million charge associated with an increase in its loan loss reserves.  The facts and circumstances that caused the Company to take this charge as of December 31, 2007 existed on December 14, 2007, the date of the Secondary Offering and were, therefore, required to be disclosed in the Registration Statement, but were not.

Furthermore, Defendants blamed the Company's disappointing 2007 fourth quarter financial results on the charge it recorded on the increase in its loan loss reserves.  Accordingly, by Defendants' own admission, the charge they recorded in connection with the decline in value

of the Company's loan portfolio negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

### D. **Material Decline In Credit Quality**

93.      In the Registration Statement, Defendants also failed to disclose that iStar had a material increase in the amount of its NPLs and watch list assets.

94.      In the Third Quarter 10-Q, which was incorporated by reference in the Registration Statement, Defendants set forth a chart detailing the Company's loan loss reserves, NPLs and watch list assets as follows:

**Risk Management**

*Loan Credit Statistics*—The table below summarizes our non-performing loans and details the reserve for loan losses associated with our loans (in thousands):

| | As of September 30, 2007 | As of December 31, 2006 |
|---|---|---|
| **Non-performing loans** | | |
| Carrying value | $ 428,694 | $ 61,480 |
| Participated portion | 420,020 | — |
| Gross book value | $ 848,714 | $ 61,480 |
| As a percentage of total assets | 5.5% | 0.6% |
| As a percentage of total loans | 8.4% | 1.0% |
| **Reserve for loan losses** | $ 124,201 | $ 52,201 |
| As a percentage of total loans | 1.2% | 0.9% |
| **Watch list loans** | | |
| Carrying value | $ 610,536 | $ 147,800 |
| Participated portion | 485,280 | — |
| Gross book value | $ 1,095,816 | $ 147,800 |

*Non-Performing Loans*—All non-performing loans are placed on non-accrual status and income is recognized only upon actual cash receipt. We designate loans as non-performing at such time as: (1) management determines the borrower is incapable of, or has ceased efforts towards, curing the cause of an impairment; (2) the loan becomes 90 days delinquent; (3) the loan has a maturity default; or (4) the net realizable value of the loan's underlying collateral approximates our carrying value of such loan. As of September 30, 2007, we had 29 non-performing loans with an aggregate carrying value of $428.7 million and an aggregate gross book value of $848.7 million, or 5.5% of total assets. Management believes there is adequate collateral and reserves to support the book values of the loans.

95. By the time of the Secondary Offering, on or about December 14, 2007, the carrying value of iStar's NPLs increased by more than 50% since September 30, 2007 and the carrying value of iStar's watch list assets increased by approximately 100% since September 30, 2007.

96. Defendants knew that between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007, the credit quality of iStar's loan portfolio declined precipitously, causing a sharp spike in the Company's NPLs and watch list assets by the time of the Secondary Offering. In fact, as noted above, just days before the Secondary Offering during, the Investor Conference, defendant O'Connor represented that Defendants inspected the Company's 4 and 5 rated loans (which composed 92% of iStar's NPLs and watch list assets) "every week, if not more."

**E.     Defendants' Misleading Risk Disclosures**

97. Pursuant to Item 3 of Form S-3, the Registration Statement was required to furnish the information pursuant to Item 503 of Regulation S-K [ 17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

98. The Registration Statement incorporated by reference the "Risk Factors" set forth by Defendants in iStar's 2006 Form 10-K. None of these so-called risk disclosures warned of the problems in the Company's corporate loan and debt portfolio then impacting the Company's operations, as Defendants characterized any impairment and credit issues as prospective when, in fact, the Company was then being negatively impacted by the problems. Indeed, the crisis in the U.S. financial markets had increased dramatically from the time Defendants caused iStar to file its 2006 Form 10-K with the SEC and the Secondary Offering in mid-December 2007.

99.     Accordingly, in the Registration Statement, Defendants failed to disclose the most significant factors that made the Secondary Offering risky or speculative as required by Item 3 of Form S-3, including the extent to which deterioration in the economy and financial markets adversely affected the quality of iStar's loan portfolio.

## Defendants Violate GAAP During the Relevant Period

100.    As noted above, the Registration Statement and the Prospectus incorporated by reference the financial statements contained in iStar's 2006 Annual Report on Form 10-K and its 2007 Quarterly Reports on Form 10-Q.  The Company's 2006 Annual Report on Form 10-K was signed by, among others, defendants Sugarman, Rice, Holman, Josephs, McDonald, Puskar, Weber, and August.  The Company's 2007 Quarterly Reports on Form 10-Q were each signed by defendants Sugarman and Rice.

101.    The unaudited financial statements included in the Third Quarter 10-Q were materially inaccurate in that Defendants failed to disclose facts, referred to under Generally Accepted Accounting Principles ("GAAP") as "subsequent events," evidencing the adverse conditions loans that were reasonably likely to have a material effect on the value of certain of the Company's investments in debt securities.  These facts, which were required to be disclosed pursuant to GAAP, were necessary to make the interim financial statements not false and/or misleading.  Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

102.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") AU §411.02.

103.    GAAP, in its Emerging Issues Task Force ("EITF") Topic D-86, provides:

A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

104.    Concerning subsequent events, EITF Topic D-86 makes reference to the American Institute of Certified Public Accountant's ("AICPA") Statement on Auditing Standards ("SAS") No. 1, Subsequent Events (or AU §560), which, in pertinent part, states:

[E]vents or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements. These occurrences hereinafter are referred to as "subsequent events."

The first type [of subsequent event] consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements. . . .

The second type [of subsequent event] consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements. ***Some of these events, however, may be of such a nature that disclosure of them is required to keep the financial statements from being misleading. . . .***

                    *        *        *

When financial statements are reissued, for example, in reports filed with the Securities and Exchange Commission or other regulatory agencies, events require disclosure in the reissued financial statements to keep them from being misleading may have occurred subsequent to the original issuance of the financial statements.

105.    In iStar's financial statements issued in the Third Quarter 10-Q, Defendants falsely represented that "[t]he accompanying unaudited Consolidated Financial Statements have been prepared in accordance with the instructions to Form 10-Q and Article 10-01 of Regulation S-X for interim financial statements." Article 10 of Regulation S-X [C.F.R. §210.10-01.(a)(5)] provides, in pertinent part, that:

- Interim financial information shall include disclosure either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading;

- Disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant; and

- Where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred.

106. Defendants further misrepresented that the interim financial statements were presented in conformity with the requirements of Article 10 of Regulation S-X.

107. As noted above, by the time the Registration Statement was declared effective by the SEC, deteriorating economic and financial conditions had a material adverse effect on the value of iStar's loan portfolio. In fact, between September 30, 2007 and the Secondary Offering, the value of iStar's loan portfolio declined by almost *$170 million*, an amount that wiped out almost 60% of iStar's earnings from its continuing operations during the first nine months of 2007.

108. These material "subsequent events," which Defendants were required to disclose pursuant to GAAP and the requirements of Article 10 of Regulation S-X, were instead omitted from the financial statements incorporated by reference in the Registration Statement and Prospectus.

109. Accordingly, Defendants issued false and misleading representations in the Registration Statement and Prospectus, in which they claimed that the Company's financial statements were presented in conformity with GAAP and Article 10 of Regulation S-X, thereby rendering the Registration Statement materially inaccurate.

110. In addition to the violations of GAAP noted above, the financial statements Defendants incorporated by reference in the Registration Statement were presented in violation of at least the following provisions of GAAP:

a.   The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred. (Statement of Financial Accounting Standard No. 5);

b.   The principle that financial statements disclose certain significant risks and uncertainties. (Statement of Position No. 94-6);

c.   The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (Statement of Concepts ("Concepts Statement") No. 1, ¶34);

d.   The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. (Concepts Statement No. 1, ¶40);

e.   The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (Concepts Statement No. 1, ¶50);

f.   The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶42);

g.   The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (Concepts Statement No. 2, ¶79); and

h.   The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (Concepts Statement No. 2, ¶¶95, 97).

111.   Defendants' failure to incorporate by reference in the Registration Statement financial statements that conformed to the requirements of GAAP and Regulation S-X rendered the Registration Statement materially inaccurate.

**The Truth Emerges**

112.   On February 28, 2008, Defendants caused the Company to issue a press release

announcing its financial results for the fourth quarter of 2007 and full year 2007, the periods

ending December 31, 2007.   For the fourth quarter, Defendants were forced to report that the

Company's financial results were impacted by *$134.9 million of charges associated with the*

*"impairment of two credits" and a $113 million increase in its loan loss provisions*.

113.   These two charges, which totaled approximately a quarter of a billion dollars,

effectively wiped out close to *90%* of the earnings Defendants reported from the Company's

continuing operations during the first nine months of 2007.

114.   In addition, Defendants reported that during the fourth quarter of 2007, the

amount of the Company's NPLs and watch list assets increased by more than 65% and 100%,

respectively.   Defendants' February 28, 2008 press release, stated, in pertinent part:

- *Our quarterly earnings include both increased reserves and mark-to-market impairments, reflecting the impact of the current credit environment on specific investments in our portfolio, as well as the continued stresses in the overall market.*

- Included in fourth quarter earnings were $134.9 million of non-cash charges associated with the impairment of two credits that are accounted for as held-to-maturity debt securities in its Corporate Loan and Debt portfolio. These securities are performing and continue to pay interest. Accounting standards for these securities do not allow for loan loss reserves to be taken on these assets; the standards require that the value be impaired based on a significant drop in market price and on management's current assessment that the decline is other than temporary.

- The Company had $217.9 million in loan loss reserves at December 31, 2007 versus $52.2 million at December 31, 2006. During the fourth quarter, the Company recorded $113.0 million in loan loss provision versus $62.0 million in the prior quarter. The $51.0 million quarter-over-quarter increase reflects the continued deterioration in the overall credit markets and its impact on the Company's portfolio as determined in its regular quarterly risk ratings review process.

- As expected, non-performing loans and watch list assets increased from the prior quarter. On December 31, 2007, the Company had 31 loans on NPL status representing $1.2 billion of gross loan value, compared to 29 loans on NPL status representing $848.7 million of gross loan value in the

prior quarter. At the end of the fourth quarter, the Company had 40 loans on its watch list representing $1.6 billion of gross loan value, compared to 28 loans on its watch list representing $1.1 billion of gross loan value in the prior quarter.

115.    That same day, Defendants held a conference call with securities analysts to discuss iStar's fourth quarter results and operations.  On the conference call, Sugarman and Rice discussed the charges and increases in reserves, stating, in pertinent part, as follows:

Sugarman:

First, on the earnings front, our fourth quarter earnings included two unusual items, $135 million in non-cash impairments in our corporate loan invest portfolio and an increase loan loss provision of approximately $50 million higher than expected.

\*      \*      \*

I would say as just a characterization, the fourth quarter was unusual.

Rice:

Our fourth quarter earnings clearly reflect the impact of the current credit environment on certain of our investments, as well as the continued stress in the overall market. Our adjusted earnings resulted in a loss this quarter of $36.6 million, or a loss of $0.29 per diluted common share.

Included in fourth quarter earnings were $135 million of non-cash charges associated with the impairment of two credits in our corporate loan and debt portfolio.

Excluding the effect of the impairment for these two credits, adjusted earnings for the fourth quarter were $95.4 million or $0.74 per diluted common share.

Let me provide you with some background on the impairments. *We took a non-cash impairment charge totaling $135 million on two credits, which are accounted for as held to maturity debt securities. Both credits are performing and continue to pay interest. The accounting for these securities does not allow loan loss provisions to be taken against them, but requires that the value be impaired based on a significant drop in market value for an extended or other than temporary period of time.*

\*      \*      \*

As we mentioned earlier, we took a relatively conservative stance based on the continued deterioration of the market and the impact we expect it to have on our portfolio. If the increase from our third quarter to our fourth quarter loan loss provision was also excluded, adjusted earnings per share would have been $4.14, in line with our guidance. However, the market has deteriorated somewhat more than we expected over the last quarter, and we believed it was prudent to increase

our loan loss provision accordingly, or by $51 million more than we originally modeled for the fourth quarter.

*       *       *

*[T]o the extent assets in that portfolio trade down significantly on a more than temporary basis, we are acquired to take an impairment based on the market trading.* So that group of assets, as we outlined, is only about $423 million. We took an impairment on two of the six assets in that bucket. And I'm sure you're well aware that the corporate debt market is being subjected to some fairly draconian trading levels at this point. *I think at the end of the quarter we felt, although we're still relatively confident in both of these assets, that we needed to take this impairment based on the market price.*

116.    Immediately following this news and these disclosures on February 28, 2008, the

price of iStar common stock declined by approximately 12%.

117.    During the next few days, iStar's common stock price continued to decline as

analysts downgraded iStar stock, representing, in pertinent part:

Credit Suisse - February 28, 2008

**NPLs Increase Across the Board**

iStar Financial reported a 4Q adjusted EPS loss of $0.29, well below our estimate ($1.07). Credit losses, both asset impairments and higher provisioning, accounted for the lower than expected earnings.

Deutsche Bank - February 28, 2008

**Downgrading to Hold given near-term risks**

We are downgrading iStar to Hold from Buy, as we are concerned about near-term market deterioration resulting in continued elevated loss provisions. We believe these elevated loss provisions as well as increasing nonperforming loans could result in depressed earnings during the next few quarters.

*       *       *

Given the expectation of lower near-term earnings, management reduced 2008 adjusted earnings guidance to $3.50 to $4.00 per share from $4.00 to $4.20 per share.

Deutsche Bank - February 29, 2008

**Disappointing 4Q results and 2008 guidance**

We are reducing our 2008 estimate and price target after disappointing 4Q results. While we expect book value and the current yield to provide support for shares, our Hold rating reflects our belief that near-term upside is unlikely given concerns

- 41 -

regarding loss provisions and increasing NPLs. While our new target is $26.50 per share, we believe our Hold rating is appropriate given near-term risks.

*    *    *

**Reducing price target to $26.50 per share from $42 per share**

While our prior target was based on applying a 10x multiple to our 2008 adjusted earnings estimate, our new price target is based on applying a 7x multiple to our new 2009 adjusted earnings estimate. Given the near-term concerns (loss provisions and NPLs) and reduced visibility for our out year estimate, we believe a 7x multiple is appropriate. Historically, iStar has traded in a range of 6-13x forward adjusted earnings. While our target represents upside from the recent close price, we believe current risks limit near-term upside warranting a Hold rating.

118.    On March 5, 2008 Citibank issued a downgrade on iStar stock, which was quickly followed by a Smith Barney downgrade on March 6, 2008.

119.    Following Defendants' admissions regarding the impairment charges and increase in loan loss reserves, the price of iStar's common stock closed at $13.98, less than half of the price it sold for in the Secondary Offering and its closing high during the Relevant Period.

120.    In its Form 10-K for the year ended December 31, 2007, the period that concluded just ten additional business days from the time of the Secondary Offering, Defendants disclosed that the Company recorded a charge for impairment of two credits, materially increased loan loss reserves and that the value of it NPLs and watch list assets increased dramatically. The Form 10-K, stated, in pertinent part:

> *During the fourth quarter, we took a $134.9 million non-cash impairment charge on two of our credits accounted for as held-to-maturity debt securities that have traded well below our carrying value.*
>
> *In addition, based on increased risks in our loan portfolio, including those associated with the Fremont acquired loans, as well as the deterioration in economic and financial conditions, we had provisions for loan losses of $185.0 million during the year, versus $14.0 million in 2006 and $2.3 million in 2005. With the addition of the Fremont portfolio, we had material increases in our watch list and non-performing loans.* Our total loss coverage, defined as the combination of loan loss reserves and the remaining purchase discount on the acquisition, was $384.8 million or 3.6% of total loans, at the end of the year. *The impairments and additional loan loss reserves negatively impacted our return on common book equity and our adjusted return on common book equity this year.*

- 42 -

121.    As a result of Defendants' breaches of fiduciary duty, the price of the Company's stock has never recovered and currently trades for under $5.50 per share -- a plummet of over *80%* since February 2008.

### Defendant Radesca Supposedly "Resigns" Immediately Following the Bad News

122.    On March 6, 2008, the Board disclosed that it permitted one of the chief culprits responsible for the Company's problems to "resign."  Specifically, Defendants revealed that defendant Radesca, iStar's CAO, had "resigned" from the Company, effective February 29, 2008, which was only one day after the truth about the Company's problems was revealed.

123.    Upon information and belief, defendant Radesca was eligible to collect severance payments and/or other valuable benefits as provided for in his employment and/or severance agreements if he "resigned," but not if he was terminated "for cause."   The timing of Radesca's resignation -- which occurred just one day after the disclosure of the Company's problems -- strongly supports the inference that the Board did not conduct any true investigation into his conduct.  After all, how can a complex investigation be completed in one day?  Thus, to the extent that that the Board may have been unaware of Radesca's conduct as it was occurring, the Board, in effect, blessed Radesca's conduct on a whim, without the benefit of any *ex post* analysis.

124.    The Board's decision to permit defendant Radesca to "resign" is particularly offensive given that Judge Sullivan has now found *indicia* that defendant Radesca engaged in a scheme to defraud iStar's investors.  Thus, the Board quickly provided a generous severance package to Radesca, who is now being indemnified with Company funds, without investigating

his conduct.[4]   Accordingly, it is clear that the Board's decision to permit defendant Radesca to resign lacked good faith and, thus, was not a proper exercise of its business judgment.

**Defendant O'Connor Supposedly "Retires" Shortly After the Filing of the Securities Action**

125.   On July 2, 2008, the Board disclosed that it permitted another one of the chief culprits responsible for the Company's problems to walk away unscathed.   Specifically, Defendants revealed that O'Connor, iStar's longtime Executive Vice President and COO, had "retired" (for all intents and purposes, a "resignation") effective June 30, 2008 -- only about four months after the truth about iStar's problems were revealed, and only about six weeks after O'Connor was named as a defendant in the Securities Action and alleged to have participated in a scheme to defraud iStar's investors.

126.   Upon information and belief, defendant O'Connor was eligible to collect severance payments and/or other valuable benefits as provided for in his employment and/or severance agreements if he "retired" or "resigned," but not if he was terminated "for cause."   As with Radesca, there is no public record that the Board conducted any true investigation of O'Connor's Relevant Period conduct.   In fact, based on the dilatory refusal of the Vancil Demand, the reasonable inference is that the Board did not investigate O'Connor's conduct, in effect, like Radesca, ratifying it after the fact.

127.   The Board's decision to permit defendant O'Connor to "retire" or "resign" is particularly offensive given that Judge Sullivan has now found *indicia* that defendant O'Connor engaged in a scheme to defraud iStar's investors.   Once again, similar to Radesca, the Company

---

[4] Typically, when an executive of a public company resigns or retires, that executive enters into an agreement pursuant to which the executive, *inter alia,* is released from certain claims and further releases the Company and/or its board of directors and members of senior management from certain claims and agrees not to disparage the Company and/or the board of directors and members of senior management.   Here, upon information and belief, it has not been disclosed in iStar's public filings whether Radesca executed such a release in connection with his "resignation."

is now forced to indemnify O'Connor, a substantial obligation it assumed without the benefit of investigation.[5]    Accordingly, it is clear that the Board's decision to permit defendant O'Connor to retire or resign lacked good faith and, thus, was not a proper exercise of its business judgment.

128.    As set forth herein, the Board's response to the Vancil Refusal mirrored its handling of Radesca and O'Connor's departures from the Company.

### Defendant Rice "Retires" and Receives a "Special Compensation Payment"

129.    Defendant Rice retired from the Company on March 6, 2009.  According to the Company's proxy, filed with the SEC on April 23, 2010, the Board awarded defendant Rice a "special compensation payment" in 2009 of $1 million due to, among other things, "her many years of valuable service as our chief financial officer."  Of course, approximately a year before she purportedly "retired," Rice was named as a defendant in the Securities Action and alleged to have participated in a scheme to defraud iStar's investors, and over eleven months before the Board disclosed that it had awarded Rice the "special compensation payment," the Vancil Demand alleging that Rice breached her fiduciary duties and otherwise committed violations of law was issued upon the Board.  Nonetheless, the Board accepted her retirement without investigation, which caused her entitlement to a lucrative severance package.

130.    The Board granted defendant Rice a special $1 million compensation payment despite causing iStar to be over-exposed to the risky loans and investments detailed herein. Further, defendant Rice was also responsible for issuing and approving numerous false and misleading statements in iStar's public filings and releases.  There is no public record that the

---

[5] Typically, when an executive of a public company resigns or retires, that executive enters into an agreement pursuant to which the executive, *inter alia*, is released from certain claims and further releases the Company and/or its board of directors and members of senior management from certain claims and agrees not to disparage the Company and/or the board of directors and members of senior management.  Here, upon information and belief, it has not been disclosed in iStar's public filings whether O'Connor executed such a release in connection with his "retirement."

Board investigated Rice's Relevant Period conduct, and once again, the cursory refusal of the Vancil Demand strongly supports the inference that the Board was unwilling to investigate her.

131.    The Board's decision to permit defendant Rice to "retire" and to pay her a $1 million special compensation payment in 2009 is particularly offensive given that Judge Sullivan has now found *indicia* that defendant Rice engaged in a scheme to defraud iStar's investors. Now, similar to Radesca and O'Connor, the Company is now forced to indemnify Rice and in addition, the Board has approved a $1 million "special compensation" award, substantial obligations the Company assumed without the benefit of investigation.[6]   Accordingly, it is clear that the Board's decisions to permit defendant Rice to retire and to award her a $1 million special compensation payment lacked good faith and, thus, were not proper exercises of its business judgment.

132.    As set forth herein, the Board's response to the Vancil Refusal mirrored its handling of Radesca's O'Connor's, and Rice's departures from the Company.  With respect to these departures, the Board has granted valuable severance packages (and quite possibly, releases) to these defendants without legitimate inquiry, and in Rice's case, paid her a $1 million special bonus that she was not entitled to under the terms of her employment contract.

133.    Notably, the Board made its decisions to permit O'Connor and Rice to "retire" after the Securities Action was commenced, and its decision to award Rice a $1 million special compensation payment after the Vancil Demand was issued.

---

[6] Typically, when an executive of a public company resigns or retires, that executive enters into an agreement pursuant to which the executive, *inter alia,* is released from certain claims and further releases the Company and/or its board of directors and members of senior management from certain claims and agrees not to disparage the Company and/or the board of directors and members of senior management.  Here, upon information and belief, it has not been disclosed in iStar's public filings whether Rice executed such a release in connection with her "retirement."

**The Securities Action**

134.   Beginning on April 15, 2008, the Company became the subject of several similar class action securities fraud lawsuits pending in this Court, which were ultimately consolidated on November 17, 2008 as the Securities Action. The "Class Period" in the Securities Action has been defined as December 6, 2007 until March 6, 2008.

135.   The individual defendants to the Securities Action -- Sugarman, Radesca, Rice, and O'Connor -- are also defendants to the instant shareholder derivative action.

136.   On March 26, 2010, Judge Sullivan issued an opinion denying in substantial part the defendants' motions to dismiss the Securities Action. In his opinion, Judge Sullivan issued a number of findings concerning certain conduct which is also alleged herein by Plaintiff. Among the findings by Judge Sullivan are that the plaintiffs to the Securities Action sufficiently alleged, *inter alia*, that:

> a.   Defendants omitted from their disclosures that by the time of the Secondary Offering, *iStar had suffered additional losses of $60 million on its held-to-maturity investments;*
>
> b.   Defendants omitted from their disclosures that by the time of the Secondary Offering, *iStar was suffering additional losses in its loan portfolio, such that it would need to record a $113 million charge associated with an increase in its loan loss reserves at the end of the quarter;*
>
> c.   Defendants omitted from their disclosures that by the time of the Secondary Offering, *the carrying value of iStar's non-performing loans had increased by more than 50%, and the carrying value of its watch list assets had increased by approximately 100%;*
>
> d.   *Defendants' following statements were false or misleading: (i) that iStar's debt was "extremely well protected," (ii) that the loan portfolio had "a lot of room for things to go wrong and for us to still be okay," (iii) that the loan portfolio was "performing pretty much as expected," and (iv) that iStar anticipated 2008 earnings of $4.00 to $4.20 per share;* and
>
> e.   *Defendants acted with scienter*, especially in light of the allegations that, *inter alia*, Defendants commenced an "Investors Day conference" with only sixteen business days remaining in the fourth quarter of 2007 and that they needed to conceal iStar's deteriorating

performance so that the Company would be able to secure financing and maintain an investment-grade credit rating.

137.   In other words, Judge Sullivan found *indicia* that defendants Sugarman, Radesca, Rice, and O'Connor were engaged in a scheme to defraud iStar's investors.

138.   Significantly, Judge Sullivan reached each the above conclusions notwithstanding the significantly heightened pleading standards imposed upon the plaintiffs to the Securities Action by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[7]

### The Vancil Demand

139.   As a result of Defendants' actions during the Relevant Period, Vancil, a stockholder of iStar who is represented by Robbins Umeda, issued the Vancil Demand upon the Board on or about June 1, 2009 to "investigate and remedy the violations of law described [therein] as required by Federal Rule of Civil Procedure Rule 23.1 and Maryland law." *See Vancil* Complaint, ¶130.

140.   On June 15, 2009, the Company's General Counsel and Secretary, Dugan, sent a letter to Robbins Umeda indicating that the Board would purportedly "conduct a reasonable and good faith investigation" in response to the Demand. *Vancil* Complaint, ¶131.

---

[7]   The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and *scienter*. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002). To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed. *Id.* at 1085. With respect to pleading *scienter*, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind. 15 U.S.C. § 78-u4(b)(2). The inference of *scienter* must be more than merely reasonable – it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 127 S. Ct. 2499, 2502 (2007). Notably, the PSLRA's heightened pleading standards do not apply to the instant shareholder derivative action.

141.   On June 26, 2009, Robbins Umeda wrote a letter to Dugan seeking additional information regarding the Board's purported investigation. *Vancil* Complaint, ¶132.  Among other things, Robbins Umeda inquired as whether the Board delegated its purported investigation to a sub-committee (and if so, who the directors of such subcommittee were and how they were selected), how the purported investigation would be documented, and whether the Board had set a schedule or deadline within which the investigation would be completed.  *Id.*  The Board, however, refused to provide further information.  *Id.*

142.   On July 10, 2009, Robbins Umeda received a letter from counsel purporting to represent the Special Committee, which was apparently charged with investigating the Demand. *Vancil* Complaint, ¶133.  Later, on September 9, 2009, Robbins Umeda received another letter from counsel for the Special Committee, in which counsel for the Special Committee characterized Vancil as a "busybody," stated that the Demand merely "serves a notice function," and stated that the Securities Action provided the Board with "notice" of Vancil's "grievances" before the Board received the Demand.  *Vancil* Complaint, ¶138.  Thus, according to the Special Committee, the Demand was "redundant notice," thus, presumably rendering it uneccesary.  *Id.* In other words, the Special Committee claimed that the Vancil Demand was superfluous and unnecessary because the Board was already on notice of the allegations therein.

143.   In the September 9, 2009 letter, counsel for the Special Committee also asserted that the Company's "engage[ment] of very competent counsel to address" the Securities Action was a sufficient and appropriate response to the "notice" of the issues underlying the Securities Action and the Demand.  *Id.*  This was an unequivocal statement that the Special Committee and the Board could simply ignore the Vancil Demand because of the pendency of the Securities Action.

144.     Finally, on November 23, 2009, the Special Committee, through its counsel, informed Robbins Umeda that the Board may "ignore the demand...if, in the exercise of its good faith judgment, the circumstances indicate that the corporation's interests would be served thereby." *Vancil* Complaint, ¶140. The only "circumstances" cited by the Special Committee as justifying its determination to ignore and refuse the Demand were Vancil's refusal to provide extensive proof that she had standing to sue derivatively[8] and iStar's retention of purportedly "very competent counsel" to represent the Company and its officers and directors in the Securities Action. *Id.*

145.     This was a refusal of the Vancil Demand, and it lacked good faith  because the Board did not truly consider its merits, or conduct any true investigation. Upon information and belief, and based on the Company's financial filings, the Board and Special Committee still have not conducted any true investigation into the allegations of this Complaint or the Vancil Demand, and the reason why is clear -- the directors on the Board refuse to investigate their own conduct, or that of the Company's current and/or former officers.

146.     This inference is supported by the Board's conduct with respect to the departures from the Company of Radesca, O'Connor and Rice. In each instance, the Board granted lucrative severance packages (and in Rice's case, a $1 million "special award") to these defendants without any true investigation of their Relevant Period conduct.[9] The Company now must indemnify each of these defendants in the Securities Action.

---

[8] In fact, Robbins Umeda provided counsel for the Special Committee with a brokerage statement reflecting its client's ownership of iStar stock. *Vancil* Complaint, ¶135.

[9] Moreover, as explained above, upon information and belief, each of these individuals may also have executed mutual releases which ran to their benefit and that of the Board, as executives of public companies typically execute upon resigning or retiring.

147.    Clearly, the refusal of the Vancil Demand, which was apparently made without any substantive analysis or investigation of the allegations and issues raised in the Vancil Demand, coupled with the Board's and/or Special Committee's failure to revisit and re-evaluate the Vancil Demand in the wake of the recent findings in the Securities Action, would give a reasonable stockholder reason to believe that the Board would not consider a pre-suit demand in good faith and within the ambit of the business judgment rule. The refusal of the Vancil Demand occurred before this action was initiated.

## DERIVATIVE AND DEMAND ALLEGATIONS

148.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

149.    Plaintiff brings this action derivatively in the right and for the benefit of iStar to redress the breaches of fiduciary duty and other violations of law by Defendants.

150.    Plaintiff will adequately and fairly represent the interests of iStar and its shareholders in enforcing and prosecuting its rights, and he has retained counsel experienced in litigating actions of this sort

151.    The Board currently consists of the following eight (8) directors: defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, Reiss, and Weber. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

        a.    Demand is excused as in light of the Board's shocking response (or lack thereof) to the Vancil Demand. In particular, the Board's and/or Special Committee's refusal of the Vancil Demand, and its explanations for doing so -- characterizing Vancil as a "busybody," claiming the Vancil Demand was "redundant," and further claiming that the supposed retention of "very competent counsel" to defend the Securities Action was somehow a complete and appropriate response to the Vancil Demand, plainly illustrates the Board's hostility to a pre-suit demand based on the allegations set forth herein. Moreover, the Board and/or

Special Committee has failed to revisit and re-evaluate the Vancil Demand in the wake of the recent findings in the Securities Action, which include Judge Sullivan's ruling that the plaintiffs adequately alleged fraud against Radesca, O'Connor, and Rice, all of whom were allowed to "resign" or "retire" from the Company with their valuable severance, without any Board investigation into their Relevant Period conduct. Accordingly, a reasonable stockholder would not believe that the Board could have considered a pre-suit demand in good faith and within the ambit of the business judgment rule. Thus, demand is excused.

b. During the Relevant Period, defendants Holman, Josephs, and Puskar served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the adequacy of the Company's internal controls and reviewing the integrity of the Company's financial statements. Further, pursuant to the Audit Committee Charter, members of the Audit Committee are responsible for reviewing and approving the Company's credit loss reserve policy, and reviewing earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies. Defendants Holman, Josephs, and Puskar breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures (which this Court found were sufficiently alleged to have been false and misleading) and failed to ensure that adequate internal controls were in place. Defendants Holman, Josephs, and Puskar further breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee reviewed and approved the Company's credit loss reserve policy, which was clearly inadequate. Moreover, defendants Holman, Josephs, and Puskar breached their fiduciary duties by allowing or permitting false and misleading financial information to analysts and rating agencies, including, but not limited to, Defendants' representations at the Investor Conference, which this Court also found were sufficiently alleged to have been materially false and misleading. Therefore, defendants Holman, Josephs, and Puskar each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

c. The principal professional occupation of defendant Sugarman is his employment with iStar as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. For example, in 2007 defendant Sugarman's salary, bonus, and other compensation totaled $6,684,713, and in 2008, defendant Sugarman's salary, bonus, and other compensation totaled $5,400,708. Thus, defendant Sugarman lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

d. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber are interested because they engaged in conduct which is not protected by the

business judgment rule in connection with their decision to allow defendant Radesca to resign, when they had grounds to terminate him "for cause." Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber clearly had grounds to terminate Radesca for cause and instead they allowed him to resign, essentially bestowing gifts on him pursuant to the terms of his employment and/or other agreements with the Company, which was a waste of corporate assets. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber's decision to permit defendant Radesca to resign is not a protected business judgment, and thus Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber could not reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule. Moreover, a stockholder would not reasonably expect the Board to respond to a demand against Radesca in good faith and within the ambit of the business judgment rule because the Board blessed Radesca's conduct without the benefit of any *ex post* analysis, and in response to the Vancil Demand, claimed to be on notice of such conduct but has nonetheless failed to investigate. Such conduct has now been found to have been adequately alleged to have been part of a fraudulent scheme. Thus, demand is excused;

e. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber are interested because they engaged in conduct which is not protected by the business judgment rule in connection with their decision to allow defendant O'Connor to "retire," when they had grounds to terminate him "for cause." Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber clearly had grounds to terminate O'Connor for cause and instead they allowed him to retire (or effectively resign), essentially bestowing gifts on him pursuant to the terms of his employment and/or other agreements with the Company, which was a waste of corporate assets. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber's decision to permit defendant O'Connor to resign is not a protected business judgment, and thus Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber could not reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule. Moreover, a stockholder would not reasonably expect the Board to respond to a demand against O'Connor in good faith and within the ambit of the business judgment rule because the Board blessed O'Connor's conduct without the benefit of any *ex post* analysis, and in response to the Vancil Demand, claimed to be on notice of such conduct but has nonetheless failed to investigate. Such conduct has now been found to have been adequately alleged to have been part of a fraudulent scheme. Thus, demand is excused; and

f. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber are interested because they engaged in conduct which is not protected by the business judgment rule in connection with their decision to allow defendant Rice to "retire," when they had grounds to terminate her "for cause." Further, defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber awarded defendant Rice a "special compensation payment" of $1 million despite

the fact that she was arguably the chief culprit responsible for the Company's problems. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber clearly had grounds to terminate Rice for cause and instead they allowed her to retire, essentially bestowing gifts on her pursuant to the terms of her employment and/or other agreements (including the "special compensation payment") with the Company, which was a waste of corporate assets. Defendants Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber's decision to permit defendant Rice to retire and to award her a "special compensation payment" of $1 million is not a protected business judgment, and thus Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber could not reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule. Moreover, a stockholder would not reasonably expect the Board to respond to a demand against Rice in good faith and within the ambit of the business judgment rule because the Board blessed Rice's conduct without the benefit of any *ex post* analysis, and in response to the Vancil Demand, claimed to be on notice of such conduct but has nonetheless failed to investigate. Such conduct has now been found to have been adequately alleged to have been a fraudulent scheme. Thus, demand is excused.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that iStar disseminated accurate, truthful and complete information to its shareholders.

154.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to iStar shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

155.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary

duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

156.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

157.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

158.    Defendants willfully ignored the obvious and pervasive problems with iStar's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

159.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.    Defendants owed and owe iStar fiduciary obligations.    By reason of their fiduciary relationships, Defendants specifically owed and owe iStar the highest obligation of good faith, fair dealing, loyalty and due care.

162.    Defendants, and each of them, violated and breached their fiduciary duties of

care, loyalty, reasonable inquiry, oversight, good faith and supervision.

163.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, iStar has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

164.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

165.   Plaintiff, on behalf of iStar, has no adequate remedy at law.

## COUNT IV

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

166.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of iStar.

168.   Plaintiff, as a shareholder and representative of iStar, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V

### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

169.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence iStar, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing iStar to misrepresent material facts

regarding its financial position and business prospects.

171.    As a direct and proximate result of Defendants' abuse of control, iStar has sustained significant damages.

172.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

173.    Plaintiff, on behalf of iStar, has no adequate remedy at law.

### COUNT VI

### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    Defendants had a duty to iStar and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of iStar.

176.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of iStar in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of iStar's affairs and in the use and preservation of iStar's assets.

177.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused iStar to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to iStar, thus breaching their duties to the Company.  As a result, Defendants

grossly mismanaged iStar.

## COUNT VII

### AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

178.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.   As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused iStar to incur (and iStar may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

180.   As a result of this waste of corporate assets, Defendants are liable to the Company.

181.   Plaintiff, on behalf of iStar, has no adequate remedy at law.

## COUNT VIII

### AGAINST DEFENDANTS SUGARMAN, AUGUST, HOLMAN, JOSEPHS, MCDONALD, PUSKAR, AND WEBER FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH RADESCA'S RESIGNATION

182.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.   Each director on the Board was required to act with the utmost loyalty and good faith to the Company.  As alleged in detail herein, each director violated these core duties by allowing Radesca to "resign" even though they had grounds to terminate him for cause.

184.   As a direct and proximate result of the Board's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT IX**

**AGAINST DEFENDANTS SUGARMAN, AUGUST, HOLMAN, JOSEPHS, MCDONALD, PUSKAR, AND WEBER FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH O'CONNOR'S RETIREMENT**

185.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.   Each director on the Board was required to act with the utmost loyalty and good faith to the Company.  As alleged in detail herein, each director violated these core duties by allowing O'Connor to "retire" or "resign" even though they had grounds to terminate him for cause.

187.   As a direct and proximate result of the Board's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT X**

**AGAINST DEFENDANTS SUGARMAN, AUGUST, HOLMAN, JOSEPHS, MCDONALD, PUSKAR, AND WEBER FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH RICE'S RETIREMENT**

188.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.   Each director on the Board was required to act with the utmost loyalty and good faith to the Company.  As alleged in detail herein, each director violated these core duties by allowing Rice to "retire" and awarding her the $1 million "special compensation payment" detailed herein even though they had grounds to terminate her for cause.

190.   As a direct and proximate result of the Board's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing iStar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to iStar restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 28, 2010

**HARWOOD FEFFER LLP**

BY: ![signature]

ROBERT I. HARWOOD
JEFFREY M. NORTON
488 Madison Avenue
New York, NY 10022
Telephone (212) 935-7400
Facsimile: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2677
Facsimile:  (610) 225-2678
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jjc@weiserlawfirm.com

*Counsel for Plaintiff*

## ISTAR FINANCIAL, INC. VERIFICATION

I, James Kautz, hereby verify that I am familiar with the allegations in the Verified Amended Shareholder Derivative Complaint, and that I have authorized the filing of the Verified Amended Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 6/21/2010

James Kautz

# EXHIBIT
# A

**10 CIV 3428**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

ADDIE VANCIL, Derivatively on Behalf of
ISTAR FINANCIAL INC.,

           Plaintiff,

vs.

JAY SUGARMAN, ROBERT W. HOLMAN,
JR., ROBIN JOSEPHS, GEORGE R. PUSKAR,
JOHN G. MCDONALD, JEFFREY A. WEBER,
GLENN R. AUGUST , DALE ANNE REISS ,
CATHERINE RICE, NICHOLAS A.
RADESCA, and TIMOTHY J. O'CONNOR,

           Defendants,

-and-

ISTAR FINANCIAL INC., a Maryland
corporation,

           Nominal Defendant.

------------------------------------------------------------- X

:  Civil Action No.

:

:

:  VERIFIED SHAREHOLDER DERIVATIVE
:  COMPLAINT FOR BREACH OF
:  FIDUCIARY DUTY, WASTE OF
:  CORPORATE ASSETS, AND UNJUST
:  ENRICHMENT

DEMAND FOR JURY TRIAL

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of iStar Financial, Inc. ("iStar" or the "Company"), on behalf of the Company against certain of its officers and directors. This action seeks to remedy defendants' violations of state law including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, which have caused substantial monetary losses to iStar and other damages, such as to its reputation and goodwill. Plaintiff has made a litigation demand upon iStar's board of directors (the "Board"). The Board has wrongfully ignored and refused plaintiff's demand.

2.     Defendant Jay Sugarman ("Sugarman") founded iStar, a real estate investment trust focused on commercial real estate and commercial mortgage financing, in 1993. He installed himself as the Company's Chief Executive Officer ("CEO"), Chairman of the Board, and public face. A graduate of Princeton University and the Harvard Business School, Sugarman presents himself as smarter than the market. His carefully crafted biography reminds investors that he received the Harvard Business School's academic prizes for both finance and marketing. Sugarman markets his finance ventures largely on the basis of self-promotion. iStar is no exception. According to Sugarman, who quotes himself on iStar's website, "One of our competitive strengths is a ***proven ability to see out ahead of markets and position our company to take advantage*** of opportunities that are less apparent to the broader investment community."

3.     In 2007, the overheated United States real estate and credit markets began their precipitous and inexorable collapse. For instance, Countrywide Financial Corp. ("Countrywide"), one of the Nation's largest mortgage originators, reported in the second quarter of 2007 that nearly 25% of its nonprime loans were delinquent. Countrywide explained in its July 24, 2007, press release that "delinquencies and defaults continued to rise across all mortgage product categories." On March 13, 2007, GMAC LLC's mortgage unit, Residential Capital LLC, announced huge losses of $631 million for the fourth quarter of 2006. By the third quarter of 2007, several of world's

- 1 -

largest banks had announced massive, multi-billion dollar write-downs of mortgage related assets, reflecting the free fall in the real estate markets. Citigroup announced $11 billion, UBS Financial Services recorded $10 billion, and Merrill Lynch reported $8 billion in write-downs.

4.    Heedless of the risks, Sugarman and his management team caused iStar to acquire the $6.27 billion commercial real estate loan portfolio and commercial real estate lending business of Fremont Investment & Loan ("Fremont") from Fremont General Corporation. Fremont's loan portfolio was riddled with billions of dollars worth of poorly collateralized construction loans and funding commitments to speculative condominium developments in some of the Nation's most overheated real estate markets, including Atlanta, Phoenix, and Southern California. On March 2, 2007, the Federal Deposit Insurance Corporation (the "FDIC") entered into a cease and desist agreement with Fremont General, finding that it had operated "with inadequate underwriting criteria"; "without an accurate rigorous and properly documented methodology concerning its allowance for loan and lease losses"; "with a large volume of poor quality loans"; "[with] unsatisfactory lending practices"; and had made "mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms[.]" But Sugarman thought he knew better and could outsmart the markets. He was disastrously wrong. As speculators vanished from the market and demand collapsed, condominium and commercial real estate developers stopped paying and later defaulted on their loans *en masse*. Confidence in the value of the collateral securing mortgage-backed securities collapsed, cutting off the spigot of easy credit. Housing-related businesses faltered, as well, resulting in deep ratings cuts and jeopardizing income streams from iStar's massive investments in their debt securities. Rather than shield the Company from the worst excesses of the overheated real estate markets, as they told shareholders they had done, Sugarman's management team had exposed iStar to the full force of the devastating market correction.

5.    But Sugarman would not forthrightly disclose the disastrous consequences of the Fremont acquisition or the material deterioration of credit quality in iStar's portfolio of loans and debt securities. Having sold himself and his management team as better informed and smarter than their competitors, Sugarman could not bring himself to tell the truth. Sugarman and his team, with

- 2 -

the knowing acquiescence of the Board, repeatedly published misleading statements about the iStar management team's purportedly unique ability to steer iStar clear of the riskiest real estate loans and to maintain the credit quality of iStar's loan portfolio.

6. Fully aware of the mounting crisis the Fremont assets created for iStar's balance sheet and the impact of the broader market meltdown on the credit quality of iStar's loan portfolio, rather than disclose the true state of iStar's finances and future challenges, Sugarman and his team set out to buttress the Company's cash reserves through debt and share offering at prices inflated by false information. Although defendants announced in May 2007 that the offering would replace a bridge facility used to fund the Fremont acquisition, they soon learned that iStar would need the cash just to survive the downturn and to fund the enormous reserves required under Generally Accepted Accounting Principals ("GAAP") to address the collapsing credit quality in its loan portfolio. Despite numerous opportunities to correct the record in the several amendments of the various registration statements and proxies that were published from May 2007 until the day of the December 12, 2007 offering (the "Secondary Offering"), Sugarman and his team repeatedly misled shareholders, withholding the material decline in the Company's debt security values, the drastic increase in loan losses, the substantial drop in the credit quality of the Company's loan portfolio, and the fact that iStar was disastrously under-reserved to cope with probable loan losses. The failure to build proper loan loss reserves permitted Sugarman and his team to substantially overstate iStar's earnings through the Secondary Offering.

7. Sugarman and his team affirmatively misled investors in order to ensure the success of the Secondary Offering, in hopes that the cash would permit them to ride out the market downturn without having to disclose the truth about iStar's disastrous financial condition. At the Company's December 6, 2007, Investors Day Conference held just six days before the Secondary Offering, Sugarman and his Chief Financial Officer ("CFO"), Catherine Rice ("Rice"), and Chief Operating Officer, Timothy O'Connor ("O'Connor"), affirmatively misrepresented iStar's "balance sheet strength," the credit quality of its loan portfolio, and its financial performance, while discounting the

- 3 -

effect of the housing market downturn on the Company. Defendants falsely assured investors and shareholders that, *inter alia*:

- iStar's debt was "extremely well protected,"

- iStar's loan portfolio had "a lot of room for things to go wrong and for us to still be okay," and

- the portfolio was "performing pretty much as expected ... no surprises."

8.     On February 28, 2008, just two months after the Secondary Offering, defendants disclosed a $134.9 million write-down of the Company's corporate loan and debt portfolio and a $113 million increase to the Company's loan loss provision.     The write-down and loan loss contributed to a $78.7 million loss. This disclosure revealed that the Company's portfolio was not performing as expected, the credit quality of the debt the Company held was drastically overstated, and iStar's loan loss reserves had been materially understated given the deteriorating condition of its loan portfolio. These facts were known to defendants well before the Secondary Offering was completed on December 14, 2007. Upon their disclosure, iStar's stock price fell from $27 per shares to less than $17 per share – a $1.3 billion loss in market capitalization.

9.     One day after these announcements, defendant Nicholas A. Radesca ("Radesca"), then iStar's Chief Administrative Officer, "resigned" from the Company. His resignation was followed four months later by the "retirement" of iStar's then-CFO, defendant O'Connor, on July 2, 2008. By permitting Radesca and O'Connor, two iStar fiduciaries bearing primarily responsibility for the Company's misleading statements and omissions, to retire and resign, rather than terminating their employment for cause, defendants wasted iStar's assets and signaled their intent not to hold any of the responsible officers and directors accountable for their misconduct.

10.     Defendants' misconduct has exposed iStar to potentially hundreds of millions of dollars in liability and defense costs in a series of securities class actions filed in this Court soon after iStar revealed its true financial condition. These actions allege that the Company and defendants Sugarman, Radesca, Rice, and O'Connor, among others, violated Sections 12(a)(2) and 15 of the Securities Act of 1933 and Sections 10(b) and 26(a) of the Securities and Exchange Act of 1934.

- 4 -

The cases were consolidated before United States District Court Judge Richard Sullivan (the "Securities Class Action"). On March 26, 2010, Judge Sullivan denied in substantial part the defendants' motion to dismiss the Securities Class Action and discovery is underway.

11.    iStar's credibility in the capital markets has been irreparably damaged. In the months following the disclosure of iStar's true financial condition, the full scope of the defendant's deception became clear, driving the stock ever lower. After initially losing $1.3 billion in market capitalization in the days following the February 28, 2008 disclosures, iStar's stock has continued to decline. By the close of trading on December 31, 2008, the last trading day of 2008, iStar's stock closed at just $2.23 per share, a $25.77 decline from its December 14, 2007 close, representing a loss of $3.2 billion in market capitalization loss.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2). Plaintiff is a citizen of Missouri. As alleged in paragraphs 16 to 26, defendants are citizens of states other than Missouri. The matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

14.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District, iStar is headquartered here, many of the witnesses reside in this District, and defendants conduct substantial business activities in this District.

- 5 -

## THE PARTIES

15.     Addie Vancil ("Plaintiff") is a shareholder of iStar and has been continuously since May 31, 2001. Plaintiff is a citizen of Missouri.

16.     Nominal defendant iStar is a Maryland corporation with its principal executive offices located at 1114 Avenue of the Americas, 39th Floor, New York, New York. iStar operates as a finance company focusing on the commercial real estate industry.

17.     Defendant Sugarman founded iStar in 1993 at which time he installed himself as iStar's CEO, a position he continues to hold. Sugarman is also iStar's Chairman of the Board and has been since April 2000. He has been a director since 1996. Sugarman is a member of iStar's Investment Committee and has been since at least April 2007. Sugarman is a member of iStar's Investment and Asset Management Committee and has been since at least April 2007. Sugarman signed the Registration Statement issued in connection with the Secondary Offering, made misleading statements at the Investors Day Conference, and certified the misleading November 9, 2007, 10-Q pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. iStar paid defendant Sugarman the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2009 | $1,000,000 | $1,999,000 | - | $10,568 |
| 2008 | $1,000,000 | - | $16,309,856 | $463,178 |
| 2007 | $1,000,000 | $3,000,000 | $5,109,217 | $482,336 |
| 2006 | $1,000,000 | $5,000,000 | $464,799 | $136,014 |

Defendant Sugarman is a citizen of New York.

18.     Defendant Robert W. Holman, Jr. ("Holman") is an iStar director and has been since November 1999. Holman is Chairman of iStar's Compensation Committee and has been since at least April 2009. Holman also is a member of the Audit Committee and has been since at least April 2007. He was Chairman of iStar's Audit Committee in 2008. Holman has been a member of the Investment Committee from at least April 2007 through at least April 2009. iStar paid defendant Holman the following compensation as a director:

- 6 -

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $197,000 | $64,718 | $5,000 | $266,718 |
| 2008 | $172,115 | - | $26,115 | $198,230 |
| 2007 | $126,750 | $88,166 | $45,534 | $260,450 |
| 2006 | $116,500 | $108,244 | $28,875 | $253,619 |

Defendant Holman is a citizen of Nevada.

19. Defendant Robin Josephs ("Josephs") is iStar's Lead Director and has been since May 2007. He has been a director since March 1998. Josephs also is a member of iStar's Audit and Compensation Committees and has been since at least April 2007. Josephs was Chairman of iStar's Compensation Committee from at least April 2007 to at least April 2008, and Chairman of the Audit Committee in 2009. iStar paid defendant Josephs the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $196,100 | $110,944 | $2,150 | $309,194 |
| 2008 | $189,720 | - | $28,471 | $218,191 |
| 2007 | $158,750 | $108,433 | $45,457 | $312,640 |
| 2006 | $112,750 | $108,244 | $28,875 | $249,869 |

Defendant Josephs is a citizen of Illinois.

20. Defendant George R. Puskar ("Puskar") is iStar's alternate Lead Director and has been since May 2007. He has been a director since November 1999. Puskar has served as Chairman of iStar's Investment and Asset Management Committee since at least April 2007. Puskar was a member of the Audit Committee in 2008. He rejoined the Audit Committee in April 2010. Puskar signed the Registration Statement issued in connection with the Secondary Offering. iStar paid defendant Puskar the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $157,600 | $64,718 | $5,000 | $227,318 |
| 2008 | $157,425 | - | $23,925 | $181,350 |
| 2007 | $144,500 | $88,166 | $42,876 | $275,542 |
| 2006 | $115,000 | $108,244 | $28,875 | $252,119 |

Defendant Puskar is a citizen of Florida.

21. Defendant John G. McDonald ("McDonald") is an iStar director and has been since November 1999. McDonald is a member of iStar's Investment Committee and has been since at least April 2009. McDonald was a member of iStar's Compensation Committee from at least April 2007

to at least April 2008. McDonald signed the Registration Statement issued in connection with the Secondary Offering. iStar paid defendant McDonald the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $106,000 | $64,718 | - | $170,718 |
| 2008 | $119,250 | - | $29,462 | $148,712 |
| 2007 | $122,750 | $88,166 | $52,189 | $263,105 |
| 2006 | $93,750 | $108,244 | $32,739 | $234,733 |

Defendant McDonald is a citizen of California.

22.     Defendant Jeffrey A. Weber ("Weber") is an iStar director and has been since June 2003. Weber is a member of iStar's Compensation Committee and has been since at least April 2007. iStar paid defendant Weber the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $118,400 | $64,718 | $5,000 | $188,118 |
| 2008 | $123,250 | - | $24,401 | $147,651 |
| 2007 | $109,000 | $88,166 | $42,876 | $240,042 |
| 2006 | $90,500 | $108,244 | $28,875 | $227,619 |

Defendant Weber is a citizen of New York.

23.     Defendant Glenn R. August ("August") is an iStar director and has been since May 2005. August signed the Registration Statement issued in connection with the Secondary Offering. iStar paid defendant August the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $88,000 | $64,718 | - | $152,718 |
| 2008 | $115,225 | - | $15,225 | $130,450 |
| 2007 | $76,000 | $88,166 | $24,900 | $189,066 |
| 2006 | $78,000 | $108,244 | $13,475 | $199,719 |

Defendant August is a citizen of New York.

24.     Defendant Dale Anne Reiss ("Reiss") is an iStar director and has been since July 2008. Reiss is Chairman of iStar's Audit Committee and has been since at least April 2010. Reiss has served on the Audit Committee since at least April 2009. Reiss is a member of the Investment Committee and has been since at least April 2010. iStar paid defendant Reiss the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $184,047 | $64,718 | $5,000 | $253,765 |
| 2008 | $59,000 | $892 | - | $59,892 |

Defendant Reiss is a citizen of Florida.

25.     Defendant Rice was iStar's CFO from November 2002 to March 2009. Rice signed the Registration Statement issued in connection with the Secondary Offering, made misleading statements at the Investors Day Conference, and certified the misleading November 9, 2007, 10-Q pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Rice is a defendant in the Securities Class Action. iStar paid defendant Rice the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2009 | $65,625 | - | - | $1,010,186 |
| 2008 | $350,000 | $1,250,000 | $1,363,915 | $143,259 |
| 2007 | $350,000 | $1,250,000 | $1,532,740 | $204,173 |
| 2006 | $350,000 | $1,500,000 | $387,388 | $115,141 |

Defendant Rice is a citizen of New York.

26.     Defendant O'Connor was iStar's Chief Operating Officer from March 1998 to June 2008. O'Connor was also iStar's Executive Vice President from March 2000 to June 2008. O'Connor made misleading statements at the Investors Day Conference. O'Connor is a defendant in the Securities Class Action. iStar paid defendant O'Connor the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2007 | $350,000 | $1,250,000 | $747,281 | $169,408 |
| 2006 | $350,000 | $1,250,000 | $314,032 | $94,392 |

Defendant O'Connor is a citizen of Connecticut.

27.     Defendant Radesca was iStar's Chief Accounting Officer from December 2006 to February 2008. Radesca signed the Registration Statement issued in connection with the Secondary Offering. Radesca is a defendant in the Securities Class Action. Defendant Radesca is a citizen of Connecticut.

28.     The defendants identified in ¶¶17-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17, 25-27 are referred to herein as the "Officer

Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants" or the "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

29.     By reason of their positions as officers, directors, and/or fiduciaries of iStar and because of their ability to control the business and corporate affairs of iStar, the Individual Defendants owed and owe iStar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage iStar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of iStar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to iStar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding to the Company's operations, financial performance, management, projections, and forecasts, and to ensure that the Company fully complied with the federal securities laws and regulations promulgated thereunder. During 2007, the Board met twenty-one times. During 2008, the Board met twenty-six times.

### Audit Committee Duties

31.     iStar's Audit Committee Charter obligates members of the Audit Committee to: (a)"discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations'"; (b) "review and approve the Company's credit loss reserve policy and establishment of reserves on a quarterly basis"; (c) "discuss policies with respect to risk assessment and risk management"; and (d) "review the adequacy of management information systems, internal accounting and financial controls."

**Reasonable and Prudent Supervision**

 32. To discharge their duties, the officers and directors of iStar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of iStar were required to, among other things:

 (a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

 (b) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate and reasonably founded statements about the Company's financial performance and future financial prospects;

 (c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

 (d) remain informed as to iStar's operations, and, upon receipt of notice or information indicating imprudent or unsound conditions or practices, or calling into question the accuracy of statements and filings published by the Company or its officers, make reasonable inquiry in connection therewith, and take steps to correct such conditions, practices, or statements, and make such disclosures as necessary to comply with securities laws;

 (e) refrain from acting upon material inside corporate information to benefit themselves; and

 (f) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, regulations, and duties to shareholders.

**Breaches of Duties**

 33. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants complained of herein involves the knowing violation and conscious disregard of their obligations as directors and officers of iStar and the absence of good faith on their part, including conscious disregard of misconduct on the part of other fiduciaries that each Individual Defendant was aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants was ratified by the other Individual Defendants, who collectively comprised all of iStar's Board.

34. Each Individual Defendants breached his or her duty of loyalty and good faith by causing, approving, and/or failing to prevent the gross mismanagement of the Company, the publication of false and misleading statements regarding iStar's financial performance and prospects, including the adequacy of iStar's loan loss reserves, its actual earnings (had iStar's earnings been reduced as necessary to fund adequate loan loss reserves), the credit quality of iStar's loan portfolio, the mounting losses in the Company's portfolio, and waste of its assets. As a result of Defendants' illegal and faithless actions and course of conduct, the Company is now a defendant in the Securities Class Action. As a result, iStar has expended, and will continue to expend, significant sums of money defending itself in the Securities Class Action, and faces potentially hundreds of millions of dollars in liability.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was misrepresenting its business prospects and financial results; (ii) enhance the Individual Defendants' executive and directorial positions at iStar and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the investing

- 12 -

public, including shareholders of iStar, regarding the Individual Defendants' management of iStar's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by Defendants. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper statements and guidance.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

41.     iStar makes and services commercial real estate loans, and buys and leases commercial office buildings. Between 2002 and 2005, historically low interest rates, widespread use of novel, high-risk loans (including no money down, interest only, adjustable rate and undocumented "Alt-A" loans), a broad loosening of lending standards, and a flood of capital from mortgage-backed

- 13 -

securities converged to reduce dramatically the cost of lending and spur unprecedented speculative real estate development. By early 2005, following years of 20% annual price appreciation, many of the Nation's most active real estate markets in Southern and Western states were seriously overheated, and the Federal Reserve reversed course, quadrupling interest rates (from 2% to 8.25%) by September 2007. As the Federal Reserve increased the pace of rate hikes in 2005, the risky loans made to speculators and poor credit risks began to reset at higher rates that were unattractive to speculative investors and unaffordable to many owners and prospective buyers. As wave after wave of loans slipped into delinquency and non-performance, lending standards were tightened. Broadly reduced buying power, unsustainable bubble prices and vanishing speculative demand led to an avalanche of defaults and foreclosures. As is now well-documented, the collapse in residential real estate demand devastated banks and cut off the spigot of easy capital, as lending standards tightened and investors began to question the value of the collateral securing hundreds of billions of dollars of mortgage-backed securities and other collateralized debt obligations ("CDOs"). The damage quickly spread to commercial real estate and lending.

42.     As interest rates increased, the warnings of a broad real estate market collapse rapidly mounted. On April 26, 2006, national homebuilder Centex Corporation reported that it was slashing its earnings forecast due to falling sales and prices. In May 2006, homebuilders Toll Bros., Inc., and Hovnanian Enterprises, Inc., announced that new orders had fallen at least 20%. On June 5, 2006, Wachovia's housing analyst reported that home builders faced a 35% jump in new and existing home inventory from the comparable period in 2005. In August, 2006, *Dow Jones Newswire* reported on the extraordinary numbers of borrowers opting to default on their home loans as interest rates rose, home and condominium prices declined, and demand for housing collapsed. The number of subprime mortgages with at least one delinquent payment *within the first three months* after origination had increased by 14% year-over-year.

43.     Not surprisingly, subprime lenders were among the first financial institutions to be damaged by falling home prices, increasing mortgage delinquencies, and slackening investor interest in residential mortgage-backed securities, as doubts about the quality of the collateral underlying

- 14 -

these instruments mounted. The first casualty was Merit Financial, a Washington-based lender that filed for bankruptcy on May 5, 2006. New Century Financial Corporation declared bankruptcy on April 2, 2007, citing rising delinquencies, non-performance, defaults, and an inability to securitize and sell its loans to fund new originations. On January 3, 2007, Ownit Mortgage Solutions, a California based subprime lender, filed for Chapter 11 and defaulted on approximately $93 million owed to Merrill Lynch. On February 5, 2007, Mortgage Lenders Network USA, the fifteenth largest subprime lender with over $3.3 billion in loans funded in the third quarter of 2006 alone, filed for Chapter 11. On February 13, 2007, ResMae Mortgage Corporation filed for Chapter 11. People's Choice Home Loans filed for Chapter 11 in March 2007, just a few weeks later. SouthStart Funding LLC, filed for Chapter 7 in April 2007. Other lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

44.     Fremont General Corporation was particularly hard hit by the downturn in the housing market. On August 8, 2006, it announced that its net income declined 43% due in a large part to "increased levels of early payment delinquencies." At that time Fremont General Corporation stated that its average first mortgage FICO score was 624, and loan to value ratio was 81%.

45.     On March 2, 2007, Fremont General Corporation reported that it had entered into a agreement with the FDIC requiring it to cease and desist from (among other things): "Operating with inadequate underwriting criteria"; "Operating without an accurate, rigorous and properly documented methodology concerning its allowance for loan and lease losses"; "Operating with a large volume of poor quality loans"; "Engaging in unsatisfactory lending practices"; and "Making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms."

46.     Despite the overwhelming evidence of a broad-based crash in the U.S. real estate and credit markets and Fremont General Corporation's noted inadequate underwriting, Defendants proceeded with the Fremont acquisition. On May 22, 2007, Defendants announced a definitive agreement to purchase Fremont General Corporation's commercial real estate lending business and interests in its commercial real estate loan assets. In this transaction, iStar would acquire approximately 285 commercial first mortgage loans from Fremont. 60% of the value of these loans

- 15 -

was collateralized by apartment and other types of residential properties. Condominium construction and conversion projects represented approximately 45% of the total portfolio. Fremont's portfolio was concentrated in Atlanta, Phoenix, Southern California, Dallas, Chicago, and Bethesda, Maryland (just outside of Washington D.C.), some of the most seriously overheated real estate markets in the Nation, and among the first to feel the effects of the market reversal in 2006.

47.     iStar paid Fremont approximately $1.9 billion in cash and transferred to Fremont a senior A-participation interest in the acquired portfolio of loan assets representing a 70% interest in the portfolio. iStar retained a 30% B-participation interest in the portfolio of loan assets with a $2.1 billion principal amount.

48.     To finance the Fremont acquisition, the Company obtained a $2 billion bridge facility, set to mature in 2008. In addition, Defendants agreed to fund up to approximately $4.4 billion of unfounded loan commitments associated with the acquired loan portfolio. The Company stated in its May 22, 2007, press release that it planned to replace the bridge facility through the issuance of debt and equity securities.

49.     On July 2, 2007, iStar, under the Individual Defendants' direction, completed the $6.27 billion Fremont acquisition. Soon after the deal closed, the Individual Defendants learned that the acquisition would prove disastrous for the Company because the deal included billions of dollars worth of poorly collateralized construction loans and funding commitments to condominium developers in some of the most overheated markets in the country and among the areas hit earliest and hardest by the real estate collapse and ensuing credit crisis. As set forth below, the Individual Defendants, knowingly or in conscious disregard of these facts, caused or permitted iStar to conceal the impact that the Fremont acquisition had and would have on the Company's corporate debt and loan portfolio, as well as the devastating impact that the general decline in real estate values and credit quality was having and would in the future have on iStar's earnings.

## IMPROPER STATEMENTS

50.     The Individual Defendants' fiduciary duties of care, good faith, and loyalty to iStar and its shareholders entail the duty to ensure that the Company's public filings and statements fairly

- 16 -

and honestly represent the operations, financial results and business prospects of the Company. In order to carry out these duties, the Individual Defendants must know and understand the facts material to iStar's core operations and financial performance, especially with regard to those metrics that are required to be disclosed under GAAP and those that the Company has elected to feature in its public statements. The Individual Defendants were required to ensure the disclosure of any non-public information necessary to render the Company's public statements and filings not misleading.

51.     The Individual Defendants breached their duty to communicate honestly with shareholders and to ensure the Company's compliance with the law by knowingly and/or in conscious disregard of the oversight duties permitting the publication of misleading statements regarding the quality of the Company's debt portfolio, the adequacy of its loan loss reserves, and the performance of the Company's portfolio, and omitting material negative information regarding the rapidly mounting losses in the Company's portfolio and dramatic rise in non-performing loans. The Officer and Director Defendants alike owed a fiduciary duty to iStar and its shareholders to ensure that the Company properly disclosed all material facts concerning the Company so as not to mislead its shareholders.

52.     In the course of their duties as officers responsible for iStar's core lending operations, public reporting, and evaluating and integrating iStar's material acquisitions, including the Fremont acquisition, the Officer Defendants reviewed this information in the form of periodic and special reports and data compilations generated to facilitate management of the Company, and discussed this material information with their fellow officers in *ad hoc* and formal management meetings, and, on information and belief, with the Director Defendants, in reports and presentations and in management's meetings with the Board and its committees, including the Audit Committee. On information and belief, the Director Defendants had ample opportunity to review and discuss, and did review and discuss, this material information with the Officer Defendants and with their fellow directors at *ad hoc* and formal meetings of the Board and its committees. In breach of their fiduciary duties, the Individual Defendants knowingly and/or in conscious disregard of their duties caused,

approved or otherwise permitted through their actions and/or inaction, the following improper statements to be disseminated by iStar to its shareholders and the investing public.

## The Prospectus and Registration Statement

53. On or about May 1, 2007, the Individual Defendants caused or allowed iStar to file a registration statement with the Securities and Exchange Commission ("SEC") on Form S-3 relating to an offer to sell, over time, common stock, preferred stock, depository shares debt securities and warrants of the Company (the "Registration Statement"). This Secondary Offering was a "shelf registration" that allowed iStar to register securities for sale, while leaving them on the "shelf" until the Company determined to conduct the Secondary Offering, *provided*, however, that the Registration Statement met all the requirements prescribed under applicable securities regulations, including that the information contained therein be current and not materially misleading. The Registration Statement was signed by defendants Sugarman, Rice, Radesca, August, McDonald, and Puskar.

54. On or about October 10, 2007, the Individual Defendants caused or allowed iStar to file a prospectus with the SEC in support of an offering of convertible senior floating rate notes. The prospectus contained a section titled "Recent Developments," which described the Company's loan portfolio and its acquisition of Fremont. The prospectus provided in pertinent part:

On July 2, 2007, we acquired the commercial real estate lending business of Fremont Investment & Loan, or Fremont, a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement, dated May 21, 2007. *We acquired approximately 285 commercial mortgage loans in the transaction, substantially all of which are first mortgage loans. Approximately 60% of the loans, by carrying value, as of June 30, 2007, are collateralized by apartment and other types of residential properties located throughout the United States.* The balance of the loans are collateralized by a variety of property types. Approximately 130 employees of Fremont located in eight offices throughout the United States joined our company at the closing of the transaction.

*The aggregate principal amount of the loans that we acquired was approximately $6.3 billion as of June 30, 2007.* As of that date, approximately $500 million principal amount of the loans were non-performing loans. We paid Fremont approximately $1.9 billion in cash and concurrently sold to Fremont a senior A-participation interest in the acquired portfolio of loan assets, representing an approximately 70% interest in the portfolio. We retained a 30% B-participation

- 18 -

interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount. Our B-participation interest is in the first loss position with respect to the portfolio. ***In addition, we have agreed to fund up to approximately $3.7 billion of unfunded loan commitments associated with the portfolio. We will hold title to all of the loans and will be solely responsible for asset management and loan servicing.***

55.     On or about October 12, 2007, the Individual Defendants caused or allowed iStar to

file a prospectus supplement with the SEC in support of an offering of $800 million worth of

convertible senior floating rate notes. The prospectus supplement contained a section titled "Recent

Developments," which described the Company's loan portfolio and its acquisition of Fremont. The

prospectus provided in pertinent part:

> On July 2, 2007, we acquired the commercial real estate lending business of Fremont Investment & Loan, or Fremont, a subsidiary of Fremont General Corporation, pursuant to a definitive asset purchase agreement, dated May 21, 2007. We acquired approximately 285 commercial mortgage loans in the transaction, substantially all of which are first mortgage loans. Approximately 60% of the loans, by carrying value, as of June 30, 2007, are collateralized by apartment and other types of residential properties located throughout the United States. The balance of the loans are collateralized by a variety of property types. Approximately 130 employees of Fremont located in eight offices throughout the United States joined our company at the closing of the transaction.

> The aggregate principal amount of the loans that we acquired was approximately $6.3 billion as of June 30, 2007. As of that date, approximately $500 million principal amount of the loans were non-performing loans. We paid Fremont approximately $1.9 billion in cash and concurrently sold to Fremont a senior A-participation interest in the acquired portfolio of loan assets, representing an approximately 70% interest in the portfolio. We retained a 30% B-participation interest in the acquired portfolio of loan assets with an approximate $2.1 billion principal amount. Our B-participation interest is in the first loss position with respect to the portfolio. In addition, we have agreed to fund up to approximately $3.7 billion of unfunded loan commitments associated with the portfolio. We will hold title to all of the loans and will be solely responsible for asset management and loan servicing.

56.     On November 9, 2007, the Individual Defendants caused or allowed iStar to issue its

third fiscal quarter 2007 earnings press release. The third quarter 10-Q was incorporated by

reference in the Registration Statement. For the quarter, iStar reported record earnings of $1.07 per

share or $135.8 million. Sugarman and his executive team, with the Board's knowing acquiescence,

claimed that "***[t]his quarter's risk ratings process included a comprehensive review of the Fremont***

*portfolio*." Based on this purportedly comprehensive review, the Individual Defendants told shareholders:

> At September 30, 2007, first mortgages, participations in first mortgages, senior loans and corporate tenant lease investments collectively comprised 86.0% of the Company's asset base, versus 83.6% in the prior quarter. The Company's loan portfolio consisted of 78% floating rate and 22% fixed rate loans, with a weighted average maturity of 3.2 years.
>
> The weighted average last dollar loan-to-value ratio for all structured finance assets was 66.6%. At quarter end, the Company's corporate tenant lease assets were 95.6% leased with a weighted average remaining lease term of 11.2 years. At September 30, 2007, the weighted average risk ratings of the Company's structured finance and corporate tenant lease assets were 2.92 and 2.48, respectively, versus 2.78 and 2.50, respectively, in the previous quarter.
>
> *Inclusive of the assets acquired in the Fremont acquisition, at September 30, 2007, the Company had 29 loans on non-performing loan (NPL) status representing $848.7 million of gross book value. At the end of the third quarter, the Company had 28 loans on its watch list representing $1.1 billion of gross book value.* Gross book values represent iStar's book value plus Fremont's A-participation interest. *Excluding Fremont's A-participation interest on the associated assets, NPL and watch list assets were $428.7 million and $610.5 million, respectively.* The Company's policy is to stop the accrual of interest on loans placed on NPL status. *The Company believes it has adequate collateral and loan loss reserves to support the book value for each of the NPL and watch list assets.*
>
> *The Company had $124.2 million in loan loss reserves at September 30, 2007* versus $52.2 million at December 31, 2006. *The third quarter increase of $62.0 million in loan loss reserves was the result of the Company's regular quarterly risk ratings review process as well as the addition of the Fremont portfolio. This quarter's risk ratings process included a comprehensive review of the Fremont portfolio.*
>
> *The Company's total loss coverage, defined as the combination of loan loss reserves and remaining purchase discount from the Fremont acquisition, was $344.9 million or 3.2% of total loan assets at the end of the third quarter.*

57.     On December 13, 2007, the Individual Defendants caused or allowed iStar to file a preliminary prospectus in support of an offering of 6 million iStar common shares. Four days later, on December 17, 2009, they amended the prospectus to increase the number of shares offered to 8 million iStar common shares. As alleged below, both prospectuses failed to disclose material

information concerning the substantial degradation of the credit quality of iStar's corporate debt and loan portfolio over the intervening quarter or the material inadequacy of iStar's loan loss reserves.

58.     The Individual Defendants filed the Registration Statement on Form S-3, a stream-lined registration statement form reserved for well-capitalized, widely followed issuers. Such issuers are permitted to file scaled down registration statements and incorporate by reference their prior periodic filings – *e.g.*, Forms 10-K and 10-Q. Instruction 11(a) of Form S-3 requires issuers utilizing Form S-3 to disclose "***any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K*** filed under the Securities Exchange Act of 1934."

59.     Accordingly, an issuer utilizing Form S-3 must update the information in its periodic filings, including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations[,]" because Item 303(a) of Regulation S-K requires issuers to disclose this information in periodic SEC filings. Item 303(a) requires issuers to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

60.     Defendants never updated the Registration Statement to disclose several "material changes" to iStar's continuing operations due to the Fremont acquisition and the substantial deterioration of credit quality in iStar's portfolio over the intervening quarter, as required under Instruction 11(a), including: (a) the material decline in the Company's debt security values; (b) the material increase in the Company's loan losses; and (c) the material decline in the credit quality of iStar's loan portfolio. In addition, the risk factors incorporated by reference into the Registration Statement failed to warn of the problems in the Company's corporate loan and debt portfolio.

61.     By the time of the Secondary Offering, and unbeknownst to shareholders, the amount of unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million, surging nearly 100% since the end of iStar's third quarter, which ended on September 30,

2007. These increased losses represented more than twenty percent of all income from continuing operations iStar reported during the first three quarters of 2007.

62. In particular, the Company incurred material incremental losses on its undisclosed Linens 'n Things ("LNT") and WCI Communities ("WCI") debt securities, the value of which were linked to the declining real estate markets, about which Sugarman had claimed to have superior knowledge and foresight. At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy. In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering.

63. At the time of the Secondary Offering, both LNT and WCI were in dire financial condition and were on the brink of bankruptcy. In fact, the price of LNT and WCI debt securities held by iStar declined by approximately 50% in value from early 2007 through the date of the Secondary Offering. Defendants knew that iStar's held-to-maturity investments had experienced a material decline in the value between September 30, 2007 and the time of the Secondary Offering on or about December 14, 2007 as the prices of the debt securities of LNT and WCI had traded in the bond market at severely depressed prices for an extended period of time. Defendants also knew that applicable accounting standards required that the Company record a charge for the impairment in of iStar's held-to-maturity investments during the fourth quarter of 2007.

64. The Individual Defendants knew or consciously disregarded the following adverse facts about WCI before the Secondary Offering:

- On November 7, 2007, *PrimeNewsWire* reported that Jerry Starkey, President and CEO of WCI stated "this prolonged downturn requires that we continue to assess our overhead and make reductions in order to remain viable through the trough of this cycle" and that "WCI announced another significant reduction to its workforce in response to continued soft demand in its markets." WCI combined several lines of business, implemented a net reduction in force of about 575 employees, which, when combined with previous reductions in force represented a 46% decline from its 2006 employment level, and its board of directors significantly reduce its compensation with six board members agreeing to forego all director compensation.

- On November 8, 2007, *The Associated Press* reported that "Moody's cut its credit ratings on struggling Florida homebuilder WCI Communities Inc. deeper into junk

- 22 -

status and suggested they could move even lower as the housing slump worsens." The credit rating agency cut WCI's corporate family rating to Caa2 from B3, and the ratings on its senior subordinated notes to Caa3 from Caa2. Moody's cited WCI's "substantially weaker-than-expected cash flow generation, continued difficulties in complying with bank covenants, accelerating losses and increasing debt leverage."

- By November 12, 2007, the shares of WCI traded at a *ten* year low, declining from more than $20 per share in early 2007 to less than $5 per share at the time of the Secondary Offering. On November 15, 2007, WCI reported that EBITDA for its twelve months ended September 30, 2007 was a negative $(62,064,000), compared with a positive EBITDA of $288,411,000 for the prior comparable twelve months.

- On November 27, 2007, *The New York Sun* reported, "A Banc of America Securities analyst, Daniel Oppenheim, is one of a number of homebuilding analysts who takes a dim view of WCI, which is awash in red ink. In its most recent quarter, WCI reported a loss of $1.66 a share, much greater than Street expectations, in large part due to higher charges. Liquidity issues are likely to increase, Mr. Oppenheim warns, citing a deteriorating cash flow outlook. The company has reported it is not in compliance with its fixed-charged covenant and the analyst expects lenders to be less flexible in renegotiations, given the deterioration in Florida. Even if a favorable income is reached, WCI will have just $210 million in liquidity, which Mr. Oppenheim believes will quickly erode."

- On November 20, 2007, *Thomson Financial News* reported, "Standard & Poor's Ratings Services lowered its junk corporate credit rating on WCI Communities Inc to 'CCC' from 'CCC+', citing a sharp spike in cancelled contracts to buy the company's luxury high-rise condominiums and the company's need to once again renegotiate the terms of its revolving credit facility. The outlook on WCI remains negative."

- On December 3, 2007, *Market News Publishing, Inc.*, reported "Of the 24 builders Standard & Poor's rates, five are currently in the 'BBB' category, seven are in the 'BB' category, and 10 are in the 'B' category. The other two companies have fallen into the low speculative-grade realm: WCI Communities is rated 'CCC' and TOUSA is rated 'CC'. U.S. homebuilders face an array of challenges at this point in the housing cycle, many of which will likely worsen before they improve. While unit deliveries were up in the recent fiscal quarter, there's little evidence to suggest that companies will be able to quickly replenish shrinking order backlogs. Additionally, impairment charges were huge in the recent fiscal quarter, as builders wrote off $6 billion on inventory, goodwill, and option deposits as home prices continued to drift lower and absorption slowed."

- In its Form 10-Q for the quarter ended September 30, 2007, WCI disclosed that is was not in compliance with a debt covenant under a revolving credit facility and term loan agreement.

65. The Individual Defendants knew or consciously disregarded the following adverse facts about LNT before the Secondary Offering:

- On August 15, 2007, Deutsche Bank Securities reiterated its Sell rating on LNT's bonds.

- On October 2, 2007, Fitch Ratings Downgraded LNT as follows: Issuer Default Rating (IDR) to 'CCC' from 'B-'; Asset-based revolver to 'B-/RR2' from 'B+/RR2'; Senior secured notes to 'CCC-/RR5' from 'CCC/RR6'. The Rating Outlook is Stable. The downgrades reflected LNT's continued weak operating performance which has resulted in worsening credit metrics and negative cash flow generation as well as the challenging operating environment and intense competition from other specialty retailers, discounters and department stores in the home furnishings segment.

- On October 15, 2007, *Standard & Poor's Ratings Services* cut its corporate credit rating on LNT to 'B-' from 'B' and removed the ratings from CreditWatch, where they had been placed with negative implications on Nov. 17, 2006, and lowered the bank loan rating on the Company's $650 million floating-rate senior secured notes to 'CCC' (two notches below its corporate credit rating). The downgrade was a result of LNT's "continued weak operating performance and poor profitability and productivity relative to its key competitor" as well as a "very high debt leverage and extremely thin interest coverage." *Standard & Poor's* stated that the outlook was negative.

- On November 13, 2007, LNT reported that adjusted EBITDA for the third quarter of 2007, the quarter ended September 30, 2007 was negative ($3) million compared with adjusted EBITDA of positive $21.5 million in the third quarter of 2006, a decrease of $24.5 million

66. Defendants also failed to disclose that the approximate $60 million incremental unrealized loss on iStar's held-to-maturity investments constituted a "material change" in the Company's operations. Since this incremental loss was then having, and would in the future have a material and unfavorable impact on the Company's operating income, Defendants were required to disclose these facts in the Registration Statement.

67. On February 28, 2008, in connection with announcing its financial results for the fourth quarter of 2007 and fiscal year 2007, which ended December 31, 2007, iStar announced that it recorded a $135 million charge associated with the "impairment of two credits." The facts that caused the Company to take this material charge as of December 31, 2007, existed on December 14, 2007, the date of the Secondary Offering, and were required to be disclosed in the Registration Statement. They were not, and shareholders and investors were misled.

68. Defendants blamed iStar's disappointing 2007 fourth quarter financial results on the impairment charge it recorded on its held-to-maturity investments in WCI and LNT, admitting that the charge iStar recorded in connection with the decline in value of these debt securities had a material negative impact on the Company's continuing operating results during the fourth quarter of 2007, before the prospectuses were revised and the Secondary Offering was conducted.

69. The Registration Statement also failed to disclose that losses in iStar's loan portfolio increased dramatically between September 30, 2007, and the time of the Secondary Offering.

70. During the fourth quarter of 2007, the economic and financial conditions material to the credit quality of iStar's loan portfolio deteriorated significantly and had a material adverse effect on market liquidity generally and the value of iStar's loan portfolio specifically.

71. During the first nine months of 2007, iStar recorded a cumulative $72 million charge against earnings for loan losses. For the fourth quarter of 2007 – a period covering just the last *three* months of 2007 alone – iStar recorded a *$113 million charge for loan losses. This amount exceed the total loan losses iStar reported during the first nine months of 2007 combined by 57%* and amounted to approximately *forty percent of all of the income iStar reported from continuing operations during the first nine months of 2007.*

72. There was no sudden decline in credit quality over the two months following the Secondary Offering that created a sudden need to record this enormous charge. Defendants knew that iStar's loan portfolio had experienced a material decline in value between September 30, 2007, and the time of the Secondary Offering on or about December 14, 2007. As defendant O'Connor touted at the Investors Conference held just days before the Secondary Offering, Sugarman's management team monitored credit risk in iStar's loan portfolio on a real-time basis: *"We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis."*

73. Defendants also failed timely to record at least the $110 million incremental increase in iStar's loan loss reserves that were finally recorded on February 28, 2008. iStar's loan loss

reserves had been artificially suppressed for months in relation to the accelerating pace of the decline in credit quality observed in its loan portfolio, which permitted them to report artificially inflated earnings leading into the Secondary Offering. These facts constituted a "material change" in the Company's operations that would have a material negative impact on operating income. As such, they were required to be disclosed in the Registration Statement and to shareholders in previous statements and filings. The disclosure of a $110 million increase in iStar's loan loss reserves would have materially altered the total mix of information available to investors in the Secondary Offering and to shareholders.

74.     On February 28, 2008, in connection with announcing its financial results for the fourth quarter of 2007 and fiscal year 2007, the periods ending December 31, 2007, iStar announced, among other things, that it recorded a $113 million charge to earnings as a result of its increase in loan loss reserves. The facts that caused the Company to take this charge as of December 31, 2007, existed on and before the December 14, 2007, Secondary Offering, and were required to be disclosed in the Registration Statement. They were not, and investors and shareholders were misled.

75.     iStar blamed its disappointing 2007 fourth quarter financial results on the charge it recorded and the increase in its loan loss reserves. Accordingly, by Defendants' own admission, the charge iStar recorded in connection with the decline in value of its loan portfolio negatively impacted the Company's continuing operating results during the fourth quarter of 2007.

76.     The Registration Statement also failed to disclose the material increase in iStar's NPLs ("Non-Performing Loans") and Watch List assets over the intervening quarter.

77.     By the time of the Secondary Offering, on or about December 14, 2007, *the carrying value of iStar's NPLs had increased by more than 50% since September 30, 2007* and *the carrying value of iStar's Watch List assets had increased by approximately 100% since September 30, 2007.*

78.     Defendants knew that between September 30, 2007, and the December 14, 2007, Secondary Offering, the credit quality of iStar's loan portfolio declined precipitously, causing a sharp spike in NPLs and Watch List assets by the time of the Secondary Offering. Just days before the Secondary Offering, *defendant O'Connor told investors at the Investors Conference that iStar*

- 26 -

*management inspected the 4 and 5 rated loans that composed 92% of iStar's NPLs and Watch List*
*assets "every week, if not more."*

79.    Item 3 of Form S-3 required Defendants to furnish this information in the Registration
Statement pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], which calls for, among
other things, a "discussion of the most significant factors that make the offering risky or speculative."

80.    The Registration Statement incorporated by reference the "Risk Factors" set forth in
iStar's 2006 Form 10-K. None of these so-called risk disclosures meaningfully advised investors in
the Secondary Offering of the problems in the Company's corporate loan and debt portfolio and their
impact on the Company's operations. Impairment and credit issues were characterized in these
warnings as potential future risks when, in fact, those risks had materialized and materially impacted
the results of operations, as well as the Company's future prospects. Indeed, the crisis in the U.S.
real estate and credit markets had progressed dramatically since iStar had filed its 2006 Form 10-K
with the SEC, and Defendants did nothing to revise these warnings to incorporate this new
information and its impact on iStar before the December 14, 2007 Secondary Offering.

81.    As such, the Registration Statement failed to disclose the most significant factors that
made the Secondary Offering risky or speculative as required by Item 3 of Form S-3, including the
extent to which deterioration in the real estate and credit markets had damaged the credit quality of
iStar's loan portfolio.

**Inaccurate Financial Statements**

82.    As alleged above, the Registration Statement and the prospectus (including their
supplements and amendments) incorporated by reference the financial statements contained in iStar's
2006 Annual Report on Form 10-K and its 2007 Quarterly Reports on Form 10-Q.

83.    The unaudited financial statements included in the Third Quarter 10-Q were
materially inaccurate in that they failed to disclose facts, referred to under GAAP as "subsequent
events," evidencing the adverse conditions that were reasonably likely to have a material effect on
the value the Company's investments in debt securities and the credit quality of its loan portfolio.
GAAP required that these facts be disclosed, and they were necessary to make the interim financial

- 27 -

statements not false and/or misleading. Regulation S-X [17 C.F.R. §210.4-01.(a)(1)] states that

financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed

to be misleading and inaccurate. GAAP are those principles recognized by the accounting profession

as the conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time. Generally Accepted Auditing Standard ("GAAS") AU §411.02.

84.     GAAP, in its Emerging Issues Task Force ("EITF") Topic D-86, provides:

A registrant and its independent auditor have responsibilities with regard to post-balance-sheet-date subsequent events, as well as the application of authoritative literature applicable to such events.

85.     In defining subsequent events that must be disclosed, EITF Topic D-86 refers to the

American Institute of Certified Public Accountant's ("AICPA") Statement on Auditing Standards

("SAS") No. 1, *Subsequent Events* (or AU §560), which states in relevant part:

[E]vents or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements that have a material effect on the financial statements and therefore require adjustment or disclosure in the statements. These occurrences hereinafter are ref erred to as "subsequent events."

The first type [of subsequent event] consists of those events that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing financial statements ....

*The second type [of subsequent event] consists of those events that provide evidence with respect to conditions that did not exist at the date of the balance sheet being reported on but arose subsequent to that date. These events should not result in adjustment of the financial statements. **Some of these events, however, may be of such a nature that disclosure of them is required to keep the financial statements from being misleading** ....*

\* \* \*

When financial statements are reissued, for example, in reports filed with the Securities and Exchange Commission or other regulatory agencies, events that require disclosure in the reissued financial statements to keep them from being misleading may have occurred subsequent to the original issuance of the financial statements.

86.    iStar's financial statements in the Third Quarter 10-Q falsely represented that "[t]he accompanying unaudited Consolidated Financial Statements have been prepared in accordance with the instructions to Form 10-Q and Article 10-01 of Regulation S-X for interim financial statements."

87.    Article 10 of Regulation S-X [17 C.F.R. §210.10-01.(a)(5)] provides, in pertinent part that:

- Interim financial information shall include disclosure either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading;

- Disclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant; and

- Where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred.

88.    Defendants misrepresented that the interim financial statements were presented in conformity with the requirements of Article 10 of Regulation S-X. As alleged above, by the time the Registration Statement was declared effective by the SEC, the deteriorating economic and financial conditions had a material adverse effect on the value of iStar's loan portfolio.

89.    These material "subsequent events," which were required to be disclosed pursuant to GAAP and the requirements of Article 10 of Regulation S-X, were omitted from the financial statements incorporated by reference in the Registration Statement and Prospectus.

90.    Accordingly, Defendants misrepresented in the Registration Statement and prospectus that its financial statements were presented in conformity with GAAP and Article 10 of Regulation S-X, rendering the Registration Statement materially inaccurate.

91.    In addition to the GAAP violations alleged above, the financial statements incorporated by reference in the Registration Statement were presented in violation of at least the following provisions of GAAP:

   (a)    The principle that financial statements disclose loss contingencies when it is reasonably likely that a loss has been incurred (Statement of Financial Accounting Standard No. 5);

   (b)    The principle that financial statements disclose significant risks and uncertainties (Statement of Position No. 94-6);

(c)     The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Statement of Concepts ("Concepts Statement") No. 1 ¶34);

(d)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1 ¶40);

(e)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (Concepts Statement No. 1, ¶50);

(f)     The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(g)     The concept of completeness, which requires the inclusion of all information that may be necessary to ensure that reported results validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(h)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (Concepts Statement No. 2, ¶¶95, 97).

92.     The failure to incorporate by reference in the Registration Statement financial statements that conformed to the requirements of GAAP and Regulation S-X rendered the Registration Statement materially inaccurate.

**The Investors Day Conference**

93.     On December 6, 2007, iStar held its 2007 Investors Day Conference at the New York Public Library. At the conference, iStar and its management made presentations concerning the

- 30 -

Company's balance sheet, the results of operations and its investments, among other things. iStar's officers and directors made several misleading statements to shareholders, potential investors, and analysts in attendance regarding iStar's risk profile. Consistent with Sugarman's shrewd marketing pitch of iStar's management team as the smartest in the business, defendants Sugarman, O'Connor, and Rice told investors and shareholders in no uncertain terms that iStar faced fewer risks than other mortgage lenders in the unfolding real estate and credit market corrections because iStar's management and Board closely monitored and conservatively valued and reserved iStar's loan portfolio. These statements imparted a false sense of confidence and were highly misleading

94.     Defendant O'Connor touted the fact that iStar's senior managers "flag internally" significant non-performing loans and "are talking about [them] every week[,]" and misleadingly claimed that, unlike other real estate lenders, iStar took a uniquely conservative approach to lending and reporting on credit quality:

> *We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can actually understand what's going on in our portfolio on a real-time basis ... [a]nd what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values....*

95.     Defendant Sugarman misleadingly touted iStar's "balance sheet strength[,]" telling investors and shareholders that iStar's business was "fundamentally different" than other lenders, that its debt was far better collateralized, and that iStar was far more "safe and secure":

> And I point this out simply to start the meeting by saying *the strength of our balance sheet has always been one of the strongholds of the iStar story... our debt is extremely well protected* ... I think *it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year....* And we think *it's a fundamentally different business, it's a different underwriting and it's so much more safe and so much more secure that these ratings are very misleading*.

96.     Sugarman went on to tell investors and shareholders that iStar was so well-positioned that the real estate and credit market corrections would actually redound to the Company's benefit as weaker rivals' access to capital dried up:

- 31 -

I guess it's fair to say *it's been a very interesting year to date*, and one we like to sum up as, "Be careful what you wish for." As many of you have heard me say many times before, *we've been very surprised and disappointed with the relative ease at which new finance companies in our space have been able to access extraordinary levels of leverage based on we thought business plans that were far inferior to the iStar enterprise*.

As you'll hear later today, *we've spent a lot of time trying to craft our business strategies to stay away from that capital, and I think what we hope was a correction in the credit and finance markets would really demonstrate the flexibility, the balance sheet strength and the opportunities embedded in having an unsecured, investment-grade model*.

Now, this slide [infra], which you're going to see a couple of times today, highlights the conservative level of leverage that we see in almost all corporate ratings of real estate finance companies, and we like to compare that with the very aggressive levels of leverage we have seen in the structured credit market over the past couple years.

And as we've pointed out in many presentations, what's really striking is the relative value, represented by bonds issued out of this corporate family, compared to this slice of the structured credit market, despite similar ratings, BBB, BAA2, in our case. And *I want to do some quick comparisons for you*. We're going to come back to this slide a couple of times, but *it's important to start with the strength of this business model*. So I guess I picked iStar Financial. Obviously, we have a viewpoint on our own credit, but I think you'll see this comparison works in a lot of other companies' case, as well.

*When you're buying bonds in the iStar enterprise, you're buying a $15 billion unencumbered asset pool across multiple assets, originated in multiple years, in multiple parts of the commercial real estate world*. This is a very strong sponsored CDO. It's one of probably the best in the business. It was issued in 2006. It has about $1 billion of assets, so a fraction of the size. Almost all of the assets are originated at the same time, and, candidly, the top 10 assets in that pool, it's a 30-asset pool, represent 52% of the balance of that entire $1 billion capital stack. So we've got a very concentrated portfolio. This portfolio, again, much more diversified, top 10 assets about 12%. *That's over $3 billion of tangible equity sitting underneath, protecting those bondholders. Over here, you've got a little over $100 million*.

97.     In discussing the Company's non-performing loans portfolio and high risk loans, the Individual Defendants represented that iStar's management fully understood the quality issues in iStar's loan portfolio and took a conservative approach to loan loss reserves, maintaining more than adequate reserves to address probable loan losses.

98.     Defendant O'Connor stated in no uncertain terms that Defendants knew exactly what was happening with credit quality in iStar's portfolio, and that iStar was simply not exposed to the

risk of major loan losses despite fast deteriorating market conditions. According to O'Connor, "[W]e devote a lot of people, a lot of assets and a lot of resources to watching the portfolio. We have 135 people that all they do from the time they get up to the time they leave work is watch our portfolio and watch our assets." On that basis, O'Connor claimed:

*we as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they become real problems.... Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected....* And again, from our perspective, *no surprises here, no surprises,* and *I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to.*

99. Defendant O'Connor went on to pitch iStar's uniquely high credit quality, and assured investors and shareholders that the Fremont acquisition did not change that picture. Despite the Fremont acquisition, Defendant O'Connor encouraged investors and shareholder to "take comfort" that the Company's loss exposure in its loan portfolio was well-understood and very limited due to: (1) the amount of borrower equity in the Company's portfolio; (2) the percentage of senior loans in the Company's portfolio; and (3) amount of the Company's loan loss reserves. O'Connor explained:

I want to talk a little bit about NPLs [Non-Performing Loans] and watch lists over the next several pages. We do have 29 assets on NPL, so 642 investments in the portfolio. We currently have 29 assets on NPL. That's less than 3% of the total assets on our balance sheet ... .

[W]e do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists.

\* \* \*

*I would say we take comfort in three things. One, let's look at how much borrower equity there is in our portfolio. That's kind of the first line of defense.* That's going to determine what's the probability that we're going to get nicked, okay? And then *the second line of defense is let's look at our position. And we're talking again about senior, secured positions. Historically, senior, secured positions, the severity of loss of those positions is less. It has been, and will be.* So borrower equity, first mortgage position, and then *if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves. We have $125 million or $124-ish million of on balance sheet reserves.*

- 33 -

*We've grown that number [loan loss reserve]. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio. So if you step back and look at it, we have available to us as kind of a bucket to address these issues, $345 million. It's a lot of money to address issues in the portfolio.*

\* \* \*

Okay, try to back up, summarize and have Jay come up here. Started by talking about *Fremont, integration's going well, not quite done yet, lots of progress. We have a bigger portfolio today than we had a year ago. We do. We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion. In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business. The good news is, as much as the markets are noticeably worse today, materially worse than they were a year ago, our on-balance sheet reserve, our cushion, is significantly greater than it was a year ago.* And then lastly, just the point again, lots of unencumbered assets. And then finally, *we have what we believe is the right team in what is a very difficult, and we think will be a difficult environment for the next 12 to 24 months. We've got the right team on the ground, process in place, to work our way through this.*

100. Defendant Rice, in turn, highlighted iStar's financial performance, minimized the

Company's short-term capital requirements, and even announced that the Fremont acquisition would

enable the Company to disburse a special dividend:

As you've heard on our third quarter earnings call, we've had solid year-to-date financial performance, with adjusted earnings up 11% and revenues up 45% from the same period in 2006. *We announced 2008 adjusted earnings guidance of $4 to $4.20. And we continued to deliver strong returns at reasonable leverage levels. We announced a 5% increase to our quarterly dividend, which will be payable in the fourth quarter.* And *due to the increase in income that we're receiving from the Fremont portfolio, we'll be declaring a special dividend in 2007 that should be in the range of $0.15 to $0.30 a share.* Typically, we consider dividend increases in the first quarter.

101. These statements were false and misleading. The truth was that: (i) like other real

estate lenders, iStar faced extraordinary business risks in the collapsing real estate and credit

markets; (ii) the Company was exposed to billions of dollars of losses from non-performing and

defaulting loans acquired from Fremont that would drain cash from the balance sheet and hammer

earnings; (iii) iStar had materially overstated the credit quality of its corporate loan and debt portfolio

and understated credit risk; and (iv) iStar had recorded patently inadequate loan loss reserves given

its exposure to probable loan losses.

- 34 -

102.    Defendants' misleading statements had the intended effect, however, convincing analysts that iStar was uniquely well-positioned to ride out the storms in the real estate and credit markets. For example, Bear Stearns reported on December 11, 2007, that "**Investor Day Adds Clarity**":

> •    **Investor Day**. iStar held its second annual investor day last week. *The presentation sought to distinguish iStar's business model* from other more highly levered companies and structured finance vehicles. *The company also sought to calm concerns regarding the credit quality of the Fremont portfolio, demonstrate its strategic benefits, and address future capital needs*.

103.    Key Banc likewise reported on December 7, 2007, that iStar's balance sheet was strong, that the credit rating agencies under-estimated the quality of iStar's debt portfolio, and that credit quality was strong and iStar's experienced management team was properly focused on controlling credit risk:

> *We believe SFI has a strong balance sheet, with more than $15 billion of unencumbered assets, favoring unsecured and secured debt over the collateralized debt obligation model used by many of its peers. The Company worked hard to achieve investment grade status, but must also comply with the agencies more stringent requirements, including lower leverage.* The Company's leverage ratio is 3.25x. SFI anticipates minimal capital raising in 2008 as *its sources of cash closely match its needs next year. SFI appears to be comfortable with the credit quality of its core portfolio. Most of its loans are senior mortgages and the weighted average LTV of the portfolio is 67%.* The corporate tenant lease portfolio is viewed as a long-term stable cash flow business, with properties 96% leased and 11.2 years average remaining lease term; 31% are investment grade credits. *SFI's assets are well-diversified by location and collateral type. The Company maintains a 135-person risk management team, which is well-tenured with extensive resources. Non-performing loans total $428.7 million, or 3% of total assets*.

### THE TRUTH IS REVEALED

104.    Then, on February 28, 2008, iStar issued its fiscal fourth quarter and full year 2007 earnings press release. The press release disclosed that iStar had reported a *loss of $0.62 per share* or $78.7 million for the quarter. This loss stemmed from a $113 million increase in the Company's loan loss provision and a $134.9 write-down of the Company's corporate loan and debt portfolio. These two charges, totaling *a quarter of a billon* dollars, effectively *wiped out close to 90% of the earnings iStar reported from its continuing operations during the first nine months of 2007*.

105. The Company further reported that during the fourth quarter, its NPLs and Watch List assets increased by more than 65% and 100%, respectively. According to iStar's earnings release:

> [A]djusted earnings (loss) allocable to common shareholders for the quarter [were] ($36.6) million or ($0.29) per diluted common share. *Included in fourth quarter earnings were $134.9 million of non-cash charges associated with the impairment of two credits that are accounted for as held-to-maturity debt securities in its Corporate Loan and Debt portfolio.* These securities are performing and continue to pay interest. Accounting standards for these securities do not allow for loan loss reserves to be taken on these assets; the standards require that the value be impaired based on a significant drop in market price and on management's current assessment that the decline is other than temporary.

*  *  *

> *Net income (loss) allocable to common shareholders for the fourth quarter was ($78.7) million, or ($0.62) per diluted common share, compared to $79.2 million, or $0.65 per diluted common share for the fourth quarter 2006. The year-over-year decrease was due to the impact of the non-cash impairment charges and higher provision for loan losses in the fourth quarter.* Please see the financial tables that follow the text of this press release for a detailed reconciliation of adjusted earnings to GAAP net income.

*  *  *

> *The Company had $217.9 million in loan loss reserves at December 31, 2007 versus $52.2 million at December 31, 2006. During the fourth quarter, the Company recorded $113.0 million in loan loss provision versus $62.0 million in the prior quarter. The $51.0 million quarter-over-quarter increase reflects the continued deterioration in the overall credit markets and its impact on the Company's portfolio as determined in its regular quarterly risk ratings review process.*

106. That same day, iStar held a conference call with securities analysts to discuss iStar's fourth quarter results and operations. On the conference call, defendants Sugarman and Rice discussed the charges and increases in reserves, and despite their best efforts to hedge the bad news, were forced to admit that nothing in iStar's management team or business model rendered it immune from the impact of the housing:

<u>Defendant Sugarman</u>:

> First, on the earnings front, our fourth quarter earnings included *two unusual items, $135 million in non-cash impairments in our corporate loan invest portfolio and an increase loan loss provision of approximately $50 million higher than expected*.

- 36 -

\* \* \*

I would say as just a characterization, *the fourth quarter was unusual*.

Defendant Rice:

*Our fourth quarter earnings clearly reflect the impact of the current credit environment on certain of our investments, as well as the continued stress in the overall market.* Our adjusted earnings resulted in a loss this quarter of $36.6 million, or a loss of $0.29 per diluted common share.

Included in the fourth quarter earnings were $135 million of non-cash charges associated with the impairment of two credits in our corporate loan and debt portfolio. Excluding the effect of the impairment for these two credits, adjusted earnings for the fourth quarter were $95.4 million or $0.74 per diluted common share.

Let me provide you with some background on the impairments. *We took a non-cash impairment charge totaling $135 million on two credits, which are accounted for as held to maturity debt securities.* Both credits are performing and continue to pay interest. *The accounting for these securities does not allow loan loss provisions* to be taken against them, *but requires that the value be impaired based on a significant drop in market value for an extended or other than temporary period of time*.

\* \* \*

As we mentioned earlier, *we took a relatively conservative stance based on the continued deterioration of the market and the impact we expect it to have on our portfolio. If the increase from our third quarter to our fourth quarter loan loss provision was also excluded, adjusted earnings per share would have been $4.14, in line with our guidance. However, the market has deteriorated somewhat more than we expected over the last quarter, and we believed it was prudent to increase our loan loss provision accordingly*, or by $51 million more than we originally modeled for the fourth quarter.

\* \* \*

*[T]o the extent assets in that portfolio trade down significantly on a more than temporary basis, we are acquired to take an impairment based on the market trading*. So that group of assets, as we outlined, is only about $423 million. We took an impairment on two of the six assets in that bucket. And I'm sure you're well aware that the corporate debt market is being subjected to some fairly draconian trading levels at this point. I think *at the end of the quarter we felt, although we're still relatively confident in both of these assets that we needed to take this impairment based on the market price*.

- 37 -

107.    The *Associated Press* published an article on February 28, 2008, following the

earnings release, titled, "iStar's Stock Sinks to 7-Year Low," which discussed the damage these

revelations had on iStar's market capitalization and credibility in the capital markets:

> iStar Financial Inc.'s stock sank to its cheapest price in seven years after the
> commercial mortgage investor reported bad credit in its loan portfolio on Thursday.
>
> iStar Financial lost $80.4 million, or 62 cents per share, in the fourth quarter,
> compared with profit of $81.1 million, or 65 cents per share, in the fourth quarter of
> 2006.
>
> ***iStar Financial owns a $11 billion portfolio of commercial real estate loans. The
> company said the portfolio lost $134.9 million on two loans because of a drop in
> the market price for the debt.***
>
> Excluding this charge, profit totaled 74 cents per share. Analysts polled by Thomson
> Financial forecast much higher profit of $1.06 per share.
>
> The company collected $308.1 million in interest payments on its loan portfolio, an
> increase of 91 percent. This was mainly because of $5.4 billion in loans acquired
> when the company bought Fremont Investment & Loan for $1.9 billion.
>
> ***iStar's portfolio is suffering from bad credit. About $1.2 billion in loans are not
> being repaid right now, compared with $848.7 million at the end of the last
> quarter.***
>
> ***Deutsche Bank analyst Stephen Laws downgraded iStar to "Hold" from "Buy."***

108.    During the next few days, the price of iStar's common stock continued to fall as

analysts downgraded their opinions of the Company. On February 28, 2008, for example, Credit

Suisse reported:

> **NPLs Increase Across the Board**
>
> iStar Financial reported a 4Q adjusted EPS loss of $0.29, well below am
> estimate ($1.07). Credit losses, both asset impairments and higher
> provisioning, accounted for the lower than expected earnings. Deutsche Bank
> - February 28, 2008
>
> **Downgrading to Hold given non-term risks**
>
> We are downgrading iStar to Hold from Buy, as we are concerned about near-
> term market deterioration resulting in continued elevated loss provisions. We
> believe these elevated loss provisions as well as increasing nonperforming
> loans could result in depressed earnings during the next few quarters.

* * *

Given the expectation of lower near-term earnings, management reduced 2008 adjusted earnings guidance to $3.50 to $4.00 per share from $4.00 to $4.20 per share.

109.    Deutsche Bank similarly reported on February 29, 2008:

**Disappointing 4Q results and 2008 guidance**

*We are reducing our 2008 estimate and price target after disappointing 4Q results.* While we expect book value and the current yield to provide support for shares, our Hold rating reflects our belief that *near-term upside is unlikely given concerns regarding loss provisions and increasing NPLs.* While our new target is $26.50 per share, we believe our Hold rating is appropriate given near-term risks.

**Reducing price target to $26.50 per share from $42 per share**

While our prior target was based on applying a 10x multiple to our 2008 adjusted earnings estimate, our new price target is based on applying a 7x multiple to our new 2009 adjusted earnings estimate. *Given the non-term concerns (loss provisions and NPLs) and reduced visibility for our out year estimate, we believe a 7x multiple is appropriate.* Historically, iStar has traded in a range of 6-13x forward adjusted earnings. While our target represents upside from the recent close price, we believe current risks limit near-term upside warranting a Hold rating.

110.    On March 6, 2008, iStar belatedly announced that defendant Radesca had resigned from his position as iStar's Chief Accounting Officer on February 29, 2008. Smith Barney issued another downgrade of the stock on this news.

111.    Despite analysts' hopes that iStar would bounce back from the poor fourth quarter, the news got markedly worse, as Defendants reluctantly revealed the truth about the Fremont acquisition's devastating effect on iStar's financial health. In the Company's Form 10-K for the year ended December 31, 2007, *the Individual Defendants belatedly admitted that "with the addition of the Fremont portfolio we had material increases in our watch list and non-performing loans."*

112.    iStar's Form 10-K for the year ended December 31, 2007, covered the period that concluded just *ten* business days after the December 14, 2007, Secondary Offering. The 10-K disclosed that iStar had recorded a charge for impairment of the WCI and LNT credits that showed little promise of repayment; that the amount of its NPLs and Watch List assets had increased dramatically; and that iStar had materially increased loan loss reserves largely because of credit risks

acquired with the Fremont portfolio – all facts and circumstances that developed and were apparent

to Defendants before the December 14, 2007 Secondary Offering. The Form 10-K, stated, in

pertinent part:

> *During the fourth quarter, we took a $134.9 million non-cash impairment charge
> on two of our credits accounted for as held-to-maturity debt securities that have
> traded* well below our carrying value.

> In addition, *based on increased risks in our loan portfolio, including those
> associated with the Fremont acquired loans, as well as the deterioration in
> economic and financial conditions; we had provisions for loan losses of $185.0
> million during the year, versus $14.0 million in 2006 and $2.3 million in 2005.
> With the addition of the Fremont portfolio, we had material increases in our watch
> list and non-performing loans.* Our total loss coverage, defined as the combination
> of loan loss reserves and the remaining purchase discount on the acquisition, was
> $384.8 million or 3.6% of total loans, at the end of the year. *The impairments and
> additional loan loss reserves negatively impacted our return on common hook
> equity and our adjusted return on common hook equity this year.*

113.    On April 2, 2008, in an article titled, "A Tale of iStar's Fremont Bet: Sugarman's

High-Risk Story," *The Wall Street Journal* reported that *the Fremont acquisition brought with it*

*"billions of dollars of construction loans and funding commitments to condominium developers,*

*the kind of assets that have higher chances of default in today's housing crisis,"* severely

damaging iStar's credibility in the capital markets:

> When iStar Financial Inc. announced its plan to snap up the commercial real-
> estate lending business from Fremont General Corp. last spring, the deal was
> applauded as the latest coup for Jay Sugarman, who over 10 years had built iStar
> from a start-up into a real-estate financing powerhouse with a solid credit record.

> Instead, *the deal has proved toxic, putting a stain on Mr. Sugarman's
> reputation and a cloud of uncertainty over the company. Most immediately, it
> burdened iStar with a $1.3 billion bridge loan that comes due June 30 amid the
> most perilous credit environment in decades. Longer term, the deal loaded iStar
> with billions of dollars of construction loans and funding commitments to
> condominium developers, the kind of assets that have higher chances of default in
> today's housing crisis.*

> *iStar's stock has plummeted almost 70% since it closed the Fremont deal in
> July. With default risk rising, it has been forced to increase its reserves for future
> loan losses to $185 million at the end of last year from $14 million in 2006.* "It's a
> high-risk story," said analyst David Fick at Stifel Nicolaus, noting that the biggest

concern is that "they will not get enough money from repayments on its existing loans to meet their funding commitments and service debt."

114. In the wake of these disclosures, iStar's value declined from over $27 per share to approximately $6 per share.

## THREE ARCHITECTS OF THE MISLEADING SCHEME
## ARE ALLOWED TO RESIGN AND RETIRE

115. On March 6, 2008, the Board disclosed that defendant Radesca, iStar's Chief Accounting Officer, "resigned" from the Company, effective February 29, 2008, just one day after the truth about iStar's financial condition began to be revealed.

116. On July 2, 2008, iStar disclosed that the Board had permitted another one of the chief architects of Defendants' misleading public campaign, defendant O'Connor, iStar's longtime Executive Vice President and Chief Operating Officer, to "retire," effective June 30, 2008. This announcement came just four months after the truth about iStar's precarious financial condition was revealed and just six weeks after O'Connor was named as a defendant in the Securities Class Action and alleged to have participated in a scheme to defraud iStar's investors

117. Defendant Rice retired from the Company on March 6, 2009. According to the Company's proxy, filed with the SEC on April 23, 2010, iStar gave defendant Rice a "special compensation payment" in 2009 of $1 million due to, among other things, "her many years of valuable service as our chief financial officer." The Board granted Rice this special compensation payment despite leading iStar into the teeth of the real estate and credit crisis over-exposed to risky loans and investments and under-reserved. Rice also was responsible for making and approving numerous misleading statements and omissions in iStar's public filings and releases. At the time her special compensation was approved she was a defendant in the Securities Class Action.

118. Upon information and belief, defendants Radesca and O'Connor were eligible to collect payments and/or other valuable benefits if they "resigned" or "retired," but not if they were terminated "for cause."

- 41 -

119. The Board's decision to permit defendants Rice, Radesca, and O'Connor to "retire" or "resign" is particularly egregious in view of the federal district court's decision permitting the securities fraud claims against Rice, Radesca, and O'Connor to proceed.

## THE SECURITIES CLASS ACTION

120. Beginning on April 15, 2008, iStar was named in a series of securities fraud class actions, which have since been consolidated and are pending before this Court.

121. On March 26, 2010, Judge Sullivan issued an opinion denying in substantial part the defendants' motions to dismiss the Securities Class Action. In his opinion, Judge Sullivan issued a number of findings concerning certain alleged conduct, which also are alleged herein by Plaintiff. Among the findings by Judge Sullivan are that the plaintiffs to the Securities Class Action sufficiently alleged under the heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") that, *inter alia*:

- Defendants omitted from their disclosures that "by the time of the Secondary Offering, iStar had suffered additional losses of $60 million on its held-to-maturity investments";

- Defendants omitted from their disclosures that "by the time of the Secondary Offering, iStar was suffering additional losses in its loan portfolio, such that it would need to record a $1.13 million charge associated with an increase in its loan loss reserves at the end the quarter";

- Defendants omitted from their disclosures that "by the time of the Secondary Offering, the carrying value of iStar's non-performing loans had increased by more than 50%, and the carrying value of its watch list assets had increased by approximately 100%";

- Defendants' following statements were false or misleading: "(1) that iStar's debt was 'extremely well protected,' (2) that the loan portfolio had 'a lot of room for things to go wrong and for us to still be okay,' (3) that the loan portfolio was 'performing pretty much as expected,' and (4) that iStar anticipated 2008 earnings of $4.20 per share"; and

- *Defendants acted with scienter, particularly in view of the allegations that Defendants "monitored the value of [the Company's] portfolio on a nearly real-time basis," that they "needed to conceal iStar's deteriorating performance so that the Company would be able to secure financing and maintain an investment-grade credit rating," and that the "Investors Day conference began with only sixteen business days remaining in the fourth quarter of 2007."*

## THE IMPROPER SHARE REPURCHASE

122. While iStar's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the share repurchase of over $10 million worth of iStar's shares at an average price of approximately $26.83 per share, which is substantially higher than iStar's current share price of less than $17 per share. The Board authorized and permitted the buyback in knowing or conscious disregard of the price inflation caused by the Defendants' misleading statements regarding iStar's corporate loan and debt portfolio, loan loss provision, earnings, and business prospects.

## DAMAGES CAUSED BY THE INDIVIDUAL DEFENDANTS

123. As a result of the Individual Defendants' misconduct, iStar misled investors and shareholders regarding its financial results and business prospects as alleged above. These improper statements have devastated iStar's credibility in the capital markets, as reflected by the Company's $3.2 billion loss in market capitalization.

124. As a direct and proximate result of the Individual Defendants' action, iStar has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending iStar and certain officers in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred in the repurchase of $10 million worth of shares at artificially inflated prices;

(c) increased costs of capital following from the loss in investor confidence in iStar's fundamentals and in the veracity of information provided in its offering prospectuses; and

(d) costs incurred in compensating and paying benefits to the Individual Defendants who breached their fiduciary duties to iStar and damaged the Company.

125. Defendants' actions have irreparably damaged iStar's corporate image and goodwill. For at least the foreseeable future, iStar stock will be discounted by an investing public concerned

- 43 -

about iStar's faithless fiduciaries and willingness to mislead the investing public. iStar's ability to raise equity capital or debt on favorable terms has been and will for the foreseeable future be impaired.

## DERIVATIVE ALLEGATIONS

126. Plaintiff brings this action derivatively in the right and for the benefit of iStar to redress injuries suffered by iStar as a direct result of the breaches of fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. iStar is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127. Plaintiff will adequately and fairly represent the interests of iStar in enforcing and prosecuting its rights.

128. Plaintiff is an iStar shareholder and Plaintiff has continuously owned iStar stock since May 31, 2001.

129. Plaintiff has made a demand upon the Board to investigate and remedy the violations of law described herein as required by Federal Rule of Civil Procedure Rule 23.1 and Maryland law. As set forth below, the Board has wrongfully ignored and refused Plaintiff's demand. The Board and its special committee's wrongful decision to ignore and refuse Plaintiff's demand was unfounded in law, and was not made independently, on the basis of a good faith and reasonable investigation of the claims made in Plaintiff's demand. The Board and its designated special committee breached their fiduciary duty to inform themselves of all material information reasonably available before determining to ignore and refuse Plaintiff's demand, and their decision was not in the best interests of iStar. The Board's decision is not entitled to the protection of the business judgment rule.

130. On June 1, 2009, Plaintiff made a litigation demand on iStar's Board to "immediately take appropriate action to commence an independent investigation" and "to recover for the Company, by litigation if necessary, damages proximately caused by the officers and directors' breaches of the fiduciary duties of loyalty, good faith, and due care" (the "Demand"). The Demand outlined evidence of gross mismanagement, specified false and misleading statements and the reasons for their falsity

- 44 -

(several of which Judge Sullivan found sufficient to support a claim for violations of the federal securities laws under the heightened pleading standards of the PSLRA), and described the injuries caused to iStar. A true and correct copy of the Demand is attached to this complaint as Exhibit A.

131. On June 15, 2009, iStar's corporate general counsel and secretary, Geoffrey Dugan, sent a letter to Plaintiff's counsel stating that "the Board has met to consider the issues raised in" the Demand. Mr. Dugan represented that "the Board has taken the matters raised in the Demand Letter under advisement and has resolved to conduct a reasonable and good faith investigation of the facts and circumstances surrounding the matters described in the Demand Letter[,]" and "will communicate further with [plaintiff] upon completion of the investigation." A true and correct copy of Mr. Dugan's June 15, 2009, letter is attached to this complaint as Exhibit B. iStar's Board has failed to fulfill any of these commitments.

132. On June 26, 2009, Plaintiff's counsel wrote to Mr. Dugan seeking additional information about the Board's purported investigation of the matters raised in the Demand. Specifically, Plaintiff sought the following information:

> 1. Has the Board delegated the investigation to a sub-committee of the Board or to some other *ad hoc* group of officers and/or directors (hereinafter, "sub-committee")? If so, who are the members of that sub-committee, and how and why were the members of the sub-committee selected?

> 2. How will the investigation and the sub-committee's proceedings, deliberations, decisions, and/or recommendations be recorded and documented? Is the sub-committee required to issue a formal written report detailing the findings of the investigation?

> 3. Has the Board set a deadline or established some other form of schedule or timeframe within which the inquiry is to be conducted?

> 4. If the Board had adopted an authorizing resolution that contains the answers to some or all of these questions, we respectfully request that you provide Ms. Vancil with a copy of that resolution.

The Board has refused to provide any of the requested information, despite Plaintiff's repeated requests over a period of several months, on grounds that Plaintiff has not provided "proof" of her standing to bring a derivative action.

- 45 -

133. On July 10, 2009, counsel purporting to represent a special committee of the Board wrote to Plaintiff's counsel and stated that the special committee would review the matters raised in the Demand. Through its counsel, however, the special committee asserted that "*[t]he predicate for [the Demand] is that you have a plaintiff who is entitled to make the demand* your letter constitutes. Accordingly, the committee needs to know whether your plaintiff is, and at all relevant times, has been a shareholder of iStar .... *If your client has standing, her demand will receive a fair, dispassionate, and reasoned response after appropriate analysis.*" The special committee then demanded not just "proof" of Plaintiff's standing to maintain a derivative lawsuit, but other information, some of it personal, that is unrelated to demonstrating a shareholder's standing to bring a derivative lawsuit, including "the full name, residential and, if applicable, business address of your client, Ms. Addie Vancil;" "brokerage statements, or the equivalent thereof, showing the name of the brokerage firm through which she allegedly purchased iStar shares;" and "the address of the brokerage firm office which oversaw and oversees her account." A true and correct copy of the special committee's counsel's July 10, 2009, letter is attached to this complaint as Exhibit C. Neither the Board nor the special committee has ever provided a substantive response of any kind reflecting any form of substantive analysis of the issues raised and claims made in the Demand.

134. Through her counsel, Plaintiff responded to the special committee by letter dated July 16, 2009. Plaintiff pointed out that Delaware law, to which Maryland courts often refer on questions of corporate law not specifically addressed by Maryland's appellate courts, rejects the notion that a shareholder must demonstrate an "entitlement" to make a demand, let alone "standing" to bring a derivative lawsuit on the Company's behalf. The Board's duty upon receiving a litigation demand is independent of any demonstrated "entitlement" by the shareholder making the demand, let alone submission of "proof" of standing. *Schick Incorporated v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235 (Del. Ch. 1987). Plaintiff invited the special committee to provide legal authority to the contrary; to date, none has been provided. Plaintiff also pointed out that much of the information the special committee requested is neither related to her status as an iStar shareholder nor necessary to demonstrate standing to sue derivatively. Plaintiff offered nevertheless

- 46 -

to provide documentation demonstrating that she is an iStar shareholder. Plaintiff also repeated her request for information about the special committee's purported investigation of the matters raised by the Demand. A true and correct copy of Plaintiff's July 16, 2009 letter is attached to this complaint as Exhibit D.

135.    Through its counsel, the special committee responded to Plaintiff's July 16 letter by questioning her counsel's candor and motives, citing Plaintiff's age, and insisting on "enough information so that I can test Ms. Vancil's share ownership." A true and correct copy of the special committee's counsel's July 22, 2009 letter is attached hereto as Exhibit E. Plaintiff's counsel responded by letter dated July 23, 2009. Plaintiff asked counsel to confirm whether the special committee would commence an investigation in response to the Demand, and enclosed an on-line brokerage statement from Fidelity Investments dated July 13, 2009, showing that Plaintiff held 1,000 shares of iStar stock. The account number and information regarding Plaintiff's other investments was redacted. A true and correct copy of this letter and the attachment are attached hereto as Exhibit F.

136.    The special committee responded through its counsel on July 27, 2009, and refused to accept the account statement as "evidence" that Plaintiff is a shareholder because the copy of the statement provided did not show Ms. Vancil's last name (it showed her first name, "Addie") and redacted unrelated information regarding other investments. The special committee also continued to demand proof of Plaintiff's standing to sue derivatively. A true and correct copy of the special committee's July 27, 2009 letter is attached hereto as Exhibit G. Plaintiff responded by letter dated August 7, 2009, noting that only unrelated investment information had been redacted from her on-line Fidelity statement, and that she was, at that time, a shareholder who had made a demand, not a plaintiff in a derivative lawsuit. Plaintiff's shareholder demand triggered the Board's obligation to investigate and make a determination as to whether to pursue the claims in her demand, regardless of whether she had standing to sue derivatively. The question of whether Plaintiff might have standing to sue derivatively was utterly irrelevant to the Board's duty to inform itself of all material facts reasonably available regarding the Demand's claims, and to make an independent, reasonably

- 47 -

informed and good faith determination about whether pursuing some or all of the claims would be in iStar's best interests. Plaintiff had not yet determined whether to file a derivative lawsuit challenging the Board's decision on the Demand because it was not clear whether the Board would pursue the claims or refuse the Demand, and she was not in a position to evaluate the Board's response. Had the Board elected to pursue the claims or had Plaintiff been satisfied that the Board's decision to refuse the Demand was well-founded, the question of her standing to sue would have been moot. A true and correct copy of Plaintiff's August 7, 2009 letter is attached hereto as Exhibit H.

137. On August 10, 2009, the special committee, through its counsel, suggested that the parties' correspondence cease because Plaintiff has not shown that she "owned any iStar shares at the time of the alleged wrongs" described in the Demand (*i.e.*, that she had standing to sue derivatively). A true and correct copy of the special committee's August 10, 2009 letter is attached hereto as Exhibit I. Plaintiff responded through her counsel by letter dated September 2, 2009, a true and correct copy of which is attached hereto as Exhibit J. Plaintiff enclosed a copy of a hardcopy Fidelity Private Client group brokerage statement for the month of July 2009 showing that she owned 1,000 shares of iStar stock. Plaintiff told the special committee once again that a shareholder's declination to provide proof of standing to sue derivatively is not a proper basis on which to refuse a demand, and asked again for the special committee to provide legal authority that might support its position. Plaintiff also sought clarification as to whether or not the special committee had, in fact, determined to refuse the Demand on that basis.

138. The special committee responded through its counsel on September 9, 2009. The special committee once again suggested that the parties cease their correspondence because Plaintiff had not provided proof that she held shares continuously from the time of the wrongs alleged through the present, and so had not demonstrated her standing to sue derivatively. This time, however, the special committee purported to rely on the *Schick* opinion provided by Plaintiff in earlier correspondence. The special committee backhandedly referred to Plaintiff as a "busybody" who may make a demand but to whom no response was owed and whose demand the Board may ignore in the absence of proof of her standing to sue. The special committee stated that a demand merely "serves a

- 48 -

notice function," that the Securities Class Action had provided the Board with "notice" of Plaintiff's "'grievances'" before the Board received the Demand, and that the Demand was nothing more than "redundant" notice. Most troublingly, the special committee asserted that iStar's "engage[ment] of very competent counsel to address" the Securities Class Action was somehow a sufficient and appropriate response to the "notice" of the issues underlying the Securities Class Action and the Demand. A true and correct copy of the special committee's September 9, 2009, letter is attached hereto as Exhibit K.

139.    By letter dated November 6, 2009, Plaintiff's counsel responded, citing controlling Maryland authority to the effect that, "[o]nce a demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation." *Bender v. Schwartz*, 917 A.2d 142, 152 (Md. App. 2007). Plaintiff pointed out that in light of this unambiguous duty under Maryland law to investigate and respond to the Demand, "the engagement of counsel to defend iStar and the individual officers and directors named defendants in the securities class action" is not evidence that the committee fulfilled its duties under the business judgment rule to conduct independently a good faith and reasonable inquiry into the claims made in the Demand. Plaintiff told the special committee in no uncertain terms that, '[b]y her demand, [she] seeks, among other things, to hold certain iStar fiduciaries responsible for exposing iStar to liability for securities fraud, including the very corporate fiduciaries that defense counsel in the securities class action represent." In order to avoid any possibility of confusion, Plaintiff asked again for a "clear and plain statement" of the special committee's and the Board's decision with respect to the Demand:

> Is it the Board's position that it will not investigate and substantively respond to the issues raised in Ms. Vancil's demand unless and until she proves to your satisfaction that she owned iStar Financial shares at the time of the alleged wrongdoing and has owned iStar shares continuously since then? This is a simple question to which we would appreciate a clear and direct answer. If there is some other basis for what appears to be a decision by the Board to refuse Ms. Vancil's demand without an investigation and report, please provide a clear and complete statement of those grounds. We seek this clarification to avoid potentially costly misunderstandings.

A true and correct copy of Plaintiff's November 6, 2009, letter is attached hereto as Exhibit L.

140. On November 23, 2009, the special committee responded through its counsel, telling Plaintiff, "[w]e are, regrettably, at an impasse. ... [Y]ou still will not provide proof of your client's continuous ownership of iStar stock, which you do not dispute is the prerequisite for bringing a shareholder derivative suit." Ignoring Plaintiff's citation to Maryland precedent, the special committee asserted that Plaintiff relied on the *Schick* opinion "to support your contention that the iStar Board of Directors is obligated to investigate Ms. Vancil's demand, despite your unwillingness to provide proof that she would have standing to sue on the company's behalf[,]" and repeated its position that demand is a form of notice and that a Board may "'ignore the demand ... if, in the exercise of its good faith judgment, the circumstances indicate that the corporation's interests would be served thereby.'" *Schick*, 533 A.2d at 1240. The only circumstances cited by the special committee as justifying its determination to ignore and refuse the Demand were Plaintiff's refusal to provide proof that she had standing to sue derivatively and iStar's retention of "very competent counsel" to represent the Company and its officers and directors in the Securities Class Action. According to the special committee, because Plaintiff had declined to prove her standing to sue, "iStar need not provide any response other than the one it has now given you no fewer than three times." A true and correct copy the special committee's November 23, 2009, letter is attached hereto as Exhibit M.

141. No legal action has been filed by iStar against any of the Individual Defendants. Two of the primary architects of the campaign of misleading statements have been allowed to resign and retire, rather than being terminated for cause. After the true state of iStar's dreadful financial condition was disclosed over the course of 2008, the Compensation Committee recommended and the Board approved substantial salaries, cash bonuses and stock awards for the officers primarily responsible for the misleading statements and the directors bearing primary responsibility for ensuring the accuracy and truthfulness of iStar's public filings and statement and guidance to analysts, ratings agencies, and shareholders.

142. The Board and its special committee's decision to ignore and refuse the Demand was not within the ambit of the business judgment rule. The decision had no basis in law, was not based

- 50 -

upon a reasonable investigation conducted in good faith, and is plainly not in the best interests of iStar. Moreover, the Board and special committee did not act independently with respect to the decision or with due care.

        (a)      The several months of correspondence between Plaintiff and the special committee appointed to consider Plaintiff's Demand betrays the special committee's failure to act independently with respect to the Demand. Rather than address the weighty issues raised in the Demand, throughout the process, the special committee sought reasons not to undertake an objective, reasonable, and good faith investigation and to refuse the demand. The special committee continued to dispute Plaintiff's status as a shareholder even after documentation was provided addressing their stated concerns. As a precondition to considering the Demand, the special committee demanded information wholly unrelated to the Demand, and even going so far as to require information unrelated to Plaintiff's standing to sue derivatively. Prejudging the question of whether a derivative lawsuit might ensue challenging the Board's decision to refuse the Demand, the special committee tried to justify its insistence on a demonstration of standing to sue by casting aspersions on Plaintiff's counsel. The special committee backhandedly referred to Plaintiff as a "busybody" not entitled to the courtesy of a response to her inquiries, based on her refusal prematurely to address the question of her standing to bring a derivative lawsuit before there was any reason to believe that a derivative lawsuit might be necessary to prosecute iStar's claims. The special committee dismissed the Demand as merely "redundant notice" of the claims made the in the Securities Class Action.

        (b)      From the beginning, the special committee took the wholly unfounded position that "*[t]he predicate for [the Demand] is that you have a plaintiff who is entitled to make the demand,*" and conditioned acting on her demand upon proof to the satisfaction of the special committee that she had standing to sue derivatively: "*If your client has standing, her demand will receive a fair, dispassionate, and reasoned response after appropriate analysis.*" The special committee did not change its position even after being provided with authority demonstrating that there is no "entitlement" predicate to making a shareholder demand and no standing precondition to

- 51 -

the Board's duty to conduct an objective, reasonable, and good faith investigation and respond to a
shareholder demand.

(c)     The position that proof of standing is a precondition to conducting a
reasonable investigation in good faith and responding to the Demand reflects the Board and its
special committee's determination not to act independently, in good faith and on the basis of all
material information reasonably available. Conditioning these duties on Plaintiff's demonstration
that she was in a position to pursue derivative litigation against the Board amply demonstrates that
the Board and its special committee did not act independently or in good faith based upon an
objective evaluation of whether pursuing the claims in the Demand would be in the Company's best
interests. Had the Board elected to pursue the claims or had Plaintiff been satisfied that the Board's
decision to refuse the Demand was well-founded, the question of standing to sue would have been
moot. Standing would only be relevant in the event that the Board had determined to refuse the
Demand. The Board's decision to insist on a demonstration of standing at the outset shows that the
Board and its committee prejudged the issue without any meaningful evaluation and based their
decision on superfluous facts.

(d)     Having baselessly dismissed the Demand as mere "redundant notice" of claims
made in the Securities Class Action, the Board and its special committee left the matter to the "very
competent counsel" it had hired to defend officers and directors targeted by the Demand in the
Securities Class Action. Any reliance on the investigation or advice of lawyers ethically and legally
bound by a duty of undivided loyalty to those individual defendants in the Securities Class Action
who are targets of the Demand is completely at odds with the Board's and its special committee's
duties in considering the Demand independently, objectively, reasonably and in good faith.

143.    The Board's decision to ignore and refuse the Demand was contrary to iStar's best
interests. Defendants breached their fiduciary duties to iStar and caused or permitted the Company to
violate federal securities laws, exposing iStar to tens and possibly hundreds of millions of dollars in
damages and irreparably damaging iStar's credibility in the capital markets. The claims of the
Demand are well-founded, valuable, and iStar's only hope of recovery.

- 52 -

144. Accordingly, Plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

145. Plaintiff has not made any demand on the other shareholders of iStar to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) iStar is a publicly held company with over 93 million shares outstanding and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

146. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147. The Individual Defendants owed and owe iStar fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe iStar the highest obligation of good faith, fair dealing, loyalty and due care.

148. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

149. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company, failed to ensure that iStar disseminated accurate, truthful and complete information to its shareholders, and authorized and permitted the purchase at a time when the Company's stock was artificially inflated. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150. In addition, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure the Company's financial statements were prepared in accordance

with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

151. In utter and complete disregard for their fiduciary duties, the Individual Defendants willfully ignored the obvious and pervasive problems with iStar's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

152. Furthermore, the Individual Defendants all are required to act with the utmost loyalty and good faith to the Company. In spite of these duties, Sugarman, August, Holman, Josephs, McDonald, Puskar, and Weber allowed defendants Rice and Radesca to "resign" and O'Connor to "retire" despite having grounds to terminate them for cause.

153. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, iStar has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Against All Defendants for Waste of Corporate Assets

154. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155. As a result of the misconduct described above, the Individual Defendant wasted corporate assets: (i) by failing to properly consider the interests of the Company and its public shareholders; (ii) by failing to conduct proper supervision; (iii) by paying bonuses to certain of its executive officers; (iv) by spending over $10 million to repurchase the Company's stock at artificially inflated prices; and (v) by incurring potentially tens of millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

156. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157. Plaintiff, on behalf of iStar, has no adequate remedy at law.

- 54 -

## THIRD CAUSE OF ACTION

### Against Defendants Sugarman, O'Connor, Radesca, and Rice for Indemnification and Contribution

158.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

159.    The conduct of defendants Sugarman, O'Connor, Radesca, and Rice described above has exposed iStar to significant liability under various federal and state laws by their disloyal acts.

160.    iStar is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

161.    Defendants Sugarman, O'Connor, Radesca, and Rice have caused iStar to suffer substantial harm through their disloyal acts.

162.    iStar is entitled to contribution and indemnification from defendants Sugarman, O'Connor, Radesca, and Rice in connection with all such claims that have been, are, or may be asserted against iStar by virtue of their wrongdoing.

## FOURTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of iStar.

165.    Plaintiff, as a shareholder and representative of iStar, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      Directing iStar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect iStar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and public disclosures;

2.      A proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.      a provision to permit the shareholders of iStar to nominate at least three candidates for election to the Board;

4.      a proposal to strengthen the qualifications of iStar's directors, executives and other employees;

5.      a proposal to ensure that iStar prudently expends funds in future stock repurchase programs on the basis of all material information reasonably available;

6.      a proposal to appropriately test and then strengthen iStar's internal audit and control functions; and

7.      a proposal to strengthen and improve the Board's procedures for evaluating and responding to shareholder litigation and inspection demands.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets so as to assure that Plaintiff on behalf of iStar has an effective remedy;

- 56 -

D.      Awarding to iStar restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

<strong>JURY DEMAND</strong>

Plaintiff demands a trial by jury.

DATED:  May 28, 2010               LAW OFFICES OF THOMAS G. AMON


                                   _____
                                   THOMAS G. AMON (TGA-1515)

                                   250 West 57th Street, Suite 1316
                                   New York, NY 10107
                                   Telephone: (212) 810-2430
                                   Facsimile: (212) 810-2427

                                   ROBBINS UMEDA, LLP
                                   BRIAN J. ROBBINS
                                   CRAIG W. SMITH
                                   KELLY M. MCINTYRE
                                   600 West B Street, Suite 1900
                                   San Diego, CA 92101
                                   Telephone: (619) 525-3990
                                   Facsimile: (619) 525-3991

                                   Attorneys for Plaintiff

490709

# Exhibit A

# ROBBINS UMEDA LLP

ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
MARK A. GOLOVACH
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

June 1, 2009

**VIA CERTIFIED U. S. MAIL**

iStar Financial Inc.
Board of Directors
c/o Jay Sugarman
Chairman of the Board
1114 Avenue of the Americas
39th Floor
New York, NY 10036

Re: *Shareholder Demand Letter*

Dear Board of Directors:

Our Firm has been retained to represent Addie Vancil, a shareholder of iStar Financial, Inc. ("iStar" or the "Company"), in connection with breaches of fiduciary duty by members of iStar's Board of Directors (the "Board") and certain of the Company's current and former executive officers. Specifically, Ms. Vancil is concerned that certain officers and directors (i) published misleading statements and made material omissions regarding iStar's exposure to and financial damage resulting from the collapsing commercial real estate and credit markets from July 2, 2007 to March 6, 2008 (the "Relevant Period"), and (ii) defrauded iStar and wasted its assets by repurchasing $10 million of iStar stock at prices that iStar's officers and directors knew were artificially inflated by these misleading statements. Demand is hereby made on behalf of Ms. Vancil that the Board immediately take appropriate action to commence an independent investigation of these matters, and to recover for the Company, by litigation if necessary, damages proximately caused by the officers and directors' breaches of the fiduciary duties of loyalty, good faith, and due care, as set forth below. Ms. Vancil also demands that the Board implement corporate governance reforms to prevent the recurrence of the acts complained of herein.

*Shareholder Demand Letter*
June 1, 2009
Page 2

### The Commercial Real Estate and Credit Market Collapse

The collapse of the market for commercial real estate that began in 2006 and accelerated through 2007 was amplified by the meltdown of the primary and secondary markets for real estate backed debt. Increasing skepticism about the ability of borrowers to service loans and the quality of collateral securing loans and mortgage-backed securities combined with reduced expected rates of return on real property to reduce substantially the value of the mortgage loans that iStar carried on its books over the course of 2007. During this period, the number of non-performing loans, delinquent loans, and loans in foreclosure in iStar's loan portfolio increased significantly, and the market and enterprise risks associated with mortgage lending increased correspondingly.

Under these circumstances, iStar's officers and directors should have closely examined iStar's corporate debt, loan portfolio risk, and current and expected loan losses to ensure that its financial reports and public statements regarding its financial condition and future business prospects accurately reflected iStar's substantial exposure to the rapidly degenerating commercial real estate and credit markets. The officers and directors had a duty to keep iStar's shareholders fully and fairly informed about the current and expected impact of these deteriorating conditions on iStar's financial performance. Unfortunately for iStar and its shareholders, the Company's officers and directors failed to respond appropriately to these challenges or to communicate properly with shareholders.

When these fiduciaries caused iStar to take on substantial new exposure to these market risks by acquiring nearly $2 billion of Fremont General Corporation's ("Fremont ") commercial mortgage portfolio, iStar's fiduciaries were obligated to explain those risks and their material negative impact on iStar's overall risk profile. iStar's officers and directors failed to meet the demands of duty. They have exposed the Company to substantial risk of liability for securities fraud and severely damaged the Company's credibility in the financial markets, increasing iStar's cost of capital in the midst of a credit crisis in which access to capital and costs of capital are paramount.

### The Fiduciaries' Failure Properly to Disclose Risks Arising out of the Fremont General Acquisition

In July 2007, iStar acquired $1.9 billion worth of Fremont's commercial-mortgage portfolio. To finance the Fremont acquisition, iStar obtained a $1.3 billion bridge loan that was scheduled to mature in June 2008. In addition, iStar agreed to fund up to $4.4 billion of unfunded loan commitments in Fremont's portfolio. The Fremont acquisition proved disastrous. Huge percentages of the billions of dollars of construction loans to condominium developers included in the deal became non-performing, delinquent or defaulting loans. The officers and directors caused or allowed the Company improperly to conceal the disastrous impact that the Fremont acquisition would have and later did have on the Company's financial performance.

On or about May 1, 2007, iStar filed a registration statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC") on Form S-3. The Registration Statement offered to sell, over time, a multitude of securities (the "Secondary

*Shareholder Demand Letter*
June 1, 2009
Page 3

Offering"). This Secondary Offering was considered a "shelf registration," pursuant to which the Company was permitted to register securities for sale until it determined to conduct an offering, provided, however, that the Registration Statement met all the requirements prescribed under applicable securities regulations, including that the information contained therein be kept current.

Specifically, an issuer utilizing Form S-3 is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The issuer also is required to update the information in its periodic filings, including information concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations." *See* Item 303(a) of Regulation S-K. The issuer further must disclose "any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year ...." *See* Instruction 11 (a) of Form S-3.

On or about October 9, 2007, iStar filed a prospectus (the "Prospectus") that formed part of the Registration Statement for the Secondary Offering. On or about December 13, 2007, iStar filed a preliminary prospectus supplement (the "Preliminary Prospectus Supplement"), offering six million common shares to the public. On or about December 14, 2007, the Registration Statement became effective. Then, on or about December 17, 2007, iStar filed a prospectus supplement (the "Prospectus Supplement," and together with the Preliminary Prospectus Supplement, the "Prospectus Supplements") to increase the number of common shares offered to the public from six million to eight million shares. On or about December 19, 2007, iStar sold eight million shares to the public at $28.41 per share. The Prospectus Supplements represented that the Company intended to use the proceeds from the Secondary Offering to pay down an existing short-term financing arrangement that the Company had used to acquire Fremont.

The Registration Statement, which incorporated the Prospectus and the Prospectus Supplements (hereinafter collectively, the "Registration Statement Materials"), contained numerous untrue statements of material fact and omitted material information that was required to be disclosed under the regulations governing its preparation. The Registration Statement Materials failed to disclose several material negative changes to iStar's continuing operations and financial performance that should have been disclosed. These required disclosures included, among other facts, the Company's: (i) material decline in debt security values; (ii) material decline in credit quality; and (iii) material increase in loan losses.

### Declining Debt Security Values

When the Registration Statement became effective on December 14, 2007, the amount of the unrealized losses on iStar's held-to-maturity investments had increased by approximately $60 million – a nearly 100% increase since the end of iStar's third quarter. These losses were material, representing more than twenty percent of income from continuing operations reported during the first nine months of 2007.

This fact was not disclosed at the time the Registration Statement became effective or in the Registration Statement Materials. The Registration Statement Materials also failed to disclose that the price of two major debt securities held by iStar declined by approximately 50%

*Shareholder Demand Letter*
June 1, 2009
Page 4

in value from early 2007 through the date of the Secondary Offering. This loss in value had an immediate material impact on iStar's operating income because the Company had to take a $134.9 million expense in the fourth quarter of 2007. These facts would have been material to investors in the Secondary Offering and should have been disclosed in the Registration Statement Materials.

### Material Decline in Credit Quality

The Registration Statement Materials also failed to alert investors to the fact that iStar experienced a material increase in the amount of non-performing loans ("NPL") and "watch list" assets in its loan portfolio. By December 2007, the carrying value of loans classified as non-performing had increased by more than 50% since September 30, 2007, and the carrying value of loans placed on iStar's "watch list" increased by 103% from $610.5 million to $1,240.2 million since September 30, 2007. This information would have been material to investors in the Secondary Offering and should have been disclosed in the Registration Statement Materials.

### Material Increases in Loan Losses

Losses in iStar's loan portfolio increased dramatically between September 30, 2007 and the date of the Secondary Offering. During the *first nine months* of 2007, iStar recorded a $72 million charge against earnings for loan losses. During the *last three months* of 2007, iStar recorded a $113 million charge to increase loan loss reserves – a material deterioration in value that the officers and directors knew about and should have been disclosed to shareholders and investors. The officers and directors knew that the Company's loan portfolio had experienced a material decline in credit quality and carrying value between September 30, 2007 and December 14, 2007, when the Registration Statement became effective, and yet the Registration Statement Materials were not supplemented or amended to disclose these facts.

There is no excuse for the officers and directors' failure to ensure that this information was disclosed. iStar's Chief Operating Officer ("COO"), Timothy J. O'Connor ("O'Connor"), stated during the Company's December 6, 2007 Investor Day Conference (the "Investors Day Conference") that iStar's management monitored the Company's portfolio to "understand what's going on in our portfolio *on a real-time basis*." The $113 million increase in iStar's loan loss reserves would have been material to investors in the Secondary Offering and should have been disclosed in the Registration Statement Materials.

### Misleading Statements at the Investors Day Conference

iStar's officers and directors made several misleading statements to shareholders, potential investors, and analysts at the Investors Day Conference regarding iStar's risk profile. The thrust of these statements was that iStar somehow faced fewer risks than other mortgage lenders in the real estate and credit market corrections because iStar conservatively valued and closely monitored iStar's loan portfolio.

For example, O'Connor stated, "We can understand the risk in the portfolio, we assessed it at the outset, we continued to monitor that risk throughout the life of the investment so we can

actually understand what's going on in our portfolio on a real-time basis ... [a]nd what we found was that our internal values were some 30% less than what the market was attributing to those deals. So we think we have as part of the kind of DNA, the iStar DNA, a bias toward relative conservatism with respect to values...." Further, Jay Sugarman ("Sugarman"), iStar's Chief Executive Officer ("CEO") and Chairman of the Board, stated, "And I point this out simply to start the meeting by saying the strength of our balance sheet has always been one of the strongholds of the iStar story" and "our debt is extremely well protected ... I think it's informative to actually just spend a second comparing these different businesses and show you how different we think our business is compared to some of those others that you're going to read about quite a bit in the next year.... And we think it's a fundamentally different business, it's a different underwriting and it's so much more safe and so much more secure that these ratings are very misleading."

In discussing the Company's non-performing loans portfolio and high risk loans, iStar's officers represented that iStar's management understood the Company's loan portfolio, maintained adequate loan loss reserves, and took a conservative approach to loan loss reserves.

For example, O'Connor stated, "[W]e as a senior management team can make very informed decisions as to strategies for changing things, getting ahead of problems, getting ahead of issues before they become real problems.... Now, the market's gotten worse and there are some challenges we have to deal with, but as far as where we underwrote and how the portfolio is performing, it's performing pretty much as expected.... And again, from our perspective, no surprises here, no surprises, and I would hope that people would come and say, hey, it looks like some of these markets, at least right now, that people are very concerned about, we don't have a lot of exposure to."

O'Connor also stated, "[W]e do publish each quarter a watch list. So not only do we define NPLs, which we define what they are and how they fit in that bucket, we also have watch lists. ... [A]nd then if all else fails, guess what, you've got to drop back and you've got to have something behind you, and what we have is our reserves.... We've grown that number. Again, for those of you that have followed us, we've been growing that over years now, continue to grow that number. And we also have the benefit of this discount on the Fremont purchase that effectively provides a cushion to our portfolio. So if you step back and look at it, we have available to us as kind of a bucket to address these issues ... [i]t's a lot of money to address issues in the portfolio.... We think that we've maintained some of the same story, or we have maintained some of the same story with respect to our position in the capital structure, first mortgages, lots of cushion. In my mind, that's never going away at iStar. It's just part of who we are, it's part of how we operate. It's how we do business."

These statements were false and misleading. The truth was that: (i) like other real estate lenders, iStar faced significant business risks in the collapsing real estate and credit markets; (ii) the Company was exposed to billions of dollars of losses from non-performing and defaulting loans acquired from Fremont; (iii) iStar had overstated the value of its corporate loan and debt portfolio; and (iv) iStar had recorded patently inadequate loan loss resources given its exposure.

*Shareholder Demand Letter*
June 1, 2009
Page 6

## The Fraudulent Stock Repurchase

During the fourth quarter 2007, while this misinformation artificially inflated iStar's stock price, iStar's officers and directors caused the Company to repurchase 400,000 shares of iStar stock in the open market at an average price of $26.83 per share, for a total cost to the Company of $10.7 million. The officers and directors knew that these prices were artificially inflated by their materially misleading statements and omissions, and defrauded iStar and wasted its assets. The repurchase took place during a quarter in which iStar recorded a net loss of $69.8 million, and cannot have reflected the Board's fully informed and considered determination that iStar stock was the best possible investment of iStar's scarce cash resources.

Just a few months later, on February 28, 2008, iStar was forced to disclose a $134.9 million write-down of its corporate loan and debt portfolio and a $113 million increase to its loan loss provisions in its fourth quarter earnings press release. As noted, the write-down and loan loss provision increase contributed to a $69.8 million loss for the fourth quarter 2007. In the wake of these disastrous disclosures, iStar's stock price has declined from over $27 per share to less than $3 per share – a $3.2 billion market capitalization loss.

### Exposure to Liability for Securities Fraud

The officers and directors' misconduct has exposed iStar to the risk of substantial liability and defense costs in connection with a securities fraud class action filed against iStar in the United States District Court for the Southern District of New York on February 2, 2009 (the "Class Action"). The plaintiffs in the Class Action allege that iStar and certain officers and directors violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by publishing false and misleading statements in the Registration Statement Materials, and are therefore liable to a class of investors who purchased iStar common stock.

### Damages

As a direct and proximate result of the Board and officers and directors' actions, iStar has incurred and will continue to incur significant expenses and damages, including, but not limited to: (i) the costs incurred in investigating and defending iStar and certain officers and directors in the Class Action; (ii) the costs of settling or to satisfying an adverse judgment in the Class Action; (iii) the excess amounts paid for the 400,000 shares repurchased at artificially inflated prices; (iv) the increased costs of raising capital as a result of the loss in investor confidence in iStar's public filings; and (v) the costs of compensating and paying for benefits for officers and directors who have breached their duties to iStar.

Accordingly, Ms. Vancil demands that the Board immediately commence an independent investigation of the matters set forth herein, led by independent counsel and supervised by independent and disinterested directors. Ms. Vancil further demands that the Company make demand upon and, if necessary, commence legal proceedings forthwith against the officers and directors to recover damages from, and compensation, benefits and bonuses paid to, any iStar officer and/or director determined to be involved in the wrongdoing set forth above, including, at a minimum, CEO and Chairman of the Board, Sugarman; COO and Executive Vice President,

*Shareholder Demand Letter*
June 1, 2009
Page 7

O'Connor; Chief Accounting Officer, Nicholas A. Radesca; Chief Financial Officer, Catherine D. Rice; Lead Director, Chairman of the Compensation Committee and member of the Audit Committee, Robin Josephs; director, Glenn R. August; director and Audit Committee member, Robert W. Holman, Jr.; director and Compensation Committee member, John G. McDonald; director and Audit Committee member, George R. Puskar; and director and member, Jeffrey A. Weber for: (i) causing the Company to publish misleading statements and financial reports; (ii) causing the Company to repurchase $10 million worth of shares at artificially inflated prices; (iii) severely damaging iStar's credibility in the capital markets; and (iv) failing to comply with their fiduciary oversight obligation by, among other things, permitting the above-described misconduct and allowing the culpable officers and directors to remain at the Company and/or on the Board.

Ms. Vancil further demands that the Board implement corporate governance reforms to prevent the recurrence of the acts complained of in this demand letter.

None of the officers and directors named in this letter should be involved in conducting, overseeing or making decisions about the investigation or litigation, since each lacks the requisite independence and disinterestedness.

We will appreciate a written statement of your intentions. If we are not advised within 21 days of the date of this demand that appropriate action is being taken, then we will take such further action on behalf of the Company as Ms. Vancil considers appropriate.

Ms. Vancil thanks you for your prompt attention to this serious matter. Please do not hesitate to contact me directly to discuss this matter.

Very truly yours,

CRAIG W. SMITH

BJR/klc

cc Addie Vancil

397098

# **Exhibit B**


Return on Ideas™

June 15, 2009

Craig W. Smith
Robbins Umeda LLP
610 West Ash Street
Suite 1800
San Diego, CA 92101

**Re:** *June 1, 2009 Shareholder Demand Letter to iStar Financial Inc.*

Dear Mr. Smith:

I am writing on behalf of the Board of Directors of iStar Financial Inc. ("iStar")
to advise you that the Board has met to consider the issues raised in your letter
dated June 1, 2009, sent on behalf of Ms. Addie Vancil, a purported shareholder
of iStar (the "Demand Letter"). The iStar Board has taken the matters raised in
the Demand Letter under advisement and has resolved to conduct a reasonable
and good faith investigation of the facts and circumstances surrounding the
matters described in the Demand Letter. We will communicate further with you
upon completion of the investigation.

Very truly yours,

Geoffrey M. Dugan
General Counsel, Corporate and Secretary

# Exhibit C

# WILMERHALE

July 10, 2009

Jeffrey B. Rudman

## *VIA EMAIL AND FIRST CLASS MAIL*

+1 617 526 6912 (t)
+1 617 526 5000 (f)
jeffrey.rudman@wilmerhale.com

Craig W. Smith, Esq.
Robbins Umeda LLP
610 Ash Street, Suite 1800
San Diego, CA 92101

> Re:   *Shareholder Demand Letter Response*

Dear Craig:

Thank you for your time and courtesy on the telephone yesterday.

As you know, this firm represents a special committee of the iStar Financial Inc. ("iStar") board. This committee will carefully review the matters raised by you in your letter of June 1, 2009.

The predicate for your letter is that you have a plaintiff who is entitled to make the demand your letter constitutes. Accordingly, the committee needs to know whether your plaintiff is, and at all relevant times, has been a shareholder of iStar. To resolve that issue, we request that you provide us with the following information:

1.     the full name, residential and, if applicable, business address of your client, Ms. Addie Vancil;

2.     brokerage statements, or the equivalent thereof, showing the name of the brokerage firm through which she allegedly purchased iStar shares;

3.     the address of the brokerage firm office which oversaw and oversees her account;

4.     brokerage statements showing the date(s) of the purchase(s) of her shares, and a current brokerage statement showing that she still owns these shares.

I look forward to working with you. If your client has standing, her demand will receive a fair, dispassionate, and reasoned response after appropriate analysis.

Very truly yours,

Jeffrey B. Rudman

JBR/dk

WILMERHALE

Craig W. Smith, Esq.
July 10, 2009
Page 2

cc:    Paul Engelmayer, Esq.

# Exhibit D

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS\*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

\*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

July 16, 2009

**VIA U.S. MAIL**

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

Re:    **Shareholder Demand Letter**

Dear Jeff:

Thank you for your July 10 letter. We appreciate your client's commitment to review carefully the matters raised in our June 1, 2009 letter.

We must take issue, however, with your assertion that the "predicate" for Ms. Vancil's demand is that she demonstrate some sort of "entitlement" to make a demand. The only authority we are aware of that squarely addresses the issue expressly rejects this proposition. *See Schick v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235, 1241 (Del. Ch. 1987) ("[T]he 'entitlement' or not of one to make a demand under Rule 23.1 is, itself, irrelevant to a board's duty upon receiving such demand . . ."). We invite you to bring to our attention any cases that you believe support the special committee's position, and we ask that the committee reconsider its refusal to act unless Ms. Vancil demonstrates her standing to sue.

Further, much of the information the committee requests is unnecessary to demonstrate standing, let alone entitlement as a shareholder to make a demand on the Board of Directors. As I stated during our call, we are willing at this point to provide the committee with documentation sufficient to demonstrate that Ms. Vancil is an iStar Financial Inc. shareholder. That is more than is required under the law and should suffice.

*iStar Financial Inc.*
July 16, 2009
Page 2

Finally, I note that your letter does not provide the information requested in my June 26 letter to Mr. Dugan. I understand that you were only recently retained by the committee. We would appreciate a response to our requests once you have had sufficient opportunity to familiarize yourself with the issues raised in Ms. Vancil's demand and the committee's plans to address them.

On an administrative note, effective August 1, 2009, the law firm of Robins Umeda LLP will change its address from 610 West Ash Street, Suite 1800, San Diego, CA 92101 to:

600 B Street, Suite 1900
San Diego, CA 92101

The telephone and facsimile numbers and email and website addresses will remain the same. Please revise your records accordingly.

Thank you very much for your anticipated cooperation.

Very truly yours,

CRAIG W. SMITH

CWS/sem

417721

# Exhibit E

# WILMERHALE

Jeffrey B. Rudman

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

*VIA EMAIL and FEDERAL EXPRESS*

July 22, 2009

Craig W. Smith, Esq.
Robbins Umeda LLP

610 West Ash Street, Suite 1800
San Diego, CA 92101

      Re:   Shareholder Demand Letter

Dear Craig:

This will acknowledge your letter of July 16, 2009. It seems to me a little disingenuous. Are you really threatening a derivative suit in the absence of having a plaintiff who owns iStar shares?

To amplify on my concern, when we spoke on the telephone on July 9, 2009, I asked you if Ms. Vancil owned shares. You did not, as you say to me in your July 16 letter, offer at that point to provide any documentation to me concerning her ownership; rather, you said that you personally did not have the facts concerning her holdings, that someone else in your office was attending to that, and that you would speak with that person.

Your words resonated with me because I had been in court opposite your firm on February 2, 2006 when Judge Tenille sitting in the Superior Court in Wake County, North Carolina asked a lawyer from Robbins Umeda and Fink, a Mr. Wedeking, how many shares of Red Hat common stock Mr. Wedeking's client, a Mr. Egelhof, owned. Mr. Wedeking replied he did not know, because "[s]omeone else in our office handles shareholder relations." (If Mr. Wedeking is still with you and if he has the transcript, you can verify this for yourself.)

It turned out that Mr. Egelhof did not have any shares: he had sold them sometime previously and your law firm either did not know that fact or otherwise failed to advise the Court of it.

Judge Tenille was not amused. He wrote:

> This is a purported shareholder derivative action in which the failure of counsel to communicate with their client in violation of the Rules of Professional Conduct, the failure of the client to communicate with counsel in contravention of his fiduciary duties, the needless rush to file a complaint, the filing of defective pleadings, and the solicitation of a plaintiff unqualified to fulfill the significant duties of a plaintiff in a shareholder derivative action all converged to create a situation in which neither the firm nor the client fulfilled their duties and obligations.

WILMERHALE

Craig W. Smith, Esq.
July 22, 2009
Page 2

He went on to say:

> According to statements made by Mr. Wedeking and Mr. Fink in
> oral argument, the firm has a "shareholder relations department"
> which is evidently charged with communicating with clients who
> are serving as shareholder derivative or class action plaintiffs in
> lawsuits being handled by the firm. It is unclear if the shareholders
> relations department is populated by lawyers, legal assistants, or
> public relations personnel. It was clear from statements made by
> both Mr. Wedeking and Mr. Fink at oral argument that neither of
> them had ever met Mr. Egelhof nor knew anything about him. Mr.
> Wedeking did not know how many shares Mr. Egelhof owned, and
> Mr. Fink erroneously represented to the Court that he owned
> hundreds of shares.

> When Mr. Wedeking appeared in this Court and knew absolutely
> nothing about his client, the Court requested that he at least find
> out how many shares of Red Hat stock his client owned. That
> request obviously prompted some inquiry which produced the
> information that Mr. Egelhof was no longer a shareholder, a fact
> communicated to the Court and counsel by e-mail. When Mr. Fink
> appeared and argued the motion for sanctions, he did not know
> much more than Mr. Wedeking about the client. *His excuse was
> that Mr. Egelhof was originally Mr. Robbins's client.* The Court
> ordered that Mr. Egelhof's deposition be taken. That deposition
> produced the facts which are of concern to the Court. (emphasis
> supplied)

It is quite true that Judge Tenille did not award us sanctions in that case and his grant of
sanctions for violations of North Carolina Rules of Professional Conduct was later reversed. But
his description of your firm's behavior was entirely accurate in my view, was left undisturbed by
the appeals court, and was embraced by Judge Cote in *In Re JPMorgan Chase & Co.
Shareholder Derivative Litigation*, 2008 WL 4298588 (Sept. 19, 2008).

Turning to more recent events: on April 15, 2008, Citiline Holdings, Inc., represented by
Coughlin Stoia, filed suit against iStar, alleging in direct form the putative wrongdoings your
letter asserts in derivative form.

The very next day – April 16, and probably not by chance – your firm filed a derivative suit. It is
hard to ignore that a very prominent lawyer at Coughlin Stoia is Darren Robbins and that a
named partner in your firm is Brian Robbins. As you know, Darren and Brian are brothers and it
is, of course, possible that it occurred to Brian that the derivative suit he was filing might yield
far more expeditious discovery than the case his brother was filing, subject as his brother's case

WILMERHALE

Craig W. Smith, Esq.
July 22, 2009
Page 3

was, to the stays of discovery imposed by the Private Securities Litigation Reform Act. That discovery might even assist Darren's firm in preparing the inevitable amended complaint.

Unhappily for your firm, it turned out that your firm's client in the derivative suit did not own any shares of iStar.

So now you are back, this time making the demand that is the predicate for a derivative suit and apparently you are back with an 85 year-old woman who lives in St. Louis.

On July 10, 2009 I sent you a short, simple letter asking for proof of her share ownership. The letter had four enumerated items. They were:

1.      the full name, residential and, if applicable, business address of your alleged client, Ms. Addie Vancil;

2.      brokerage statements, or the equivalent thereof, showing the name of the brokerage firm through which she allegedly purchased iStar shares;

3.      the address of the brokerage firm office which oversaw and oversees her account;

4.      brokerage statements showing the date(s) of the purchase(s) of her shares, and a current brokerage statement showing that she still owns these shares.

Would you kindly tell me which of those four items you find so onerous or difficult to comply with? What *exactly* do you propose to produce which will demonstrate that she does own iStar shares?

Permit me to be direct. I have considerable misgivings about the candor of your firm when it comes to proffering plaintiffs who, in fact, own the shares your firm says they own. All I want from you is enough information so that I can test Ms. Vancil's share ownership. Between the Egelhof case and the Arnold case, you cannot deny my grounds for concern. And you, perhaps better than I, could bring to my attention other cases which might stoke my concern.

Very truly yours.

Jeffrey B. Rudman

JBR/dk

# Exhibit F

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

July 23, 2009

**VIA E-MAIL and U.S. MAIL**
jeffrey.rudman@wilmerhale.com

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

      *Re:   Shareholder Demand Letter*

Dear Jeff:

      I decline to join in the unfortunate tone of your July 22, 2009 letter or to address each of its misstatements and irrelevancies. But I will join you in being direct.

      If I may trust the statement in your letter's final paragraph that all you want from me is information demonstrating Ms. Vancil's share ownership, then it appears that no further discussion is required. That is what I offered to provide during our July 9 telephone conversation, and that is what we will provide.

      Your July 10 letter misstated the law, and on that basis you sought more information than the committee is entitled to. Your July 22 letter does not dispute that Ms. Vancil need not demonstrate any "entitlement" to make a demand, and that the board's duty upon receiving her demand is independent of any demonstration of "entitlement."

      You also misremember our July 9 telephone conversation. I did say that other members of our Firm were in direct communication with Ms. Vancil, but I did not say that I did not have the facts concerning Ms. Vancil's holdings. In fact, I told you that I understood that our Firm had recently confirmed Ms. Vancil's shareholdings, and that we were willing to provide you with documentation

*iStar Financial Inc.,*
July 23, 2009
Page 2

to that effect. You asked me to confirm additional personal information about Ms. Vancil, which I told you I was not in a position to provide.

Enclosed herewith, please find a true and correct copy of Ms. Vancil's July 13, 2007 account statement showing that she is indeed an iStar shareholder. Please confirm whether or not the committee will commence its work in connection with Ms. Vancil's demand.

Finally, I note that despite repeated requests, we have received none of the information requested in my June 26 letter to Mr. Dugan. Please let us know at your earliest convenience when we can expect to receive this information.

Very truly yours,

CRAIG W. SMITH

CWS/acm

Enclosure

cc:   Addie Vancil

Positions: Fidelity Investments

Accounts & Trade > Portfolio >
**Positions**

Help/Glossary | Download | Print

Account | ADDIE INDIVIDUAL - [                ]  ▼ |  Name This Account

Fields highlighted in yellow indicate today's prices and/or activity.

| Current Values | Cost Basis | Closed Positions |
| --- | --- | --- |

Positions: Fidelity Investments                                                     Page 2 of 3

Show: All Positions ▾                                                As of: 07/13/2009, 1:37 PM

| Symbol | Description | Quantity | Previous Price | Most Recent Price | Previous Value | Most Recent Value | Change Since Last Close $ | Change Since Last Close % |
|--------|-------------|----------|----------------|-------------------|----------------|-------------------|---------------------------|---------------------------|
| SFI | ISTAR FIN INC (Margin) | 1,000.000 | $2.29 | $2.34 | $2,290.00 | $2,340.00 | +$50.00 | +2.18% |

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  | **Total:** | Today's Change |

# Exhibit G

## WILMERHALE

**Jeffrey B. Rudman**

July 27, 2009

+1 617 526 6912(t)
+1 617 526 5000(f)
jeffrey.rudman@wilmerhale.com

*Via First Class Mail and Email*

Craig W. Smith, Esq.
Robbins Umeda LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

      Re:   Shareholder Demand

Dear Craig:

This will respond to your July 23, 2009 letter.

The next to last paragraph of it states as follows:

> Enclosed herewith, please find a true and correct copy of Ms. Vancil's
> July 13, *2007* account statement showing that she is indeed an iStar
> shareholder. Please confirm whether or not the committee will commence
> its work in connection with Ms. Vancil's demand. (emphasis supplied)

Attached to your letter is a deeply redacted, hard to decipher, document which possibly came
from Fidelity Investments, but is so redacted one scarcely knows what to make of it. That
document references a date of July 13, *2009*. (emphasis supplied). It does not reference *2007*
and it does not even squarely reference Ms. Vancil. The only "evidence" that this brokerage
statement refers to Ms. Vancil is (a) your paragraph quoted above, which gets the year wrong,
and (b) a separate page from Fidelity which says "Addie Individual" followed by an apparent
redaction.

Your letter also references my request for "additional personal information about Ms. Vancil."
The only information for which I have ever asked you in terms of Ms. Vancil is set forth in my
letter to you of July 10, 2009, which I attach for your convenience. I suppose that asking for
such things as Ms. Vancil's full name and residential address is personal information, but it is
hardly prying given that she wishes to be a representative plaintiff.

Putting to the side the fact that your letter references what I believe to be an erroneous date, or
that, in any event, the attachment offers a date two years later and that, in any event, the
attachment does not show that anybody named Addie Vancil owned any iStar stock, there is a
more profound difficulty. Your original demand dated June 1, 2009 suggests that during the
period from July 2, 2007 to March 6, 2008, certain of iStar's officers and directors did certain
unlawful things. You describe the July 2, 2007 to March 6, 2008 period as "the Relevant
Period." What exactly happened on those two dates is left to the reader's imagination.

WILMERHALE

Page 2

It is, I think, a fair reading of your letter that the "wrongs" began in July 2007 and possibly were over by March 2008. You do mention a class action suit filed in February 2009, but if that is the suit we have both been discussing, that suit was in fact filed in April 2008. Nothing in your letter indicates that the harms occurred for the first time on or about July 13, 2009 which is the date on the brokerage statement which suggests that "Addie Individual" – redaction owned iStar stock as of that date.

Even you do not pretend that you have offered me anything to show that Ms. Vancil owned shares during the "Relevant Period" unless you claim that the apparent typo from the above quoted paragraph in your July 23 letter constitutes that proof. Just to remind you of what you surely already know: to bring a derivative suit, one must have been a shareholder at the time of the wrongs of which one complains and one must own the shares continuously from that date through the duration of the lawsuit.

So let us get back to basics and please provide me with the information I asked of you in my letter to you of July 10, 2009. In the alternative, kindly tell me what is so onerous about the information I have asked of you.

Very truly yours,

Jeffrey B. Rudman

JBR/dk
Enclosure

cc:    Paul Engelmayer, Esq.

# Exhibit H

# ROBBINS UMEDA LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS*
MARC M. UMEDA
FELIPE J. ARROYO
GEORGE C. AGUILAR
S. BENJAMIN ROZWOOD
KEVIN A. SEELY†
CRAIG W. SMITH
CAROLINE A. SCHNURER

600 B STREET, SUITE 1900
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

KELLY M. MCINTYRE
LOUIS A. KERKHOFF
SHANE P. SANDERS
REBECCA A. PETERSON
ASHLEY R. PALMER
DANIEL R. FORDE
ARSHAN AMIRI
JULIA M. WILLIAMS
GREGORY E. DEL GAIZO
ERIN P. FRASER
DAVID L. MARTIN
JAY N. RAZZOUK

*Admitted in CA & CT
†Admitted in CA, CNMI & Guam

August 7, 2009

**VIA E-MAIL and U.S. MAIL**
jeffrey.rudman@wilmerhale.com

Jeffrey B. Rudman
Wilmer Hale LLP
60 State Street
Boston, MA 02109

        *Re:    Shareholder Demand Letter*

Dear Jeff:

        Thank you for your July 27, 2009, letter. You are correct in noting that my July 23, 2009, letter contains a typographical error. The on-line account statement we provided to you is dated July 13, 2009. My apologies. The redactions to which you refer delete information concerning Ms. Vancil's positions other than her iStar Financial holdings and her account numbers. This information is not relevant. The information relating to Ms. Vancil's ownership of iStar Financial stock remains intact. It shows that Ms. Vancil owns 1000 shares of iStar Financial stock.

        Ms. Vancil has made a demand on the board. She has not yet decided whether to commence litigation on behalf of iStar Financial. If the Board's response to Ms. Vancil's demand is not sufficient and she decides to file suit, we will gladly discuss the parties' discovery requests at that time.

                Very truly yours,

                CRAIG W. SMITH

CWS/acm

Enclosure

cc:    Addie Vancil